No. 22-01745

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

## IN RE: MARRIOTT INTERNATIONAL, INC., CUSTOMER DATA SECURITY BREACH LITIGATION

---

## OPENING BRIEF OF DEFENDANT-APPELLANT MARRIOTT INTERNATIONAL, INC.

---

On Appeal
from the United States District Court for the District of Maryland,
MDL No. 8:19-md0-2879 (Grimm, J.)

---

Daniel R. Warren
Lisa M. Ghannoum
Dante A. Marinucci
Kyle T. Cutts
BAKER & HOSTETLER LLP
127 Public Square
Suite 200
Cleveland, OH 44114
Tel: 216-621-0200

Gilbert S. Keteltas
BAKER & HOSTETLER LLP
1050 Connecticut Ave. NW
Suite 200
Washington, DC 20036
Tel: 202-861-1530

Lindsay C. Harrison
Matthew S. Hellman
Zachary C. Schauf
Kevin J. Kennedy
Mary E. Marshall
Raymond B. Simmons
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: 202-639-6000
mhellman@jenner.com

*Counsel for Defendant-Appellant Marriott International, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendant-Appellant Marriott International, Inc. certifies that Marriott International, Inc. (NASDAQ: MAR) is a publicly owned company and that no public corporation or entity owns 10% or more of Marriott International, Inc.'s stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... C-1

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 5

STATEMENT OF ISSUES .................................................................... 5

STATEMENT OF CASE ........................................................................ 6

    A.    Marriott Suffers A Data-Security Incident, And Class Actions Avoid Dismissal By Alleging Identity Theft .................. 6

    B.    Plaintiffs Move For Class Certification Using An Unworkable "Overpayment" Theory. ............................................ 7

    C.    Marriott Opposes Certification Based On Plaintiffs' Class Waivers, Lack Of Standing, And Failure To Satisfy Rule 23. .................................................................................................. 10

    D.    The District Court Blue-Pencils Plaintiffs' Proposed Classes And Certifies Bellwether Classes Of 20 Million Members. ...................................................................................... 11

SUMMARY OF ARGUMENT .............................................................. 13

STANDARD OF REVIEW .................................................................... 15

ARGUMENT ........................................................................................ 16

I.    The District Court Erred As A Matter Of Law By Certifying Classes Because Every Class Member Signed A Class Action Waiver. ............................................................................................ 16

    A.    Courts May Not Certify Classes Composed Of Individuals Who Have Waived Class Litigation. ............................................. 17

B.    The Answer To The Class-Waiver Issue Is Clear And Ripe For Resolution. ..................................................27

II.    The District Court Erred By Certifying Classes That Cannot Be Ascertained In Any Manner Consistent With Rule 23 Or The Constitution. ..................................................32

    A.    Ascertainability Requires Plaintiffs To Demonstrate An Administratively Feasible Method For Determining Class Membership. ..................................................33

    B.    Plaintiffs Failed To Satisfy This Court's Ascertainability Requirement. ..................................................35

    C.    The District Court Identified Nothing That Could Solve The Fatal Ascertainability Defects. ..................................................40

III.    Plaintiffs' Damages Theory Fails *Comcast*. ..................................................46

    A.    Rule 23 Requires Courts To Subject Plaintiffs' Damages Model To "Rigorous Analysis." ..................................................47

    B.    Plaintiffs' Shifting Damages Model Depends On Co-Movement. ..................................................49

    C.    Plaintiffs' Discredited Co-Movement Assumption Fails *Comcast*. ..................................................52

    D.    Plaintiffs' Model Cannot Satisfy *Comcast* Because It Calculates Overpayment, Not Damages. ..................................................57

IV.    The District Court Erred As A Matter Of Law In Certifying Issue Classes Under Rule 23(c)(4). ..................................................59

REQUEST FOR ORAL ARGUMENT ..................................................62

CONCLUSION ..................................................62

CERTIFICATE OF COMPLIANCE ..................................................64

CERTIFICATE OF SERVICE .......................................................................65

# TABLE OF AUTHORITIES

CASES

*In re A.H. Robins Co.*, 880 F.2d 709 (4th Cir. 1989), *abrogated by Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ......................... 21

*Abdul-Hasib v. Aerotek, Inc.*, No. CV 17-1502, 2017 WL 5903555 (D. Md. Nov. 30, 2017) ............................................................................ 29

*Ackal v. Centennial Beauregard Cellular L.L.C.*, 700 F.3d 212 (5th Cir. 2012) ........................................................................................... 45

*In re Aluminum Warehousing Antitrust Litigation*, 336 F.R.D. 5 (S.D.N.Y. 2020), *appeal docketed*, No. 21-954 (2d Cir. Apr. 14, 2021) ................................................................................................... 48

*American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013) ................................................................................................ 17

*American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88 (4th Cir. 1996) ........................................................ 27, 28

*Archer v. Carnival Corp. & PLC*, No. 20-cv-04203, 2020 WL 6260003 (C.D. Cal. Oct. 20, 2020) ................................................... 20

*AstraZeneca AB v. United Food & Commercial Workers Unions (In re Nexium Antitrust Litigation)*, 777 F.3d 9 (1st Cir. 2015) ............................................................................................ 35

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ............................... 25

*Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132 (2d Cir. 2013) .................... 25

*Brecher v. Republic of Argentina*, 806 F.3d 22 (2d Cir. 2015) ........................ 37

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015) ....................................... 48

*Bryte ex rel. Bryte v. American Household, Inc.*, 429 F.3d 469 (4th Cir. 2005) ........................................................................................... 54

*Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015) ...................................... 33, 34

*Califano v. Yamasaki*, 442 U.S. 682 (1979)....................................................17, 19

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) ..................................43, 44

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494
U.S. 558 (1990) .........................................................................................39

*Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir. 1974)...................45

*Cohen v. UBS Financial Services, Inc.*, 799 F.3d 174 (2d Cir.
2015) .........................................................................................................18

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ............... 1, 3, 15, 16, 23, 24, 34,
47, 48, 52, 54, 56, 57, 58

*Construction Laborers Pension Trust for Southern California
v. Marriott International, Inc. (In re Marriott International,
Inc.)*, 31 F.4th 898 (4th Cir. 2022)......................................................6, 7

*Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978), *superseded
by rule as stated in Microsoft Corp. v. Baker*, 137 S. Ct. 1702
(2017)........................................................................................................24

*Dakota Granite Co. v. BNSF Railway Co. (In re Rail Freight
Fuel Surcharge Antitrust Litigation - MDL No. 1869)*, 934
F.3d 619 (D.C. Cir. 2019)........................................................................42

*Earl v. Boeing Co.*, 339 F.R.D. 391 (E.D. Tex.), *appeal docketed*,
No. 21-40720 (5th Cir. Sept. 30, 2021) ..................................................20

*East Texas Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395
(1977)........................................................................................................21

*Edd Potter Coal Co. v. Director, Office of Workers'
Compensation Programs, United States Department of
Labor*, 39 F.4th 202 (4th Cir. 2022)......................................................30

*Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ...................................24

*EQT Production Co. v. Adair*, 764 F.3d 347 (4th Cir.
2014) .................................................................... 2, 14, 21, 24, 33, 34, 35, 37

*Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273 (S.D. Ala. 2006) ............................................................................... 38

*Freeman v. Capital One Bank*, No. 08CV242, 2008 WL 2661990 (E.D. Va. July 3, 2008) ............................................................ 30

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356 (4th Cir. 2004) ............... 15-16

*Granfinanciera, S.A. v. Norberg*, 492 U.S. 33 (1989) ......................................... 39

*Grunley Walsh U.S., LLC v. Raap*, 386 F. App'x 455 (4th Cir. 2010) ............................................................................................ 30

*Hammond v. Powell*, 462 F.2d 1053 (4th Cir. 1972) ............................... 2, 21, 33

*Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349 (3d Cir. 2013) ........................ 35

*Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009) ............................................................................................ 27

*Horton v. Dow Jones & Co.*, 804 F. App'x 81 (2d Cir. 2020) ............................ 29

*Hunter v. American General Life & Accident Insurance Co.*, No. CA 301-4506-22, 2004 WL 5231631 (D.S.C. Dec. 2, 2004), *aff'd*, 205 F. App'x 177 (4th Cir. 2006) .......................................................... 26

*In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305 (3d Cir. 2008) ............................................................................................ 23

*Karhu v. Vital Pharmaceuticals, Inc.*, 621 F. App'x 945 (11th Cir. 2015) ...................................................................................... 43, 44

*Kaspers v. Comcast Corp.*, 631 F. App'x 779 (11th Cir. 2015) ................. 17, 19

*Kern v. Siemens Corp.*, 393 F.3d 120 (2d Cir. 2004) ...................................... 45

*King v. Capital One Bank (USA), N.A.*, No. 11-CV-00068, 2012 WL 5570624 (W.D. Va. Nov. 15, 2012) .................................................. 29

*Kirkman v. North Carolina Railroad Co.*, 220 F.R.D. 49 (M.D.N.C. 2004) ...................................................................................... 38

*Korea Week, Inc. v. Got Capital, LLC*, No. CV 15-6351, 2016 WL 3049490 (E.D. Pa. May 27, 2016) ............................................................21, 29

*Krakauer v. Dish Network, LLC*, 925 F.3d 643 (4th Cir. 2019) .....3, 21, 32, 35

*Laver v. Credit Suisse Securities (USA), LLC*, 976 F.3d 841 (9th Cir. 2020) ...........................................................................................18

*Lawson v. Grubhub, Inc.*, 13 F.4th 908 (9th Cir. 2021)....................................20

*Lindsay v. Carnival Corp.*, No. C 20-982, 2021 WL 2682566 (W.D. Wash. June 30, 2021) .............................................................19

*Marcus v. BMW of North America, LLC*, 687 F.3d 583 (3d Cir. 2012) ...............................................................................................41, 43

*In re Marriott International Inc., Customer Data Security Breach Litigation*, 440 F. Supp. 3d 447 (D. Md. 2020)..................................7

*Miles v. Merrill Lynch & Co. (In re Initial Public Offerings Securities Litigation)*, 471 F.3d 24 (2d Cir. 2006), *clarified on denial of reh'g*, 483 F.3d 70 (2d Cir. 2007) .......................................26

*Mitchell v. Forsyth*, 472 U.S. 511 (1985)..........................................................19

*Mladenov v. Wegmans Food Markets, Inc.*, 124 F. Supp. 3d 360 (D.N.J. 2015) .............................................................................. 37-38

*Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173 (4th Cir. 2013)......................29

*Palacios v. Boehringer Ingelheim Pharmaceuticals, Inc.*, No. 10-22398-CIV, 2011 WL 6794438 (S.D. Fla. Apr. 19, 2011) .............................................................................................19

*Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022)..............................................................................35

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) .......................................................19

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395 (1967)...............................................................................27

*In re Rail Freight Fuel Surcharge Antitrust Litigation-MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013) ..................................47, 48, 52, 56

*Ranzy v. Extra Cash of Texas, Inc.*, No. Civ. A. H-09-3334, 2011 WL 13257274 (S.D. Tex. Oct. 14, 2011) ..........................................19

*Sandusky Wellness Center, LLC v. Medtox Science, Inc.*, 821 F.3d 992 (8th Cir. 2016) ................................................................33

*Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1304 (4th Cir. 1978) ....................18, 21

*In re Skelaxin (Metaxalone) Antitrust Litigation*, 299 F.R.D. 555 (E.D. Tenn. 2014) ........................................................37

*Snowden v. CheckPoint Check Cashing*, 290 F.3d 631 (4th Cir. 2002) ...............................................................................29

*Spotswood v. Hertz Corp.*, No. CV 16-1200, 2019 WL 498822 (D. Md. Feb. 7, 2019) ...........................................................31

*State Farm Mutual Automobile Insurance Co. v. Elegant Massage, LLC*, No. 21-255, 2021 WL 4202678 (4th Cir. Sept. 2, 2021) .....................................................................................45

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998)................................................................................61

*Thorn v. Jefferson-Pilot Life Insurance Co.*, 445 F.3d 311 (4th Cir. 2006) ...............................................................................16

*In re Titanium Dioxide Antitrust Litigation*, 962 F. Supp. 2d 840 (D. Md. 2013) .............................................................31

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).....................3, 32, 39, 61

*In re Tropicana Orange Juice Marketing & Sales Practices Litigation*, No. CV 11-07382, 2018 WL 497071 (D.N.J. Jan. 22, 2018) ..............................................................................38

*Tyger Construction Co. v. Pensacola Construction Co.*, 29 F.3d 137 (4th Cir. 1994) ..............................................................54

viii

*U1it4Less, Inc. v. FedEx Corp.*, No. 11-CV-1713, 2015 WL 3916247 (S.D.N.Y. June 25, 2015) ....................................29

*United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Warner Chilcott Limited (In re Asacol Antitrust Litigation)*, 907 F.3d 42 (1st Cir. 2018) ..................................................................................42, 43

*US Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013) .......................................22

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ..........................................36-37

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468 (1989) ........................................18

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)....................23, 24, 34, 43

*Wooddell v. International Brotherhood of Electrical Workers, Local 71*, 502 U.S. 93 (1991)..............................................................39

*Zoroastrian Center & Darb-E-Mehr of Metropolitan Washington, D.C. v. Rustam Guiv Foundation of New York*, 822 F.3d 739 (4th Cir. 2016)..............................................28

## STATUTES

28 U.S.C. § 1292(e) ...............................................................................5

28 U.S.C. § 1332 ...................................................................................5

## OTHER AUTHORITIES

Amendments To Rules of Civil Procedure, 39 F.R.D. 69 (1966) ..................22

Sungjin Cho et al., *Optimal Dynamic Hotel Pricing* (2018), https://economics.sas.upenn.edu/system/files/2018-04/hp_fina l_update.pdf ..........................................................................................55

Fed. R. Civ. P. 23(a)............................................................................21

Fed. R. Civ. P. 23(a)(2).......................................................................20

Fed. R. Civ. P. 23(b)(3)................................................................22, 34

Fed. R. Civ. P. 23(c)(1)(C) (1998)...........................................26

Fed. R. Civ. P. 23(c)(1)(C) Adv. Comm. Notes 2003.......................26

Fed. R. Civ. P. 23(c)(3)(B)........................................................45

Fed. R. Civ. P. 23(f)..................................................................5

Greg Myre, *Pompeo Says China Is Responsible For Marriott Computer Hack, Espionage Is Growing*, NPR.org (Dec. 12, 2018), https://www.npr.org/2018/12/12/676199045/pompeo-says-china-is-responsible-for-marriott-computer-hack-espionage-is-growing ..............................................................8

3 *Newberg and Rubenstein on Class Actions* § 9:48, Westlaw (6th ed., database updated June 2022).........................................45

David E. Sanger et al., *Marriott Data Breach is Traced to Chinese Hackers as U.S. Readies Crackdown on Beijing*, N.Y. Times (Dec. 11, 2018), https://www.nytimes.com/2018/12/11/us/politics/trump-china-trade.html ...............................8

INTRODUCTION

This appeal concerns the certification of one of the largest consumer-data class actions ever. That certification is as wrong as it is consequential. This Court should reverse.

In November 2018, Defendant Marriott International, Inc. ("Marriott") disclosed a security incident involving unauthorized access to the guest-reservation database of Starwood, which Marriott had recently acquired. Putative class actions quickly followed. Those suits avoided dismissal largely by raising the specter of potential identity theft—but classwide evidence did not materialize. Nonetheless, plaintiffs sought and obtained certification of classes of 20 million plaintiffs across six states, via a decision that flouts the Supreme Court's admonition that courts conduct a "rigorous analysis" to ensure Rule 23's requirements are met prior to certification. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). The district court instead adopted a "certify now, analyze later approach"—glossing over fatal Rule 23 flaws and repeatedly asserting that it could always decertify down the road.

The correct approach is the simple one: Because plaintiffs failed to satisfy Rule 23, the district court should have denied certification. The

district court's contrary decision rests on four legal errors, each of which independently requires reversal.

*First*, every class member agreed to resolve "[a]ny disputes … individually without any class action[.]" JA727. Courts may not certify classes composed of individuals who agreed not to litigate as a class. Courts nationwide thus properly address such waivers as a threshold certification question. The district court's contrary approach—certifying despite the waiver while proposing to consider it "at the merits stage"—nullifies the parties' agreement to forego class litigation, violates Rule 23's express terms, creates enormous pressure to settle with classes that should not exist, and wastes both litigant and judicial resources. Because all the claims certified for class treatment are squarely barred by a valid waiver, this Court should reverse the certification order.

*Second*, the district court ran afoul of Rule 23 and this Court's precedents by certifying classes whose members are not "readily identifiable." *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972); *see EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). When discovery failed to substantiate plaintiffs' claims of identity theft, they pivoted to an "overpayment" theory—that they paid more for hotel stays than they would

have paid had they known of the security incident. But many people who make reservations *do not* pay. They are reimbursed and do not bear the economic burden of their stays. The district court correctly recognized that such individuals are uninjured and lack Article III standing. So it *sua sponte* narrowed the classes to "those who bore the economic burden" for the stays.

That improvisation, however, put the classes in conflict with the settled law that class membership must be "ascertainable" via "administratively feasible" means. *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT*, 764 F.3d at 358). No Marriott or Starwood database says who ultimately paid. Nor can any other document settle that question. It requires transaction-by-transaction proof as to tens (perhaps hundreds) of millions of reservations. And because standing "must be supported adequately by the evidence adduced at trial," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (citation omitted), all this evidence must be presented to the jury. This Court and others have correctly rejected classes with such endemic administrability problems.

***Third***, plaintiffs' damages theory also fails because plaintiffs did not prove, as Rule 23 requires, that their model is "capable of measurement [of damages] on a classwide basis." *Comcast*, 569 U.S. at 34. Plaintiffs' damages

3

model depended on a single assumption: That Starwood's hotel prices always rose and fell in sync with its competitors' prices—no matter the kind of room at issue, the date of the stay, the kind of rate involved, or anything else. If that (highly improbable) simplifying assumption were incorrect, plaintiffs' damages model would require enormous swaths of data that plaintiffs do not have and cannot get, and millions of calculations that would be impossible to perform.

Plaintiffs' expert, however, never tested this assumption: He never checked to see if Starwood's prices did in fact "co-move" with competitor prices. That omission alone dooms plaintiffs under *Comcast*'s rigorous standards. What's more, when defendants' expert did check the data, she proved that this assumption was false: Starwood's prices regularly moved to a different degree than, and in a different direction from, competitors' prices.

The district court nonetheless held that plaintiffs had done enough because their expert had "tested" his model. JA591. But the district court failed to appreciate that plaintiffs' expert tested his model *assuming* that co-movement was valid. An expert does not validate an assumption by assuming it is correct. And Rule 23 does not allow certification based on

4

mere assumptions—let alone disproven ones. Plaintiffs failed to carry their burden to prove they had an adequate method of calculating class damages. It was thus error under *Comcast* for the district court to certify the classes.

***Fourth,*** as explained in Accenture LLP's brief, the district court erred as a matter of law by misusing Rule 23(c)(4).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332. Marriott and Accenture timely filed petitions under Federal Rule of Civil Procedure 23(f) on May 17, 2022, which this Court granted. This Court's jurisdiction is proper under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f).

## STATEMENT OF ISSUES

1. Whether the district court erred by certifying classes where every class member waived the right to pursue class litigation.

2. Whether the district court erred by certifying classes where ascertaining standing and class membership will require tens of millions of mini-trials on who bore the "economic burden" of the alleged misconduct.

3. Whether the district court erred by certifying classes where the classwide damages theory rests on a premise that plaintiffs' expert never tested and that defendants' expert showed was false.

4.     Whether the district court erred by invoking Rule 24(c)(4) to certify issue-only negligence classes lacking a common theory of injury and limited only to a few elements of the claim.

## STATEMENT OF CASE

### A.     Marriott Suffers A Data-Security Incident, And Class Actions Avoid Dismissal By Alleging Identity Theft.

In September 2016, Marriott acquired Starwood.     JA542. Unbeknownst to Marriott, an unauthorized third party had accessed Starwood's reservation database.     *Id.*   In September 2018, Accenture— which provided information technology services to Starwood—observed an abnormality.     JA543.     Investigation revealed that from July 2014 to September 2018, the unauthorized party had access to certain personal information, including names, addresses, email addresses, phone numbers, and birthdates plus, in a small fraction of cases, passport or payment-card numbers that were mostly encrypted.  JA542-543, JA633.

Lawsuits inevitably followed.  Those included securities suits, whose dismissal this Court recently affirmed.  *See Constr. Laborers Pension Tr. for S. Cal. v. Marriott Int'l, Inc. (In re Marriott Int'l, Inc.)*, 31 F.4th 898 (4th

Cir. 2022).[1] They also included putative consumer class actions. The Judicial Panel on Multidistrict Litigation consolidated pre-trial proceedings in the United States District Court for the District of Maryland. Dkt. 1. The named plaintiffs in the consumer cases filed a consolidated amended complaint. Dkt. 413. Litigation proceeded first on ten "bellwether" claims. Relying heavily on plaintiffs' allegations that they had suffered actual identity theft, the district court largely denied the motions to dismiss. *See In re Marriott Int'l Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447 (D. Md. 2020).

## B. Plaintiffs Move For Class Certification Using An Unworkable "Overpayment" Theory.

Discovery failed to substantiate plaintiffs' allegations that the class suffered identity theft due to the incident. JA633-635. The information obtained in the incident consisted mostly of personal information that was already publicly available and credit card numbers that were almost always encrypted and mostly expired. *Id.* Indeed, according to press reports and

---

[1] This court concluded that Marriott and Starwood's privacy statements were not misleading. *See In re Marriott Int'l, Inc.*, 31 F.4th at 903. Both websites warned that data storage is never "100% secure." *Id.* And "the fact that a company has suffered a security breach does not demonstrate that the company did not place significant emphasis on maintaining a high level of security." *Id.* (cleaned up).

statements of former U.S. government officials, the incident has been traced to a foreign government intelligence-gathering campaign, not hackers trying to steal guests' identities or credit-card information for financial gain.[2]

Plaintiffs nonetheless moved to certify sprawling classes encompassing every consumer in the bellwether states who provided personal information to Starwood before and during the incident. Dkt. 1022-1 at 4-7. The proposed classes—thirteen in total—sought to recover for: (1) breach of contract, (2) consumer fraud, and (3) negligence.

In their certification motion, plaintiffs transformed their approach to the case. For the first time, plaintiffs limited the proposed contract classes (though not the other classes) to members of the Starwood Preferred Guest ("SPG") program. *Id.* Plaintiffs also abandoned any classwide identity-theft claims. Instead, plaintiffs contended they had classwide standing and suffered classwide damages based on an "overpayment" theory—that people

---

[2] Greg Myre, *Pompeo Says China Is Responsible For Marriott Computer Hack, Espionage Is Growing*, NPR.org (Dec. 12, 2018), https://www.npr.org/2018/12/12/676199045/pompeo-says-china-is-responsibl e-for-marriott-computer-hack-espionage-is-growing; *see* David E. Sanger et al., *Marriott Data Breach is Traced to Chinese Hackers as U.S. Readies Crackdown on Beijing*, N.Y. Times (Dec. 11, 2018), https://www.nytimes.com/2018/12/11/us/politics/trump-china-trade.html.

would have paid less for rooms had Marriott discovered and disclosed the data-security issue.  JA572.[3]

The overpayment theory faced an obvious problem.  Hotel prices—and thus any "overpayment damages"—change constantly and can vary based on (for example) renovations, conferences and other group packages, and online reviews.  JA1938-1940.  Plaintiffs' expert, Dr. Prince, nonetheless claimed his model could calculate overpayment damages across the entire class.  JA514-519.  He initially proposed running that model separately for every stay by every class member.  JA1012.  But this endeavor would have required millions of individual analyses.  And because the model required as inputs the prices and market shares of competing hotels for *each market* and *each stay*, it would also have required collecting hundreds of millions of pieces of information, the vast majority of which is not available.  JA514-517.

---

[3] Plaintiffs also claimed their personal information had "inherent value."  But when plaintiffs proffered expert testimony that attempted to substantiate that theory, the district court rejected it under *Daubert* as unduly speculative.  JA506.  The district court noted that plaintiffs' expert, Dr. Prince, was "content to just trust his assumptions that his model would work, and that his algorithm was equal to the task of performing the calculations that were needed."  JA537.

C.    Marriott Opposes Certification Based On Plaintiffs' Class Waivers, Lack Of Standing, And Failure To Satisfy Rule 23.

Marriott opposed certification on multiple grounds and moved under *Daubert* to exclude Dr. Prince's model.  JA618-690; Dkt. 895.  Marriott argued that every SPG member, including all named plaintiffs, agreed to resolve disputes "individually without any class action" and could not pursue class litigation.  JA666-667 (quoting JA727, SPG Terms & Conditions § 13.21).  Moreover, because non-SPG putative class members had signed different contracts than the named plaintiffs, the named plaintiffs were not typical and adequate class representatives.  JA669-670.  Marriott also argued that individuals lacked standing to sue over reimbursed stays and that it was infeasible to determine whether the individuals were in fact reimbursed for each of the millions of stays at issue.  JA660, JA678-679.

As to the overpayment theory, Marriott explained that Dr. Prince's model could not calculate classwide damages because he would have to run that model many millions of times using data he did not have and could not get.  JA649-652.  Dr. Prince all but conceded as much and, in rebuttal, changed course.  He now claimed he only needed to run one instance of the model for all stays at a given hotel.  JA1568-1569.

Marriott showed this new approach fared no better. Dr. Prince claimed he could eliminate the massive number of calculations his old approach required by assuming prices "co-moved." If a Marriott hotel's prices were (for example) 5% lower than a nearby Hilton's when the damages period began on July 28, 2014, then Dr. Prince assumed those prices would also be 5% lower when the damages period ended on November 30, 2018—and each day in between.

Defendants' expert tested that "co-movement" premise and showed it was false. JA1938. Dr. Prince, tellingly, did *not* test this assumption. Instead, he relied on a single academic article—which expressly did not claim that hotel prices consistently co-move in all markets at all times, and, if anything, disproved that proposition. Marriott argued both that Dr. Prince's testimony was insufficiently reliable under *Daubert*, Dkt. 961 at 3-5, and was inadequate to support certification under *Comcast*. JA652-655.

## D.  The District Court Blue-Pencils Plaintiffs' Proposed Classes And Certifies Bellwether Classes Of 20 Million Members.

The district court granted class certification in part, after trying to remedy multiple deficiencies in the uncertifiable classes plaintiffs proposed.

First, because the class waivers applied to SPG members but not to others, the court narrowed all the classes—not just the contract classes—to

11

*only* SPG members. The new class definitions tried to solve the typicality problem with plaintiffs' proposed classes by ensuring that every named plaintiff and every class member had signed the same waiver. *See* JA564-565. The court deferred the waiver's "applicability" to the merits stage. JA565.

Second, the court agreed that individuals who received reimbursement did not "overpay" and therefore lacked standing. So it narrowed all the classes to those who "bore the economic burden for a hotel stay." JA549-551, JA609-611. The court believed an administratively feasible claims process could determine who paid for every stay by every class member. The court did not specify what that claims process might be.

Third, the court declined to exclude Dr. Prince's overpayment testimony under *Daubert* and held that overpayment provided a viable classwide damages theory. The court acknowledged that Dr. Prince's model depended on his co-movement assumption but incorrectly believed that, because Dr. Prince had conducted test runs with the model, he had adequately substantiated his methodology. JA521-524. In reality, Dr. Prince never tested his co-movement assumption. He ran his model

*assuming* (incorrectly) that co-movement existed and without ever verifying that foundational assumption. JA1568-1569.

The court certified Rule 23(b)(3) damages classes covering Maryland (contract, consumer fraud), New York (same), and California (consumer fraud). JA610-611. It also certified, under Rule 23(c)(4), negligence classes covering Maryland, Florida, Connecticut, and Georgia limited only to the elements of duty and breach. JA611-612. Although the court found that injury, causation, and damages were not amenable to class treatment, it nonetheless concluded that, under a "broad view" of Rule 23(c)(4), it could certify classes limited to these elements of the negligence claim. JA602-607. In five places, the court's opinion mentioned the possibility that it could later opt to decertify if certification was mistaken. JA558, JA592, JA599-600. Marriott estimates the certified classes encompass 20 million individuals.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's certification order. That certification order is predicated on four legal errors, each of which requires reversal and precludes class treatment going forward.

I.    The district court erred by certifying classes where every named plaintiff and every putative class member signed a class waiver agreeing to

forego class litigation as to the certified claims. Courts nationwide routinely and correctly address such waivers as threshold certification issues. Deferring the issue until the merits stage, as the district court did, effectively abrogates the parties' agreement not to pursue class litigation, violates Rule 23, and wastes the resources of the parties and the courts. This Court should resolve the issue now and find that the waiver precludes class treatment.

II.    The district court erred by certifying classes whose members cannot be ascertained using any administratively feasible method, contrary to this Court's precedents. *EQT*, 764 F.3d at 358. The district court limited the certified classes to guests who bore the "economic burden" for their hotel stays. Guests who did not pay, or were reimbursed, fall outside the class and lack Article III standing. But no administratively feasible method can determine who bore the economic burden for millions of stays. Doing so will require millions of "mini-trials." *Id.* Indeed, because this issue goes to Article III standing, and implicates Marriott's Seventh Amendment and due process rights, it will have to be resolved at a *jury trial*. No Rule 23–compliant jury trial can do so.

III. The district court erred in certifying the classes because plaintiffs' damages model does not satisfy Rule 23's predominance requirement under *Comcast*. 569 U.S. at 33. Plaintiffs' damages model rests entirely on the assumption that the prices of different hotels in the same markets rise and fall at all times in lockstep, or "co-move." But plaintiffs' expert did not test this assumption. And when defendants' expert tested this assumption, it proved false. Under *Comcast*, a damages model must be based on more than a mere assumption, let alone a disproven one. Predominance is also lacking under *Comcast* because plaintiffs' damages model will still require millions of individual and wholly impractical mini-trials to determine whether each class member was reimbursed for every stay for which the model contends there was an overpayment.

IV. As explained in Accenture's brief, the district court erred by invoking Rule 23(c)(4) to certify negligence classes limited to the issues of duty and breach.

## STANDARD OF REVIEW

"[P]laintiffs bear the burden … of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden...." *Gariety v. Grant Thornton,*

15

*LLP*, 368 F.3d 356, 370 (4th Cir. 2004). "Repeatedly," the Supreme Court has "emphasized that it 'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied.'" *Comcast*, 569 U.S. at 33 (citation omitted).

This "analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim'"—because "the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 33-34. "A district court per se abuses its discretion when it makes an error of law or clearly errs in its factual findings." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).

## ARGUMENT

### I. The District Court Erred As A Matter Of Law By Certifying Classes Because Every Class Member Signed A Class Action Waiver.

Certification should have been denied because every named plaintiff and putative class member agreed to resolve "disputes … individually without any class action[.]" JA727. The district court's perverse contrary

16

theory—that because it narrowed the classes to *only* individuals who agreed to waive class litigation, class actions could *proceed*—is wrong. As court after court has recognized, class waivers must be enforced at the threshold, before "consider[ing] the requirements for class certification under Rule 23." *Kaspers v. Comcast Corp.*, 631 F. App'x 779, 784 (11th Cir. 2015). The Court should reverse the certification order.

### A.    Courts May Not Certify Classes Composed Of Individuals Who Have Waived Class Litigation.

Rule 23 creates "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). And when, as here, parties have waived class litigation and "agreed to [litigate] pursuant to [the] 'usual rule'" of individually litigated claims, the Supreme Court has emphasized that "it would be remarkable for a court to erase that expectation." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Below, the district court effected precisely such an erasure by disregarding the class waiver at class certification and refusing to address it until the merits stage. The district court could not certify without addressing the waiver.

1. That conclusion follows, first, from the nature of class actions and class-action waivers. A *class action* begins at certification. Certification

17

"gives birth to 'the class as a jurisprudential entity'" and "provides [a] sharp line of demarcation between an individual action seeking to become a class action and an actual class action." *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1304 (4th Cir. 1978) (citation omitted). A *class waiver*, meanwhile, represents a "promise to forgo a procedural right to pursue class claims." *Laver v. Credit Suisse Sec. (USA), LLC*, 976 F.3d 841, 846 (9th Cir. 2020); *see Cohen v. UBS Fin. Servs., Inc.*, 799 F.3d 174, 179 (2d Cir. 2015). So when individuals promise to forego that "procedural right," *Laver*, 976 F.3d at 846, they must stay on one side of the "sharp line" dividing individual from class actions, *Shelton*, 582 F.2d at 1304.

Such agreements, moreover, are enforceable—and are enforceable *at certification*. As with "other contracts," courts enforce class waivers "in accordance with their terms." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). That means keeping the parties on their agreed-upon side of the line, by refusing to certify classes that include individuals who have agreed not to litigate as a class.

Deferring the issue until the "merits stage," as the district court did, abrogates the parties' bargain to proceed pursuant to "the usual rule that litigation is conducted by and on behalf of the individual named parties only."

18

*Califano*, 442 U.S. at 700-01. Class waivers do not bear on the "merits" of a plaintiff's claim; they speak only to the process available to the plaintiff to pursue that claim. Deferring a decision on a class waiver miscategorizes that waiver as a "mere defense to liability," rather than what it is: An "*immunity from suit*" via class litigation, and one that—like qualified immunity—is "effectively lost if" litigation proceeds. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see Plumhoff v. Rickard*, 572 U.S. 765, 771-72 (2014).

Recognizing as much, courts consistently resolve issues of class waivers at the class certification stage. *E.g.*, *Kaspers*, 631 F. App'x at 784 (holding that where class waiver was "valid," district court correctly declined "to consider the requirements for class certification under Rule 23, Fed.R.Civ.P."); *Lindsay v. Carnival Corp.*, No. C20-982, 2021 WL 2682566, at *4 (W.D. Wash. June 30, 2021) (denying class certification as barred by class waiver); *Ranzy v. Extra Cash of Tex., Inc.*, No. Civ. A. H-09-3334, 2011 WL 13257274, at *8 (S.D. Tex. Oct. 14, 2011) ("Because the loan agreements contain class action waivers ..., [plaintiff] may not assert claims on behalf of a class" and "[t]here is no need ... to reach the Rule 23 factors."); *Palacios v. Boehringer Ingelheim Pharms., Inc.*, No. 10-22398-CIV, 2011 WL 6794438, at *4 (S.D. Fla. Apr. 19, 2011) (finding that waiver "precludes Plaintiff from

serving as a class representative" and that denial of certification motion is warranted "[f]or this reason alone"); *Archer v. Carnival Corp. & PLC*, No. 20-cv-04203, 2020 WL 6260003, at *8 (C.D. Cal. Oct. 20, 2020) (denying class certification as barred by class waiver); *cf. Lawson v. Grubhub, Inc.*, 13 F.4th 908, 913 (9th Cir. 2021) (affirming that class was not "worthy of certification" where all class members except one representative signed waivers).

Marriott has found just one decision taking the same approach as the district court here—and the Fifth Circuit is presently reviewing it on interlocutory appeal. *See Earl v. Boeing Co.*, 339 F.R.D. 391, 421 n.16 (E.D. Tex.), *appeal docketed*, No. 21-40720 (5th Cir. Sept. 30, 2021).

2. The district court believed it could certify the classes here despite the class waiver because all putative class members agreed to waivers and the waiver thus raised "questions … common to the class." Fed. R. Civ. P. 23(a)(2). But Rule 23 does not authorize courts to abrogate parties' agreements to forego class litigation, whether or not they have *all* done so. Rule 23's text only confirms that class waivers preclude class certification.

That text starts with Rule 23(a), which directs courts to ask whether "a class" satisfies various requirements for class treatment and whether "[o]ne or more members of a class may sue … as representative parties on

behalf of all members[.]" Fed. R. Civ. P. 23(a).  There can be no "class" under Rule 23(a) when every would-be member has agreed to forego participation in such a "jurisprudential entity."  *Shelton*, 582 F.2d at 1304 (citation omitted); *cf. EQT*, 764 F.3d at 358 (looking to requirements that are "implicit" in Rule 23's express text); *accord Krakauer*, 925 F.3d at 655; *In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir. 1989), *abrogated by Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *Hammond*, 462 F.2d at 1055.

Likewise, putative class representatives may not "sue … as representative parties on behalf of all members" when the representatives have agreed not to do so.  It is well-established, and just common sense, that "a class representative must be part of the class" she would represent.  *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).  So when, as here, all class representatives have relinquished the right to participate in a Rule 23 class, they are "simply not eligible to represent a class of persons"—and again, that remains so whether or not the class is subject to *the same* waiver.  *Id.* at 404; *accord Korea Wk., Inc. v. Got Cap., LLC*, No. CV 15-6351, 2016 WL 3049490, at *10-11 (E.D. Pa. May 27, 2016) ("As the named Plaintiffs contractually waived their right to bring, or participate in, a class action they cannot adequately represent the proposed Class.").

The text of Rule 23(b) yields the same conclusion. It requires courts to ask whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). But a class action cannot be "superior," and cannot be "fair[]," when the parties have by contract agreed to forego class litigation. Courts must "declin[e] to apply rules—even if they would be 'equitable,'" or fair, "in a contract's absence—at odds with the parties' expressed commitments" in their agreement. *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 98 (2013). Instead, the "agreement itself becomes the measure of" what constitutes the fair and superior method of adjudication. *Id.* at 100.

Indeed, because Rule 23(b)(3) is "an adventuresome innovation … designed for situations in which class-action treatment is not as clearly called for," *Comcast*, 569 U.S. at 34 (internal quotation marks and citation omitted), courts must be especially careful to avoid "sacrificing procedural fairness or bringing about other undesirable results." Amendments to Rules of Civil Procedure, 39 F.R.D. 69, 102-03 (1966). That verdict—"sacrificing procedural fairness"—aptly describes what the district court did by certifying classes despite the agreement of every putative member to forego class litigation.

22

3.  The district court's approach also violated the Supreme Court's central *procedural* command in class-action cases:  Certification "is proper only if 'the trial court is satisfied, after a rigorous analysis'" that Rule 23's requirements "have been satisfied."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (citation omitted); *see Comcast*, 569 U.S. at 34 (emphasizing that Rule 23(b)(3) is, if anything, "more demanding" than Rule 23(a)).  If the permissibility of a class action turns on the resolution of a disputed legal or factual question, courts must resolve that issue before certifying.  And courts "err[] as a matter of law when [they] fail[] to resolve a genuine legal or factual dispute relevant to determining [Rule 23's] requirements."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008).  That is what the district court did here when it refused to resolve the class-action waiver yet certified class actions anyway.

It is no answer to say, as the district court did, that the class waiver can be characterized as a "merits" issue.  JA565.  That claim is, first, wrong for the reason explained above:  A class waiver does not go to the merits of any plaintiff's claims but to *how* plaintiffs may pursue their claims—as a class under Rule 23, or as individuals.  And second, even if the class waiver could be called a merits issue, the district court's approach would still be wrong.

23

After all, issues that control class certification often "overlap with the merits." *Wal-Mart Stores*, 564 U.S. at 350-51. Yet the ironclad rule remains: "[A] court should consider merits questions to the extent 'that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *EQT*, 764 F.3d at 358 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

4. Violating this command, as the district court did, inflicts all the harms the Supreme Court has sought to avoid by requiring a "rigorous analysis" at class certification. *Comcast*, 569 U.S. at 33 (citation omitted). It is "well known" that certification "can unfairly 'plac[e] pressure on the defendant to settle even unmeritorious claims." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1632 (2018) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 445 n.3 (2010) (Ginsburg, J., dissenting)). That is because certification, particularly of a "large class," can "so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978), *superseded by rule as stated in Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017). When the parties have agreed to forego class litigation, courts must not abet such "in

terrorem' settlements" by deferring consideration of the class waiver until the merits stage. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011).

The district court's approach also needlessly proliferates costs for litigants and courts alike. A certification order launches the parties into full-blown merits litigation, which will entail years of discovery, production of millions of pages of documents, and the development of factual and expert testimony going to questions of duty, breach, causation, and damages. Those herculean efforts (and expenses) will be for naught when the district court belatedly enforces the parties' bargain to forego class litigation. That is precisely why issues going to the *propriety of class treatment* must be resolved at *class certification*, even if they are "common" issues or overlap with merits questions. *E.g.*, *Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132, 134-35 (2d Cir. 2013) (reversing certification decision because "resolution of [defendant's] fair use defense in the first instance will necessarily inform and perhaps moot our analysis of many class certification issues").

5. The decision below—certifying now and deferring the waiver until "the merits stage," JA565—also violates Rule 23's prohibition on "conditional" certification. Before 2003, Rule 23 provided that a class

25

certification "may be conditional." Fed. R. Civ. P. 23(c)(1)(C) (1998). But in the 2003 Amendments, the Civil Rules Advisory Committee "deleted" this authorization—precisely because such conditional certifications are inconsistent with district courts' obligation, at certification, to be "satisfied that the requirements of Rule 23 have been met." Fed. R. Civ. P. 23(c)(1)(C) Adv. Comm. Notes 2003. After those amendments, courts have drawn the obvious conclusion: Conditional certification is no longer permitted. *See Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.)*, 471 F.3d 24, 40 (2d Cir. 2006) ("It would seem to be beyond dispute that a district court may not grant class certification without making a determination that all of the Rule 23 requirements are met."), *clarified on denial of reh'g*, 483 F.3d 70 (2d Cir. 2007); *Hunter v. Am. Gen. Life & Accident Ins. Co.*, No. CA 301-4506-22, 2004 WL 5231631, at *4 (D.S.C. Dec. 2, 2004), *aff'd*, 205 F. App'x 177 (4th Cir. 2006) ("[B]ased on the 2003 amendments to Rule 23, the court no longer has the option to grant class certification on a conditional basis.").

The district court protested that its approach "should not be construed as conditional certification." JA558. But saying doesn't make it so. If it looks like a duck, swims like a duck, and quacks like a duck, then it is a duck. Likewise here, a certification order is conditional if it "rel[ies] on later

developments to determine whether certification is appropriate." *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 202 (3d Cir. 2009) (citation omitted). And that is exactly what the district court did: It deferred the question of class waiver, and its certification decision will hold only if plaintiffs prevail on that issue.

### B. The Answer To The Class-Waiver Issue Is Clear And Ripe For Resolution.

This Court should not only vacate the district court's certification order but reverse. The waiver—which extends to claims "arising out of or related to the SPG program," JA727, forecloses the certification of any of the classes at issue here.

1. This waiver, to begin, applies to all the classes and all the claims the district court certified. The Supreme Court has recognized that waivers precisely like the one in the SPG Terms—applying not only to claims "arising out of" the contract but also claims "relat[ed] to" it—are "broad." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967). This Court, too, has recognized such provisions' "expansive reach." *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996). Interpreting a nearly identical waiver, this Court explained that such language stretches far beyond questions concerning "*the literal*

*interpretation or performance of the contract*" and "embrace[s] every dispute between the parties having a significant relationship to the contract regardless of the label attached." *Id.* (citation omitted).

Here, the putative class members seek to litigate as SPG members based on wrongs Marriott supposedly committed relating to reservations plaintiffs made as SPG members and in violation of the SPG program's terms. Such claims have an obvious "significant relationship to" the SPG program. The waiver thus applies to all of the class claims.

2. The waiver is also enforceable. Plaintiffs' briefs before the district court never disputed the waiver's enforceability. To the extent plaintiffs now make that argument on appeal, this Court should deem it forfeited. "Issues raised for the first time on appeal are generally not considered by this Court." *Zoroastrian Ctr. & Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 753 (4th Cir. 2016). The district court's certification order confirms the point: It noted that plaintiffs disputed the waiver's *applicability* but said nothing about enforceability—because plaintiffs did not preserve any such argument. JA565.

Nor would an enforceability challenge, even if preserved, help plaintiffs. The SPG Terms provide that New York law applies. JA727. And

under New York law, courts enforce "contractual proscription[s] against class actions" according to their terms because they are "neither unconscionable nor violative of public policy." *Horton v. Dow Jones & Co.*, 804 F. App'x 81, 84 (2d Cir. 2020) (quoting *Tsadilas v. Providian Nat'l Bank*, 13 A.D.3d 190 (N.Y. App. Div. 2004)); *accord U1it4Less, Inc. v. FedEx Corp.*, No. 11-cv-1713, 2015 WL 3916247, at *5 (S.D.N.Y. June 25, 2015) (upholding class waiver under New York law); *Korea Wk.*, 2016 WL 3049490, at *7-8 (same).

Courts in this Circuit, too, have routinely held that class waivers are enforceable. *See Abdul-Hasib v. Aerotek, Inc.*, No. CV 17-1502, 2017 WL 5903555, at *3 (D. Md. Nov. 30, 2017) (citing *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674 (4th Cir. 2016)). Courts in this Circuit have thus enforced class waivers in employment matters, s*ee Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 180-81 (4th Cir. 2013) (holding that the class action waiver was not unconscionable in the context of a Maryland Franchise Law claim); in consumer matters, *see e.g.*, *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002); *King v. Cap. One Bank (USA), N.A.*, No. 11-cv-00068, 2012 WL 5570624, at *10 (W.D. Va. Nov. 15, 2012) (citing *CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (2012)); and in matters related

to arbitration agreements, *see Freeman v. Cap. One Bank*, No. 08CV242, 2008 WL 2661990, at *2-3 (E.D. Va. July 3, 2008).

3.    There is no merit to the argument, which plaintiffs raised in response to Marriott's Rule 23(f) petition, that Marriott forfeited its right to raise the class waiver as a defense.  Forfeiture can occur only when a party is *required* to raise an argument but *fails to do so*.  *Edd Potter Coal Co. v. Dir., Off. of Workers' Comp. Programs, United States Dep't of Lab.*, 39 F.4th 202, 206 (4th Cir. 2022) ("Forfeiture results when a party fails to raise an issue at the appropriate time.").

Here, Marriott cannot have forfeited its defense because it raised the class waiver at the first possible opportunity (in its Answer) and then fully pressed the defense at exactly the right time (class certification).

First, by raising the class waiver as an affirmative defense in its Answer, Dkt. 604 at 97, Marriott complied with Rule 8(c), which directs parties to "affirmatively state" any "affirmative defense" in a response to a pleading.  In providing that affirmative notice, Marriott carried out the "purpose of Rule 8(c)," which "is to give the opposing party notice of the affirmative defense and a chance to rebut it."  *Grunley Walsh U.S., LLC v. Raap*, 386 F. App'x 455, 459 (4th Cir. 2010) (citation omitted).

30

Second, Marriott sought to enforce its class waiver at the proper time when it raised the issue in opposition to class certification.  JA666-667.  A class waiver is not a merits defense to a claim.  It is a defense to *class treatment* of the claim.  The "proper stage" of litigation at which to enforce a class waiver is thus "class certification."  *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 853 (D. Md. 2013).

Nothing supports plaintiffs' argument, again raised in response to Marriott's Rule 23(f) petition, that Marriott forfeited the class waiver by failing to do more to *remind* plaintiffs of its class-waiver defense.  First, plaintiffs cite no law to support their contention that defendants must do more to preserve a defense against class treatment than raising it in their Answer and pressing it at class certification.  Courts have reached precisely the opposite conclusion.  *See, e.g.*, *Spotswood v. Hertz Corp.*, No. CV 16-1200, 2019 WL 498822, at *5 (D. Md. Feb. 7, 2019) ("Moreover, it is no secret that [defendant] intended to defend this action based on the presence of arbitration agreements and class action waivers. [Defendant] indicated as much in its Answer to the Amended Complaint.").  Second, none of the moments of supposed omission that plaintiffs have identified—bellwether negotiation, scheduling conferences, a motion to dismiss the complaint for

31

failure to state a claim—presented an opportunity to litigate the class-waiver defense against certification. And third, Marriott *did* address the waiver in its depositions of named plaintiffs. Dkt. 1019-34 at 263:11-266:5 (Maldini Dep.); Dkt. 1019-35 at 248:20-249:9 (Cullen Dep.). So even if plaintiffs and their counsel were dozing at the wheel when they reviewed Marriott's Answer, they were notified (repeatedly) during discovery.

## II. The District Court Erred By Certifying Classes That Cannot Be Ascertained In Any Manner Consistent With Rule 23 Or The Constitution.

The district court also erred by certifying classes with a fatal ascertainability problem. Under Article III, "[e]very class member must have … standing.'" *TransUnion*, 141 S. Ct. at 2208; *cf. Krakauer*, 925 F.3d at 658 (stating, before *TransUnion*, that classes may not contain a "large number of uninjured persons"). The district court correctly recognized that plaintiffs' original definition would "include a large number of uninjured persons." JA549. That definition included individuals who were "reimbursed," *id.*, and plaintiffs below correctly acknowledged that individuals who did not pay for, or received reimbursement for, their stays did not suffer any "overpayment" injury. *See* Dkt. 905 at 30. The court thus *sua sponte* narrowed the classes to include only "persons who bore the

economic burden" of their hotel stays. JA551. In doing so, the court created a disabling ascertainability problem: No administratively feasible method can identify who bore the burden for each of the hotel stays by 20 million people. Much less is it possible via a *jury trial*, as Article III, due process, and the Seventh Amendment require.

## A. Ascertainability Requires Plaintiffs To Demonstrate An Administratively Feasible Method For Determining Class Membership.

For decades, this Court has held that classes must be "readily identifiable." *Hammond*, 462 F.2d at 1055. Nor is this Court alone: "[M]ost [ ] circuit courts of appeals have recognized" Rule 23's requirement that "members of a proposed class be 'readily identifiable.'" *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995 (8th Cir. 2016) (collecting cases) (citation omitted). That requirement is often characterized as "ascertainability." *EQT*, 764 F.3d at 358; *see Sandusky*, 821 F.3d at 995. Plaintiffs "must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).

This ascertainability requirement flows from Rule 23 itself. Ascertainability "allows a trial court effectively to evaluate the explicit requirements of Rule 23." *Id.* at 162. If class members are not readily

33

identifiable, a court cannot perform the "rigorous analysis" that Rule 23 requires with respect to numerosity, commonality, typicality, or adequacy. *Wal-Mart Stores*, 564 U.S. at 351. Nor can the court "rigorous[ly]" assess the requirements of Rule 23(b)(3) absent a method of ascertaining who belongs in the class. *Comcast*, 569 U.S. at 35. It would be impossible, for example, to evaluate whether "a class action [would be] superior to other available methods for fairly and efficiently adjudicating the controversy"— because doing so requires consideration of "the likely difficulties in managing a class action," such as identifying class members. Fed. R. Civ. P. 23(b)(3). Finally, ascertainability "dovetails with" Rule 23(c)(1)(B)'s requirement that the class-certification order include "a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified[.]" *Byrd*, 784 F.3d at 163 (internal quotation marks and citation omitted).

In *EQT Production Company*, this Court held that ascertainability requires not just "objective criteria" for identifying class members, but an "administratively feasible" method for determining membership "without extensive and individualized fact-finding or 'mini-trials.'" 764 F.3d at 358 (internal quotation marks and citations omitted). *EQT* then applied this rule

34

to vacate, on a Rule 23(f) petition, a class whose membership was not defined by any readily obtainable records and thus would necessitate mini-trials to determine who was and was not a member. *Id.* at 358-60. Since *EQT*, this Court has continued to reaffirm that administrative ascertainability requirement. *Krakauer*, 925 F.3d at 658; *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022). And again, this Court is in good company. *E.g.*, *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013); *AstraZeneca AB v. United Food & Commercial Workers Unions (In re Nexium Antitrust Litig.)*, 777 F.3d 9, 19 (1st Cir. 2015).

## B.    Plaintiffs Failed To Satisfy This Court's Ascertainability Requirement.

1. The feature that defines the district court's classes—whether an individual bore the "economic burden" of a hotel stay—cannot be ascertained in any administratively feasible manner. It will require "extensive and individualized fact-finding" to determine the extent to which any stay by a class member was or was not reimbursed. *EQT*, 764 F.3d at 358 (citation omitted).

To illustrate the point, consider just one reservation made by just one of the 20 million putative class members—call her Jane Doe. Maybe Jane is booking her own stay (and so bearing the "economic burden"). Or maybe

35

Jane is booking for her spouse, parent, or friend, who plans to reimburse her (and who will instead bear the economic burden). Maybe Jane is traveling for business and using a corporate card. Or maybe Jane uses her own card and her employer reimburses her. Maybe those reimbursements, if they come, will be standalone direct deposits in the exact amount of the hotel stay. Or maybe they will come as supplements to Jane's paycheck (perhaps lumped together with other reimbursements), or via petty cash. Maybe Jane will remember, years later, whether she received such reimbursements and be able to compile the relevant documents. Or maybe not.

One thing is beyond dispute: No administratively feasible process can answer those questions and identify who bore the "economic burden" of the stays booked by Jane Doe and 20 million other putative class members. And certainly, neither plaintiffs nor the court below *identified* any such process.

This problem is so unsolvable because no single document, like a receipt showing payment, can ever answer the question the district court posed. Instead, the court defined the classes to require proof of a negative— that an individual paid for a stay *and was not reimbursed* (not via direct deposit, paycheck supplement, Venmo, or a crumpled wad of $20 bills). "[P]roof of a categorical negative. … is a challenge in any context." *Vieth v.*

36

*Jubelirer*, 541 U.S. 267, 311 (2004) (Kennedy, J., concurring).  And it is impossible to prove a negative many millions of times via Rule 23–compliant proceedings.

2.  The district court's decision to certify the classes badly conflicts with *EQT*.  There, this Court vacated the certification of classes whose definition similarly rested on proof of a negative—namely, that individuals had "never received [certain] royalties" for their properties.  764 F.3d at 355.  Certification was improper, this Court emphasized, because ascertaining membership would require "complicated and individualized" review of land records, which might or might not resolve class membership.  *Id.* at 359-60.  This case is the same.

The decision below also conflicts with myriad other decisions that, consistent with *EQT*, have recognized that similar fact-intensive, individualized inquiries, including those hinging on "who bore the 'economic burden'" for a transaction, defeat ascertainability.  *E.g.*, *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 572 (E.D. Tenn. 2014).[4]

---

[4] *Accord, e.g.*, *Brecher v. Republic of Arg.*, 806 F.3d 22, 26 (2d Cir. 2015) (vacating class certification because "determining class membership would require the kind of individualized mini-hearings that run contrary to the principle of ascertainability"); *Mladenov v. Wegmans Food Mkts., Inc.*, 124

3.  The lack of ascertainability is especially egregious because, here, these individualized determinations must occur *at trial* and before *a jury*. The district court appeared to contemplate a claims administrator resolving these issues "when putative class members actually come forward," after a trial on the merits. JA557 (quoting *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 56 (E.D. Va. 2021)).  But as impossible as this task would be for a claims administrator, even that shortcut is not available to plaintiffs.

That is so, first, because the requirement that defines class membership here—that an individual bears the "economic burden" of a hotel stay—also defines Article III standing.  The Supreme Court recently held

---

F. Supp. 3d 360, 372 (D.N.J. 2015) (ascertainability lacking where "cash purchasers of Defendants' bread and bakery products (who did not use loyalty cards) could not be identified by Defendants in any reliable way"); *In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, No. CV 11-07382, 2018 WL 497071, at \*11 (D.N.J. Jan. 22, 2018) (same where "the retailer data is the critical component in determining whether putative class members can be ascertained and that data is not in the record"); *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 301-03 (S.D. Ala. 2006) (same where "determination that a particular parcel of land was or was not 'income-producing'" would require "a series of mini-trials just to evaluate the threshold issue of which property owners are class members"); *Kirkman v. N.C. R.R. Co.*, 220 F.R.D. 49, 53 (M.D.N.C. 2004) (same where "ascertain[ing] potential class members through detailed title searches" was "not administratively feasible given the number of potential members across more than 300 miles of land").

that, under Article III, each class member's standing "be supported adequately by the evidence adduced *at trial*." *TransUnion*, 141 S. Ct. at 2208 (emphasis added) (citation omitted). Thus, in cases that "proceed[ ] to trial," plaintiffs must present admissible evidence to prove standing "at trial." *Id.* Here, that means presenting all the individual-specific evidence necessary to prove that 20 million putative class members bore the economic burden of every one of their hotel stays and did not receive reimbursements from any source.

Second, Marriott is entitled to a *jury* trial on these issues. The class claims—breach of contract, consumer fraud, and negligence—are quintessentially "legal" claims, to which the Seventh Amendment applies. *See Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 569-70 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42-43, 42 n.4 (1989); *Wooddell v. Int'l Bhd. of Elec. Workers, Loc. 71*, 502 U.S. 93, 97-98 (1991). So again, 20 million plaintiffs would have to present their individual-specific evidence to the jury.

4. The record evidence, moreover, underscores that litigation over reimbursement will go to the heart of who has standing at all. Plaintiffs in discovery produced a "stay spreadsheet" identifying each named plaintiff's

39

stays at Marriott and Starwood properties. That spreadsheet showed, on plaintiffs' own recounting, that 373 of the 424 stays at Starwood-branded hotels over the class period, or 87.97%, were reimbursed. Dkt. 1019 Exs. 40-54. And of the fourteen named plaintiffs, four admitted that they received reimbursement for *all* their stays. *Id.* Meanwhile, in depositions, the named plaintiffs often failed to accurately recall whether they paid for particular reservations. *E.g.*, JA679 (citing JA1102, JA1106-1107 (Bittner Dep.) (could not "recall" who paid for stays); JA1097-1098 (O'Brien Dep.) (did not know who paid for two reservations); JA1093-1094 (Fishon Dep.) (could not say for certain whether he paid for a particular stay)). *See also* JA1109-1111 (Marks Dep.) (similar); JA1113 (Cullen Dep.) (similar); JA1115-1117 (Maisto Dep.) (similar). So litigation over reimbursement will undoubtedly exclude many individuals from the classes. But it is impossible to know just how many without 20 million mini-trials.

## C. The District Court Identified Nothing That Could Solve The Fatal Ascertainability Defects.

The district court acknowledged that its decision to "narrow the proposed classes … to include only those who bore the economic burden surely raises the salience of … concern[s]" based on administrative ascertainaibility. JA555. But the court believed that three sources would

40

allow it to address these concerns: (1) Starwood's reservation database; (2) guests' bank and credit card records; (3) and self-certification affidavits. JA554-557. None of these sources, however, offers a way out of the millions of mini-trials that will be necessary to identify class members.

1. The district court credited plaintiffs' claim that Starwood's database "can [be] use[d] [ ] to identify class members." JA554. But that claim is mistaken, and clearly so. Starwood's reservation database is just that—a *reservation* database that identifies who made reservations (and sometimes a card number used to book and pay for the room). *See* JA556. That database says nothing about to whom a card belonged or whether a putative class member, like Jane Doe, later received reimbursement. Thus, "nothing in [Starwood] databases shows or could show whether individuals should be included in the proposed class[.]" *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

2. Nor can "bank and credit card statements" provide what Starwood's database does not. JA556. Reimbursement could have come through any one of an individual's bank accounts or credit cards. So even embarking on the district court's approach would require collecting all those statements, dating back years, for all 20 million class members. Nor would that morass

41

of documents, when collected, actually *answer* the question. Recall again Jane Doe: Her reimbursements might have come via add-ons to her paychecks, as lump sums encompassing many different expenses, or in cash. And whatever the answers for Jane, they may differ for the other 19,999,999 putative class members. Sorting through the various methods of proof, and adjudicating related challenges, cannot occur via any Rule 23–compliant jury trial the human mind can devise.

3. The district court's fallback suggestion—that putative class members might rely on "self-certification" affidavits, JA555-556—only underscores the fatal lack of ascertainability.

To begin, such affidavits would be "inadmissible hearsay at trial." *United Food & Commercial Workers Unions & Emps. Midwest Health Benefits Fund v. Warner Chilcott Ltd. (In re Asacol Antitrust Litig.)*, 907 F.3d 42, 53 (1st Cir. 2018). After all, "class certification provides no occasion for jettisoning the rules of evidence and procedure." *Id.*; *accord Dakota Granite Co. v. BNSF Ry. Co. (In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869)*, 934 F.3d 619, 625 (D.C. Cir. 2019) ("contested affidavits" would be "inadmissible"). So all 20 million would-be class members would have to come forward. That is not an "administratively

42

feasible" answer. The "[i]nefficiency can be pictured as a line of [millions] of [putative] class members waiting their turn to offer testimony and evidence" on the question of economic burden. *In re Asacol Antitrust Litig.*, 907 F.3d at 51-52.

Indeed, relying on self-certification affidavits here would force the district court to make one of two errors. First, the court could treat those affidavits as conclusive. But the Due Process Clause entitles defendants "to challenge the proof used to demonstrate class membership." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013). And a "class cannot be certified on the premise that [the defendant] will not be entitled to litigate its … defenses to individual claims." *Wal-Mart Stores*, 564 U.S. at 367. Hence, "allowing class members to self-identify without affording defendants the opportunity to challenge class membership provides inadequate procedural protection to defendants and implicates their due process rights." *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015) (cleaned up); *accord Marcus*, 687 F.3d at 594 (use of self-certifying affidavits "would have serious due process implications").

Second, the court could follow the Constitution and protect Marriott's right to challenge those affidavits. But that approach is "administratively

43

infeasible, because it requires a 'series of mini-trials just to evaluate the threshold issue of which [persons] are class members.'" *Karhul*, 621 F. App'x at 948-49 (citation omitted). No piece of evidence will reliably or uniformly corroborate what the affidavits claim: That the putative class member bore the economic burden for the hotel stay and did not receive reimbursement from any source. Instead, affidavits simply add one more contestable piece of evidence to the millions of mini-trials over membership.

Vindicating the right to challenge such affidavits, moreover, is no mere formality. The Third Circuit has emphasized that relying on such affidavits is especially inappropriate when a "named plaintiff's deposition testimony suggested that individuals will have difficulty accurately recalling" the key facts. *Carrera*, 727 F.3d at 309. That is exactly what occurred here, where the named plaintiffs often failed to reliably recall key facts about booking and reimbursement from years ago. *Supra* 40.

4. The district court's approach also creates an impermissible "opt-in" class: Individuals can become a class member if, but only if, they come forward with evidence—like account statements, affidavits, and so on—purporting to show that they bore the "economic burden" of hotel stays and were not reimbursed.

44

That violates Rule 23, which provides for "opt-out" classes but not "opt-in" classes. Fed. R. Civ. P. 23(c)(3)(B). Consistent with Rule 23's express terms, circuit courts have uniformly recognized that "opt-in" classes are impermissible. *E.g.*, *Kern v. Siemens Corp.*, 393 F.3d 120, 125-26 (2d Cir. 2004); *Ackal v. Centennial Beauregard Cellular L.L.C.*, 700 F.3d 212, 213-14 (5th Cir. 2012); *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 340 (7th Cir. 1974). That includes this Court, which reversed a district "court's *sua sponte* certification of an 'opt-in' … class." *State Farm Mut. Auto. Ins. Co. v. Elegant Massage, LLC*, No. 21-255, 2021 WL 4202678, at *1 (4th Cir. Sept. 2, 2021). Leading commentators agree: "Put simply, Rule 23 is an opt-out, not an opt-in, mechanism." 3 *Newberg and Rubenstein on Class Actions* § 9:48, Westlaw (6th ed., database updated June 2022).

In enforcing this rule, moreover, courts look to substance—not form. "[*D*]*e facto* 'opt in'" classes, where individuals can become class members only if they fill out "questionnaires" or "proofs of claim," are just as impermissible as express opt-in classes. *Kern*, 393 F.3d at 125-26. Courts thus routinely reject such classes. *Id.* (string citing *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986); *McCarthy v. Paine Webber Grp., Inc.*, 164 F.R.D. 309, 313 (D. Conn. 1995); *Enter. Wall Paper Mfg. Co.*

45

*v. Bodman*, 85 F.R.D. 325, 327 (S.D.N.Y. 1980); *Abulaban v. R.W. Pressprich & Co.*, 51 F.R.D. 496, 497 (S.D.N.Y. 1971)).

Here, the district court impermissibly certified such a *de facto* opt-in class.  Because Starwood's reservation database says nothing about whether individuals received reimbursement, the district court will have to demand account statements and affidavits from every putative class member purporting to show that they did not receive reimbursement.  That is, in everything but name, an opt-in class.

## III.  Plaintiffs' Damages Theory Fails *Comcast*.

Plaintiffs' overpayment theory of damages does not satisfy Rule 23 for another reason:  Their damages model is incapable of calculating class damages.  Plaintiffs conceded below that their damages model depended entirely on a "co-movement" assumption:  That hotel prices—in all places, at all times, and for all rooms—rise and fall at the same rate relative to each other.  Without this assumption, plaintiffs' expert, Dr. Prince, would need to undertake an impossibly large number of calculations to run his model and determine the extent to which any particular class member allegedly overpaid for a hotel stay.  The district court here incorrectly believed that plaintiffs had verified their co-movement assumption (they had not) or that

they were prevented from doing so due to a lack of discovery (again, they were not). That alone is sufficient to require reversal under *Comcast*.

But the problems do not stop there: Reversal is doubly warranted because Dr. Prince's model does not even purport to account for whether an individual was reimbursed—which means (for the same reasons explained above) that determining damages will require millions of mini-trials.

## A. Rule 23 Requires Courts To Subject Plaintiffs' Damages Model To "Rigorous Analysis."

Before certifying a class, "courts must conduct a 'rigorous analysis' to determine whether" plaintiffs' proposed damages model can support classwide calculation of damages. *Comcast*, 569 U.S. at 34 (quoting *Wal-Mart Stores*, 564 U.S. at 351). There is a simple reason for requiring this rigorous analysis: Accurate models "are essential to the plaintiffs' claim they can offer common evidence of classwide injury." *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 253 (D.C. Cir. 2013). "Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact." *Id.* at 252-53.

Under *Comcast*, courts must vet the operation of the plaintiffs' proffered model. *See* 569 U.S. at 36-38; *In re Rail Freight*, 725 F.3d at 251-54. In particular, "a court must examine whether any statistical assumptions

made in [plaintiffs' proffered damages model] are reasonable." *Brown v. Nucor Corp.*, 785 F.3d 895, 904 (4th Cir. 2015). In this way, the *Comcast* analysis is related to but distinct from the normal *Daubert* reliability assessment. The latter asks whether expert testimony is sufficiently reliable to be "*admissible* evidence" for the jury's consideration; *Comcast* asks whether the plaintiffs have "*establish*[*ed*] that damages could be measured on a classwide basis" such that Rule 23 is satisfied. *Comcast*, 569 U.S. at 33 n.4.

In short, "[i]t is now indisputably the role of the district court to scrutinize the evidence *before* granting certification, even when doing so 'requires inquiry into the merits of the claim.'" *In re Rail Freight*, 725 F.3d at 253 (quoting *Comcast*, 569 U.S. at 35) (emphasis added). "[T]he reliability of [a] model[] may not be deferred or deflected to a trial on the merits …. [and] instead must be shown, at this [certification] stage, to be suitably rigorous." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020) (citing *Comcast*, 569 U.S. at 35), *appeal docketed*, No. 21-954 (2d Cir. Apr. 14, 2021).

**B.** **Plaintiffs' Shifting Damages Model Depends On Co-Movement.**

Plaintiffs' model purports to measure the overpayment damages for each class member.  To do so, the model must measure the differential between what the class member actually paid for each Marriott stay and what that guest would have paid in the counterfactual world in which they knew about the data incident. JA572-573.  That requires historical data not only about the guest's stay, but also about the relevant hotel market at the time—specifically, the prices of the Marriott hotel and of competitor hotels for each and every stay at issue during the class period. JA518-519.  That is because calculating the amount that guests would have paid, had they known about the security incident, requires looking at the pricing offered by alternative hotels they might have booked instead.  *See* JA972.

Dr. Prince's opening report first proposed that he would perform these calculations by collecting and employing the relevant competitor-set hotel data for every stay during the class period. JA520.  But given the scale of the proposed classes and the duration of the class period, that data was not available.  Nor would it have been usable in any event:  It would have required many millions of calculations to determine every supposed overpayment over the class period, Dkt. 961 at 3, a point that Dr. Prince

49

conceded at his deposition. JA650-651 (cataloging Dr. Prince's deposition testimony on this point). Marriott explained that this approach was infeasible, JA649-657 and the district court acknowledged such a model would require an "enormous number of calculations." JA520.

Facing an insurmountable mountain for calculating overpayment, Dr. Prince made a late retreat in his rebuttal report. Instead of calculating the counterfactual world at every point in the class period, Dr. Prince maintained that he could determine class damages by measuring the market data from any given Marriott hotel and its competitors at a *single* random point in time. Suddenly, rather than needing millions of pieces of data to make countless calculations across the 4.5-year class period, Dr. Prince asserted he could calculate overpayment using just a few pieces of data and creating only one instance of the model for all stays at a given hotel. JA1568-1569.

Dr. Prince's new approach depended entirely on a single, sweeping assumption—that the relative prices of hotels would retain a similar structure over time. *Id.* Using this assumption of "co-movement," Dr. Prince asserted that because prices supposedly always rose and fell in sync, he could compare the price of a *single* Starwood room to its competitors on

a *single* date during the class period and assume that the overpayment would be the same for *every* stay at that Starwood hotel on *every* date of the class period.[5]

Dr. Prince thus claimed that it did not matter what kind of room a customer booked (double, queen, king, suite, etc.), when a room was booked (peak season, off-season, Christmas Eve, during hotel renovations, etc.), what kind of rate a customer received (rack rate, group rate, senior rate, etc.), what kind of package a customer selected (breakfast included, parking included, etc.), what terms the rate included (refundable, non-refundable, etc.), or anything else.  For every stay at a given hotel during the class period, Dr. Prince assumed that the degree of overpayment was the same as the overpayment he calculated for a single stay at that hotel.

---

[5] At his deposition, Dr. Prince said that his model might require a "few" runs for each hotel, which the district court concluded was manageable.  JA521-522.  But if Dr. Prince's co-movement premise is wrong, then he would need to run his model millions of times, not a "few" times—a process that is unworkable.  JA592, JA520.

### C. Plaintiffs' Discredited Co-Movement Assumption Fails *Comcast.*

Plaintiffs failed to carry their burden to establish the validity of the audacious co-movement assumption upon which Dr. Prince's entire model depends.

1. Plaintiffs' damages methodology fails at the first step: Dr. Prince never tested whether co-movement exists. Although Dr. Prince had a data set containing Marriott's prices and those of its competitors, he acknowledged that he did not look to see if those prices co-moved. *See* Dkt. 961 at 4. That omission is fatal by itself. Rule 23 requires the plaintiffs to *prove* their class damages model works, not assume that it does. *Comcast*, 569 U.S. at 33. For example, in *Rail Freight*, the plaintiffs argued that their model adequately calculated class damages because the defendants had not conclusively shown it was flawed. The D.C. Circuit roundly rejected that argument, explaining that the plaintiffs "misapprehend their burden" by submitting a "questionable model" that they had not verified. *In re Rail Freight*, 725 F.3d at 254.

But there is more. Although Dr. Prince never checked the validity of his all-important assumption, *defendants'* expert Dr. Tucker did—and she proved it was false. Dkt. 985 ¶ 19. Using the data from the six markets Dr.

Prince studied, Dr. Tucker examined the relative prices of ten hotels across all six markets.  JA1938.  That data showed that hotels' relative price ranking changed frequently over time.  *Id.*  If the co-movement assumption were accurate, this data would have shown that the most expensive hotel remained the most expensive, by the same amount, even as the overall price rose and fell.  The same would be true for the second most expensive, all the way down to the least.  Instead, Dr. Tucker observed that every hotel that Dr. Prince used in his report changed relative rank at least once when she looked at dates other than Dr. Prince's randomly selected ones.  *Id.*

Because Dr. Tucker was the only expert to test the co-movement assumption, her testimony on this point is uncontradicted.  She looked at the actual pricing data for actual hotels at issue in this suit and found that prices did not co-move.  Dr. Prince never looked at that data for this purpose and instead relied on an assumption that they did co-move.  It is difficult to think of a clearer failure to prove that a damages methodology is capable of calculating classwide damages.

2.    In certifying, the district court relied primarily on *Daubert* rather than *Comcast*, to determine that plaintiffs had met their burden to prove that their damages model was capable of determining classwide

53

damages. The court rested its conclusion that Dr. Prince's testimony was "reliable" on the ground that he had supposedly "adequately tested his model" with the data he had, JA591, and that he had cited an economics article that supported his co-movement premise. JA517. The court further stated that if more data and future discovery demonstrated that the co-movement premise was false, the court could decertify the class later, JA592. Every aspect of that assessment is wrong.

First, Dr. Prince never tested his co-movement assumption; he ran his model *assuming* that co-movement existed. One does not test an assumption by assuming its correctness. If that were true, "at the class-certification stage *any* method of measurement [would be] acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Comcast*, 569 U.S. at 35-36. "Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity."[6] *Id*. at 36.

------

[6] A failure to test a key assumption also demonstrates unreliability for *Daubert* purposes. Expert testimony is inadmissible "when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005) (explaining that the reliability requirement in "*Daubert* aims to prevent expert speculation").

Second, the article invoked by Dr. Prince—which he conceded was the entirety of the support for his co-movement premise, JA1568-1569—provides no support whatsoever for his assumption that co-movement is universal or consistent in all markets and at all times. The article never made such a claim, nor could it. The article examined a grand total of "seven [unnamed] luxury hotels operating in a tightly defined local area" prior to the start of the class period. *See* Sungjin Cho et al., *Optimal Dynamic Hotel Pricing* 16 (2018), https://economics.sas.upenn.edu/system/files/2018-04/hp_final_update.pdf. It did not purport to address the dozens of markets and wide range of hotels during the time period at issue in this case. Nor did the article even *aim* to test co-movement. Instead, it attempted to use the data from the seven hotels to create "optimal prices . . . in virtually any scenario." *Id.* at 3. And the article concluded that co-moving was *not* an optimal pricing strategy, especially in the hardly uncommon scenario when the hotel may sell out. *Id.*

A lone article that did not consider the relevant markets, hotels, and time period is no proof of an assumption that all hotel prices everywhere co-move at all times. That is particularly so when the article expressly concludes that co-movement is frequently not an optimal strategy (not to mention

where the sole analysis of the actual data in this case refuted the co-movement premise). *Comcast* requires far more.

Finally, the district court got things backwards when it invoked the possibility of decertification. Plaintiffs bear the burden to "affirmatively demonstrate" a reliable basis for measuring classwide damages *before* certification. *Comcast*, 569 U.S. at 33 (citation omitted). As the D.C. Circuit put it in *Rail Freight*: "No damages model, no predominance, no class certification." 725 F.3d at 253.

No additional discovery, moreover, can *make* Dr. Prince's model reliable. Dr. Prince has had the opportunity to test his model on the data for the bellwether classes. The district court seemed to believe that Marriott could provide more data that would allow for testing the co-movement assumption. But Marriott's database contains only its own prices, not the prices charged by competitors. JA1569 (Dr. Prince noting that finding competitor prices requires using the Wayback Machine, a third-party archive of websites). It thus cannot shed light on co-movement—which presumes that Marriott's prices move in perfect tandem with those of its competitors.

### D. Plaintiffs' Model Cannot Satisfy *Comcast* Because It Calculates Overpayment, Not Damages

Plaintiffs' model is also inadequate for another, independent reason: While it purports to calculate *overpayment* for stays, it does not (and could not) determine the *damages* for any given stay.

The problem is the same one detailed in Part II: Individuals have standing to recover damages only when they bore the "economic burden" of a stay, and cannot recover damages for stays for which they were reimbursed. But Dr. Prince's model does not, and cannot, account for those issues. Every stay requires individualized proof about who bore the economic burden. And absent such individualized proof, Dr. Prince's "damages" calculations will often include stays that do not fit plaintiffs' theory of harm. That violates *Comcast*, which holds that "a model purporting to serve as evidence of damages" must "measure only those damages attributable to that theory." 569 U.S. at 35. Plaintiffs' model fails that requirement—and any effort to cure that defect will require millions of mini-trials on the reimbursement status of individual stays. In such proceedings, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 34.

The district court overlooked this problem entirely. It reasoned that Dr. Prince's model required only two things: "(1) personal data of an administrative nature that is in [the Starwood reservation] database, including the exact Starwood hotel at which a class member stayed, the price paid for that hotel stay, and the date(s) of that stay, and (2) verifiable market data information such as historical prices and hotel attributes that Dr. Prince has demonstrated are available." JA589.

But as explained above, Starwood's *reservation* database does not settle *reimbursement*. *Supra* 41. Thus, the district court's contemplated method stops at *overpayment* and does not reach *damages*. The district court asserted that determining damages would not require "resolving individualized issues of a substantive nature." JA589. But "such assurance is not provided by a methodology that identifies damages that are not the result of the wrong." *Comcast*, 569 U.S. at 37.

\*\*\*

Rule 23 requires that plaintiffs produce a model that can effectively measure damages on a classwide basis. Because Dr. Prince's model cannot, the district court's class certification order should be reversed.

## IV. The District Court Erred As A Matter Of Law In Certifying Issue Classes Under Rule 23(c)(4).

Finally, the district court erred by certifying Rule 23(c)(4) "issue only" negligence classes limited to two elements of the negligence claim: duty and breach. As we understand Accenture will address in greater detail in its brief, that approach violates both Article III and Rule 23.[7]

1. The negligence classes did not assert an "overpayment" theory of harm. They could not: Overpayment is a benefit-of-the-bargain injury that does not apply to negligence claims. JA572. But the district court rejected the classwide theory of harm that plaintiffs *did* assert as to negligence— namely, that plaintiffs' personal information had "inherent value" that was lost due to the security incident. The district court found that Dr. Prince's testimony supporting that theory was unduly speculative and thus inadmissible under *Daubert*, JA506, which left plaintiffs "[w]ithout an accepted damages model" for their negligence claims. JA573.

Plaintiffs also moved to certify liability-only classes that would bifurcate the damages related to identity fraud, time spent responding to the data incident, and other out-of-pocket losses, which plaintiffs conceded were

---

[7] Marriott incorporates Accenture's brief in its entirety.

individualized.  Dkt. 1022-1 at 3.  But the court rejected that approach too. It explained that core liability questions of injury and causation—not just damages—also raised individualized issues.  JA603.  That is because an individual incurs a negligence injury only if (say) he or she suffers identity theft and can recover only if Marriott's negligence caused that injury—all of which would require a "full-blown trial" for each plaintiff.  *Id.* (citation omitted).

The district court, however, again tried to salvage the uncertifiable classes plaintiffs proposed.  It certified Rule 23(c)(4) "issue" classes limited to the elements of duty and breach, reasoning that common questions predominated as to these elements, even if the overall question of liability remained hopelessly individualized.  JA603-607.

2.  For three reasons, the district court erred by using Rule 23(c)(4) to certify classes lacking any common injury that could be established with classwide proof.

A.  First, the district court's issue-only classes violate Article III by contemplating class trials involving countless plaintiffs who have not demonstrated standing.  The trial that the district court contemplated will not even *try* to determine whether "[e]very class member … ha[s] Article

III standing" for their negligence claims. *Trans Union*, 141 S. Ct. at 2208. It reserves that question for later. Article III forbids holding merits proceedings in which courts hypothesize—without establishing—that the plaintiffs before them have standing. *Id.*; *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

Second, certifying classes absent a common injury violates Rule 23. Rule 23 does not permit courts to carve out individual elements from a claim and certify only those elements for class treatment. Rule 23(c)(4) is instead a management tool that allows courts to certify liability-only classes or to designate some claims as class claims and other claims as individual claims. Much of Rule 23 would become a dead letter if courts could revive classes that fail predominance by carving out individual elements of a single claim and positing that predominance exists as to those narrow elements (particularly where, as here, those narrow elements do not establish standing).

Third, these issue-only classes flunk Rule 23(b)'s superiority requirement. Even if the district court could hold a "class" trial on these narrow issues, the question remains: To what end? This trial will resolve virtually nothing. Every plaintiff who desires to recover will have to come

forward and conduct a *separate* trial on fact-intensive issues of injury and causation. That will require *just as many* full-blown trials as would occur without certification. Certification is not "superior" when it does not bring the parties any closer to a proceeding that, as a practical matter, can sensibly resolve their dispute.[8]

The district court's certification of Rule 23(c)(4) negligence classes should thus be reversed.

## REQUEST FOR ORAL ARGUMENT

Marriott respectfully requests oral argument in this case. This appeal raises important issues under both Rule 23 and Article III of the U.S. Constitution.

## CONCLUSION

This Court should reverse the district court's certification order.

---

[8] Under the relevant states' laws, moreover, there will be overlap between the narrow class proceeding addressing duty and breach and the numerous individualized ones addressing injury and causation. That redundancy further undermines the minimal benefits of the class proceeding. It also causes a Seventh Amendment Reexamination Clause problem, because the initial factfinder's determinations will be open to reconsideration by a subsequent one.

Dated: September 26, 2022          Respectfully submitted,


Daniel R. Warren                        /s/ Matthew S. Hellman
Lisa M. Ghannoum                        Lindsay C. Harrison
Kyle T. Cutts                           Matthew S. Hellman
Dante A. Marinucci                      Zachary C. Schauf
BAKER & HOSTETLER LLP                   Kevin J. Kennedy
127 Public Square                       JENNER & BLOCK LLP
Suite 200                               1099 New York Avenue, NW
Cleveland, OH 44114                     Suite 900
Tel: 216-621-0200                       Washington, DC 20001
                                        Tel: 202-639-6000
Gilbert S. Keteltas                     MHellman@jenner.com
BAKER & HOSTETLER LLP
1050 Connecticut Ave. NW
Suite 200
Washington, DC 20036
Tel: 202-861-1530


*Counsel for Defendant-Appellant Marriott International, Inc.*


63

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), Plaintiff-Appellant, by and through its counsel of record, hereby certify that this brief complies with the type-volume limitations of Fed. Rule App. P. 32(a)(7) and L.R. 32(b) because this brief contains 12,783 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Expanded LT Standard 14-point font.

Dated: September 26, 2022          /s/ Matthew S. Hellman

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2022, I caused the Opening Brief of Defendant-Appellant Marriott International, Inc. to be electronically filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Dated: September 26, 2022                    /s/ Matthew S. Hellman