**No. 22-1745**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

IN RE: MARRIOTT INTERNATIONAL, INC., CUSTOMER DATA
SECURITY BREACH LITIGATION

---

On Appeal
From the United States District Court for the District of Maryland,
MDL No. 8:19-md-2879 (Grimm, J.)

---

## BRIEF OF PLAINTIFFS-APPELLEES (PUBLIC)

---

Amy Keller
**DiCELLO LEVITT LLC**
Ten North Dearborn Street
Chicago, Illinois 60602
312.214.7900

James J. Pizzirusso
**HAUSFELD LLP**
888 16th Street, NW
Washington, D.C. 20006
202.540.7200

Andrew N. Friedman
**COHEN MILSTEIN
SELLERS & TOLL PLLC**
1100 New York Ave., NW
Washington, D.C. 20005
202.408.4600

*Co-Lead Counsel*

Norman E. Siegel
Kasey Youngentob
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
816.714.7100

Jason L. Lichtman
Sean A. Petterson
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
212.355.9500

*On Brief*

***Counsel for Plaintiffs-Appellees***
***Additional counsel on signature page***

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a),

Appellees certify that they are all natural persons.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................. 1

STATEMENT OF THE ISSUES............................................ 4

STATEMENT OF THE CASE ............................................. 5

SUMMARY OF ARGUMENT ............................................ 14

STANDARD OF REVIEW................................................. 16

ARGUMENT ................................................................... 16

I.   Marriott's "Choice of Law and Venue" clause does not bar this class litigation. ....................................................... 16

    A.   Marriott repudiated every provision of its "Choice of Law and Venue" clause, including the class action waiver. .............................................................. 17

    B.   Marriott's class action waiver is unenforceable. ............ 22

        1.   Marriott's class action waiver is not enforceable in federal court. ......................................... 22

        2.   Marriott's class action waiver is unenforceable under New York law. .......................................... 28

    C.   The Choice of Law and Venue clause cannot apply to Plaintiffs' tort and consumer fraud claims. ......................... 33

II.  The District Court's classes are ascertainable............................ 35

    A.   Marriott has misunderstood the law.................................... 36

    B.   Marriott's records contain the names of all potential class members and most of their identifying characteristics. ..................................................... 38

    C.   The District Court outlined an administratively feasible plan for determining class members. ..................... 40

        1.   Plaintiffs can rely on multiple records to show class membership..................................... 41

# TABLE OF CONTENTS
### (continued)

| | | | **Page** |
|---|---|---|---|

      2.    The District Court's use of affidavits is accepted almost universally.......................................................... 42

    D.    The Court can modify the class definitions to include reimbursed customers............................................................ 48

        1.    Every person who paid Marriott for a hotel room has standing, whether or not they were reimbursed. ................................................................ 50

        2.    The Court can modify the class definitions to include reimbursed customers. ................................... 57

III.    Plaintiffs' damages theory satisfies *Comcast*................................ 58

    A.    Marriott cannot relitigate *Daubert* on 23(f)......................... 58

    B.    The District Court was well-within its discretion to find that Plaintiffs' damages expert provided admissible testimony. .................................................................. 59

        1.    Dr. Prince presented a robust economic model to the District Court.......................................................... 60

        2.    Dr. Prince appropriately incorporated the co-movement principle into his model, and the principle is not as Marriott describes it...................... 63

    C.    Dr. Prince's model fits Plaintiffs' damages theory. ............. 70

IV.    The District Court properly certified duty and breach negligence issue classes. ................................................................ 72

    A.    Rule 23(c)(4) allows courts to certify individual elements of a cause of action. ................................................. 73

    B.    The issue class members have standing. ............................. 75

        1.    The Supreme Court has held that individual class members may prove whether they suffered an injury after a trial that determines defendants' general liability............................................................. 76

# TABLE OF CONTENTS
(continued)

**Page**

    2.    The Supreme Court has held that a judgment that increases the risk of recovery in subsequent proceedings is not an advisory opinion. ...................... 78

C.    The District Court applied the correct legal standard. ....... 79

    1.    Plaintiffs seeking class certification under Rule 23(c)(4) need not prove that a class could also be certified under Rule 23(b)(3). ..................................... 80

    2.    The majority approach is supported by the text and purpose of the rule. ............................................... 81

    3.    This Court should decline to create a circuit split. .... 83

D.    Issue classes are superior to other options. ........................ 84

    1.    The certified issue classes will materially advance the litigation and avoid significant problems that would arise in their absence. ....................................... 84

    2.    Defendants' superiority arguments are misguided. ................................................................... 88

CONCLUSION ........................................ 91

CERTIFICATE OF COMPLIANCE ....................................... 94

CERTIFICATE OF SERVICE ............................................... 95

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. Mills*,
  286 U.S. 397 (1932) ........................................................................... 52
*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) ........................................................................... 33
*Am. Int'l Grp. Eur. S.A. (Italy) v. Franco Vago Int'l, Inc.*,
  756 F. Supp. 2d 369 (S.D.N.Y. 2010) ................................................ 19
*Anhui Konka Green Lighting Co., Ltd. v. Green Logic LED Elec.*
  *Supply, Inc.*,
  --- F. Supp. 3d ---, 2022 WL 4086831 (S.D.N.Y. Sept. 6, 2022) ........... 53
*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ........................................................................... 28
*Atlantic Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
  571 U.S. 49 (2013) ............................................................................. 24
*Avis Rent A Car Sys., Inc. v. Heilman*,
  876 So.2d 1111 (Ala. 2003) ............................................................... 55
*Bell v. Ascendant Solutions, Inc.*,
  422 F.3d 307 (5th Cir. 2005) ............................................................. 59
*Bennett v. Dart*,
  --- F.4th ---, 2022 WL 16915837 (7th Cir. Nov. 14, 2022) .............. 74, 77
*Brecher v. Republic of Arg.*,
  806 F.3d 22 (2d Cir. 2015) ................................................................ 40
*Brennan v. Bally Total Fitness*,
  153 F. Supp. 2d 408 (S.D.N.Y. 2001) ................................................ 29
*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) ........................................................................... 27
*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ....................................................... 37, 47
*Butler v. Sears*,
  727 F.3d 796 (7th Cir. 2013) ............................................................. 47
*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004) ............................................................. 31
*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) .............................................................. 44

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Castano v. Am. Tobacco Co.,*
    84 F.3d 734 (5th Cir. 1996),.................................................81

*Cernelle v. Graminex, LLC,*
    2022 WL 2759867 (6th Cir. July 14, 2022) ..........................55

*Chen-Oster v. Goldman, Sachs & Co.,*
    2022 WL 814074 (S.D.N.Y. Mar. 17, 2022)..........................75

*Cherry v. Dometic Corp.,*
    986 F.3d 1296 (11th Cir. 2021).............................................37

*City Select Auto Sales Inc. v. BMW of N. Am. Inc.,*
    867 F.3d 434 (3d Cir. 2017) ...........................................42, 47

*Clark v. Universal Builders, Inc.,*
    501 F.2d 324 (7th Cir. 1974)................................................48

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ..................................................... passim

*Continental 332 Fund, LLC v. Albertelli,*
    317 F. Supp. 3d 1124 (M.D. Fla. 2018)................................52

*Conwood Co., L.P. v. U.S. Tobacco Co.,*
    290 F.3d 768 (6th Cir. 2002)................................................67

*Cottrell v. AT&T Inc.,*
    2020 WL 4818606 (N.D. Cal. Aug. 19, 2020) ......................52

*Cox v. Spirit Airlines, Inc.,*
    341 F.R.D. 349 (E.D.N.Y. 2022)..........................................39

*Crawford v. Franklin Credit Mgmt. Corp.,*
    758 F.3d 473 (2d Cir. 2014) ................................................56

*Crotzer v. Atlas Roofing Corp. (In re Atlas Roofing Corp. Chalet
    Shingle Prods. Liab. Litig.),*
    2018 WL 2929831 (N.D. Ga. June 8, 2018)..........................79

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006) ................................................76

*Dietz v. Bouldin,*
    579 U.S. 40 (2016) ..............................................................16

*E. Shore Title Co. v. Ochse,*
    453 Md. 303 (Md. Ct. App. 2017)........................................53

## TABLE OF AUTHORITIES
### (continued)

*EQT Prod. Co. v. Adair,*
  764 F.3d 347 (4th Cir. 2014)....................................................36, 39, 40
*Frey v. First Nat'l Bank Sw.,*
  602 Fed. App'x 164 (5th Cir. 2015).......................................................41
*Gamble v. New England Auto Fin., Inc.,*
  735 F. App'x 664 (11th Cir. 2018).........................................................34
*Gillman v. Chase Manhattan Bank, N.A.,*
  534 N.E.2d 824 (N.Y. 1988) .................................................................29
*Good v. Am. Water Works Co., Inc.,*
  310 F.R.D. 274 (S.D. W.Va. 2015) ...........................................74, 85, 86
*Gunnells v. Healthplan Servs., Inc.,*
  348 F.3d 417 (4th Cir. 2003).................................................................82
*Hargrove v. Sleepy's LLC,*
  974 F.3d 467 (3d Cir. 2020) ...........................................................42, 46
*Helfend v. S. Cal. Rapid Transit Dist.,*
  465 P.2d 61 (Cal. 1970) ........................................................................52
*Hewitt v. Metro-North Commuter R.R.,*
  244 F. Supp. 3d 379 (S.D.N.Y. 2017)....................................................67
*Hirsch Elec. Co. v. Comm. Servs., Inc.,*
  145 A.D.2d 603 (N.Y. App. Div. 1988)..................................................55
*Horton v. Dow Jones & Co., Inc.,*
  804 Fed. App'x 81 (2d Cir. 2020) .........................................................32
*In re Asacol Antitrust Litig.,*
  907 F.3d 42 (1st Cir. 2018) ..................................................................44
*In re Currency Conversion Fee Antitrust Litig.,*
  361 F. Supp. 2d 237 (S.D.N.Y. 2005)....................................................30
*In re Deepwater Horizon,*
  739 F.3d 790 (5th Cir. 2014)................................................................81
*In re Delta/AirTran Baggage Fee Antitrust Litig.,*
  317 F.R.D. 675 (N.D. Ga. 2016).....................................................39, 43
*In re FCA US LLC Monostable Electronic Gearshift Litig.,*
  16-md-02744, ECF No. 82 (E.D. Mich. Sept. 16, 2022) ......................89
*In re IKO Roofing Shingle Prods. Liab. Litig.,*
  757 F.3d 599 (7th Cir. 2014)................................................................59

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Paoli R.R. Yard PCB Litig.*,
    113 F.3d 444 (3d Cir. 1997) ................................................................ 89

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017) ............................................................... 36

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
    725 F.3d 244 (D.C. Cir. 2013) ........................................................... 71

*In re Sonic Corp.*,
    2021 WL 6694843 (6th Cir. Aug. 24, 2021) ...................................... 42

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ............................................................... 59

*Jacobson v. Sassower*,
    66 N.Y.2d 991 (N.Y. 1985) ............................................................... 35

*JetBlue Airways Corp. v. Stephenson*,
    932 N.Y.S.2d 761 (N.Y. Sup. 2010) *aff'd*
    931 N.Y.S.2d 284 (1st Dep't 2011) .................................................... 30

*Jones v. Hyatt Ins. Agency, Inc.*,
    356 Md. 639 (Md. 1999) ..................................................................... 55

*Karlin v. IVF Am., Inc.*,
    93 N.Y.2d 282 (N.Y. 1999) ................................................................ 56

*Kelly v. RealPage, Inc.*,
    47 F.4th 202 (3d Cir. Aug. 24, 2022) ................................................ 41

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004), *abrogated in part on other*
    *grounds by*
    *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) .............. 26

*Korea Week, Inc. v. Got Capital, LLC*,
    2016 WL 3049490 (E.D. Pa. May 27, 2016) ...................................... 30

*Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*,
    257 F. Supp. 3d 348 (S.D.N.Y. 2017) ................................................ 18

*Krakauer v. Dish Network L.L.C.*,
    925 F.3d 643 (4th Cir. 2019) ............................................. 16, 39, 44, 75

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................ 67

# TABLE OF AUTHORITIES
## (continued)

<u>**Page**</u>

*L-3 Commc'ns Corp. v. Serco, Inc.*,
  673 Fed. App'x 284 (4th Cir. 2016)......................................................55

*Lamps Plus, Inc. v. Varela*,
  139 S. Ct. 1407 (2019)............................................................................31

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
  897 F.3d 88 (2d Cir. 2018) ....................................................................45

*Licitra v. Gateway, Inc.*,
  189 Misc.2d 721 (N.Y. Civ. Ct. Oct. 18, 2001)....................................32

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)................................................................................75

*Martin v. Behr Dayton Thermal Prods. LLC*,
  896 F.3d 405 (6th Cir. 2018)................................................................72

*Martin v. Marriott Int'l, Inc.*,
  2019 WL 4201260 (D. Haw. July 12, 2019)........................................20

*Matter of Frankel v. Citicorp Ins. Servs., Inc.*,
  80 A.D.3d 280 (N.Y. App. Div. 2010)...................................................31

*McCormick v. Resurrection Homes*,
  956 N.Y.S.2d 844 (Civ. Ct. N.Y. 2012) ...............................................30

*Morgan v. Sundance, Inc.*,
  142 S. Ct. 1708 (2022)...........................................................................21

*Mullins v. Direct Digit., LLC*,
  795 F.3d 654 (7th Cir. 2015)...................................................36, 47, 72

*Naparala v. Pella Corp.*,
  2016 WL 3125473 (D.S.C. June 3, 2016).............................................85

*OConner v. Agilant Solutions, Inc.*,
  444 F. Supp. 3d 593 (S.D.N.Y. 2020)...................................................30

*Oden v. Chemung Cnty. Indus. Dev. Agency*,
  87 N.Y.2d 81 (N.Y. 1995) ......................................................................53

*Oswego Laborers' Local 212 Pension Fund v. Marine Midland
  Bank*,
  85 N.Y.2d 20 (N.Y. 1995) ......................................................................56

*Parker v. Asbestos Processing, LLC*,
  2015 WL 127930 (D.S.C. Jan. 8, 2015) ...............................................82

## TABLE OF AUTHORITIES
### (continued)

*Peters v. Aetna Inc.*,
  2 F.4th 199 (4th Cir. 2021) ................................................................ 37

*Plank v. Summers*,
  203 Md. 552 (Md. Ct. App. 1954) ...................................................... 53

*Powers v. Hamilton Cnty. Pub. Def. Comm'n*,
  501 F.3d 592 (6th Cir. 2007) ............................................................. 57

*Reeves v. Case W. Reserve Univ.*,
  2009 WL 3242049 (N.D. Ohio Sept. 30, 2009) ................................. 46

*Rikos v. Procter & Gamble Co.*,
  799 F.3d 497 (6th Cir. 2015) ............................................................. 37

*Russell v. Educ. Comm'n for Foreign Med. Graduates*,
  15 F.4th 259 (3d Cir. 2021) .......................................................... 74, 83

*S. Pac. Co. v. Darnell-Taenzer Lumber Co.*,
  245 U.S. 531 (1918) ........................................................................... 52

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
  821 F.3d 992 (8th Cir. 2016) ........................................................ 37, 44

*Scarcella v. Am. Online, Inc.*,
  11 Misc.3d 19 (N.Y. Sup. Ct. Dec. 28, 2005) ................................... 32

*Searcy v. R.J. Reynolds Tobacco Co.*,
  902 F.3d 1342 (11th Cir. 2018) ......................................................... 90

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ........................................................................... 23

*Sholopa v. Turk Hava Yollari A.O., Inc.*,
  --- F. Supp. 3d ---, 2022 WL 976825 (S.D.N.Y. Mar. 31, 2022) ........... 34

*Silvers v. Sony Pictures Ent., Inc.*,
  402 F.3d 881 (9th Cir. 2005) ........................................................ 22, 23

*Simon v. Philip Morris Inc.*,
  200 F.R.D. 21 (E.D.N.Y. 2001) ........................................................ 90

*Snowden v. CheckPoint Check Cashing*,
  290 F.3d 631 (4th Cir. 2002) ............................................................. 33

*Stern v. Marshall*,
  564 U.S. 462 (2011) ........................................................................... 19

*Stuart v. State Farm Fire & Cas. Co.*,
  910 F.3d 371 (8th Cir. 2018) ............................................................. 57

## TABLE OF AUTHORITIES
### (continued)

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) ................................................................88
*Taylor v. Sturgell*,
  553 U.S. 880 (2008) ...........................................................................73
*Tillman v. Highland Indus., Inc.*,
  2021 WL 4483035 (D.S.C. Sept. 30, 2021) .......................... 82, 85, 86, 88
*TorPharm, Inc. v. Ranbaxy Pharm., Inc.*,
  336 F.3d 1322 (Fed. Cir. 2003) ...........................................................69
*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ...................................................................50, 77
*Traton News, LLC v. Traton Corp.*,
  528 Fed. App'x 525 (6th Cir. 2013).................................................34, 35
*Tsadilas v. Providian Nat'l Bank*,
  13 A.D.3d 190 (N.Y. App. Div. 1st Dep't 2004) ....................................29
*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ........................................................................76
*U1IT4Less Inc. v. FedEx Corp.*,
  2015 WL 3916247 (S.D.N.Y. June 25, 2015).....................................30, 32
*United States v. Abdelshafi*,
  592 F.3d 602 (4th Cir. 2010).................................................................74
*United States v. Thomas*,
  939 F.3d 1121 (10th Cir. 2019).............................................................83
*Utah v. Evans*,
  536 U.S. 452 (2002) ...........................................................................79
*Vance v. DirecTV, LLC*,
  2022 WL 3044653 (N.D. W.Va. Aug. 1, 2022)......................................45
*Ventura Assocs., Inc. v. Int'l Outsourcing Servs., Inc.*,
  2009 WL 691066 (S.D.N.Y. Mar. 17, 2009).........................................53
*Weidman v. Ford Motor Co.*,
  2022 WL 1071289 (E.D. Mich. Apr. 8, 2022) ......................................88
*Zoroastrian Ctr. and Darb-E-Mehr of Met. Washington, D.C. v.*
  *Rustam Guiv Found. of New York*,
  822 F.3d 739 (4th Cir. 2016),...............................................................29

# TABLE OF AUTHORITIES
## (continued)

**Page**

**Statutes**

28 U.S.C. § 2106 ...................................................................58

Lab L § 198-C (2015) ............................................................54

N.Y. C.P.L.R. 4545.................................................................54

N.Y. Gen. Bus. Law § 349 ....................................................57

N.Y. Gen. Bus. Law § 349(a) ................................................56

**Rules**

Fed. R. Civ. P. 23(b)(3) .........................................................26

Fed. R. Civ. P. 23(b)(3)(A) ....................................................87

Fed. R. Civ. P. 23(b)(3)(B)-(C) .............................................26

Fed. R. Civ. P. 23(c)(4) Adv. Committee Notes 1966 Amendment ........75

Fed. R. Civ. P. 81 ..................................................................22

**Treatises**

*Manual for Complex Litigation* § 21.24 (4th ed. 2004) ....................73, 75

**Other Authorities**

Cho, et al., *Optimal Dynamic Hotel Pricing,* Working Paper, 2018.65, 66

Joseph M. Perillo, *The Collateral Source Rule in Contract Case*,
  46 San Diego L. Rev. 705 (2009)...........................................53

Myriam Gilles and Gary Friedman, Rediscovering the Issue Class
  in Mass Tort MDLs, 53 Ga. L. Rev. 1305 (2009) .................90

## **INTRODUCTION**

In 2018, Marriott told hundreds of millions of its customers that they were victims of the largest data breach in history. Marriott minced no words: it admitted that it had allowed hackers to make off with "the crown jewels." Attackers took passports, credit cards, addresses, email addresses, detailed travel schedules, and more. The damage was breathtaking and the cause was common—Marriott and its vendor Accenture did not follow even the most rudimentary security measures, allowing hackers years of free rein inside Marriott's systems.

The cases that followed are now before this Court and are well-suited for class treatment: Marriott made the same uniform promises (express and implied) of adequate data security to every customer while secretly instead providing every customer the exact same inadequate security. And every customer suffered the same fundamental injury when Marriott and Accenture allowed hackers to steal their personal information. The total damage is significant, even if Marriott and Accenture "only" cost each customer ten, fifty, or a few hundred dollars.

Against this backdrop, Plaintiffs respectfully submit that the question before the Court is not particularly close. District Court Judge

Paul W. Grimm issued an extraordinarily careful opinion on a developed record predicated on years of fact discovery and half a dozen expert reports, and Judge Grimm was well within his discretion to conclude that Plaintiffs had shown that state bellwether claims should proceed to trial on a classwide basis.

Defendants' arguments that the District Court erred have no traction. Marriott contends that class members waived the right to proceed in a class action, that it is impossible to ascertain who is in the class, and that Plaintiffs' damages model was insufficient. Accenture adds that the District Court should not have certified an "issues class." None of these claims survives mild scrutiny.

Marriott's lead argument that Plaintiffs purportedly waived their rights to participate in a class action comes too late and wrong on the merits as well. At issue is a contractual clause entitled "Choice of Law and Venue." This clause provides that all litigation must occur individually under New York law in New York. At the outset of this case, Marriott repudiated this same clause, demanding group litigation in Maryland under the laws of numerous states. That alone could end the Court's analysis, but it is worth considering the effect of Marriott's

repudiation: tens of millions of dollars spent on consolidated litigation in Maryland, thousands of hours of work from the District Court and its Special Master, and this appeal. The law does not permit Marriott to treat litigation as a game it cannot lose. And even a cursory examination of this clause reveals it does not apply to the claims at issue here.

Marriott's fallback argument about ascertainability fares no better. The class members are not only ascertainable; all are also in the exact same database that Marriott and Accenture exposed to hackers. Marriott may well assert that a single issue—whether someone was later reimbursed for her stay—is *not* in the database, but this is exactly the type of narrow administrative issue well-suited to class member affidavits or other manageability procedures.

Damages are similarly straightforward. The District Court took the extraordinary step of hiring its own economist so that it could interrogate whether Plaintiffs' model was rigorous and sound. Judge Grimm did not abuse his discretion when he concluded that it was. There's no real question that the model "fits" Plaintiffs' liability theory;

Marriott's "*Comcast*" challenge here is an attempt to relitigate its failed *Daubert* motion under a different label.

Accenture's lone argument is no stronger than the three advanced by Marriott. In particular, Accenture argues that the District Court was not permitted to certify the indisputably common issue of Accenture's liability for jury trial without also certifying damages. Every Circuit to consider that argument—including this one—disagrees. Plaintiffs thus ask this Court to affirm the District Court in full.

## STATEMENT OF THE ISSUES

1.      Whether the District Court properly exercised its discretion by deferring consideration of whether Marriott voluntarily and intentionally abandoned enforcement of its class action waiver where the evidence shows that Marriott repudiated the waiver unambiguously and the waiver did not apply in any event.

2.      Whether the District Court properly exercised its discretion to conclude that it is administratively feasible to identify the class members in its revised class definition limiting the classes to people who were not later reimbursed for their hotel stays.

3.      Whether this Court should decline to reexamine *Daubert* on a Rule 23(f) appeal even when that reexamination is presented under the heading of "*Comcast*."

4.      Whether the District Court was within its discretion to find that certifying negligence issue classes under Rule 23(c)(4) would materially advance the litigation.

## STATEMENT OF THE CASE

On November 30, 2018, Marriott announced that its customers were the victims of one of the largest data breaches in history. JA542. From 2014 to September 2018, attackers accessed a trove of personal information about Marriott's customers. JA543.[1] In one place, the attackers had access to Marriott customers' names, addresses, phone numbers, email addresses, and payment-card information. JA542. They also had access to some customers' passport information, room preferences, travel destinations, and other personal information. SA502. This access turned into theft after the attackers exfiltrated and

---

[1] The database at issue had been operated by a large hotel chain known as Starwood Hotels and Resorts Worldwide, Inc., which Marriott purchased in 2016 (mid-breach) for $12.2 billion. JA542. This brief uses "Marriott" to refer to both Marriott and Starwood.

absconded with the class members' personal information. *Id.* Now, class members are at risk for identity theft and all its attendant harms because of cybercriminals' unfettered access to Marriott's systems for years.

Discovery has shown that Marriott did not meet its contractual promises to provide adequate security. Marriott employees spoke frankly about Marriott's weak security, referring to it as the "cumulative effect" of "having a couple of shots of tequila . . . every night for years," making Marriott "vulnerable to [a] weak defense in the court of law in case of a breach." SA509-510, SA514. The United Kingdom Information Compliance Office ("ICO") investigated the breach and determined that it stemmed from four key security failures: (a) the lack of multifactor authentication; (b) the presence of overprivileged accounts; (c) the lack of adequate systems monitoring; and (d) the failure to encrypt personal information.[2]

---

[2] Plaintiffs' unrebutted liability expert, Mary Frantz, identified similar issues. SA510-511.

## A. <u>Multifactor Authentication</u>

Multifactor authentication requires users to enter more than a password to access sensitive information. This technology is not new. SA511. Marriott discussed adding multifactor authentication for years, it was warned by auditors about the risk of its lack of multifactor authentication in 2017, and Accenture knew that multifactor authentication was not enabled on all the accounts that had administrative privileges to the main customer database at issue in this litigation—i.e. the "crown jewels." SA512. This basic technology may well have stopped the attack in its tracks. *See* SA513. And it was neither costly nor disruptive to employ; days after the data breach, Marriott implemented multifactor authentication for ███ users for less than ██████ and without any business interference. *Id.*

## B. <u>Overprivileged Accounts</u>

Marriott also provided far too many individuals broad privileges to access extremely sensitive information. SA513. Limiting privileges mitigates the risks that even if an attacker obtains a particular user's credentials, their access is limited. Unsurprisingly, auditors warned Marriott and Accenture to fix this rudimentary security issue. SA514. But for years, the project stalled. *Id.*

### C.    Poor System Monitoring

Marriott and Accenture also failed to properly monitor Marriott's systems for attackers. SA515. In the words of the ICO, "that Marriott did not detect the Attack . . . is indicative of Marriott failing regularly to test, assess, and evaluate the effectiveness of its security measures." *Id.* Nor did Marriott block risks—its system could only alert it to suspicious activity. *Id.*

### D.    Failure to Encrypt Personal Identifying Information

Defendants did not generally encrypt their customers' sensitive personal information. Instead, they limited any encryption to credit card data and some (but not all) passport numbers. SA517. And the limited encryption was deficient, ██████████████████████ ███████████, were able to decrypt at least one customer's credit card (and likely others). *Id.* If any reasonable doubts about the attackers' criminal motives remained, that act alone shows the attackers' nefarious intentions for the data. After the breach, Marriott found a suspicious file on its systems that *included portions of a decryption program and the master key*. SA518. Marriott failed to explain who or why any legitimate user would have attempted this decryption

-8-

maneuver and the only plausible explanation is that the attackers were decrypting Marriott's "secure" data. *Id.*

## II.  PROCEDURAL BACKGROUND

### A.  The at-issue contract—the "SPG Terms."

During the relevant period, Marriott customers were eligible to participate in the Starwood Preferred Guest ("SPG") Rewards Program. As a hotel rewards program, the SPG Terms & Conditions controlled "how members [would] manage their accounts, book reservations, achieve elite status, earn and redeem points, [address] the expiration of points as well as the ability to use points with third-party partners such as airline frequent flyer programs." JA708. These terms were in effect at the time of the breach. Marriott retained the unilateral right to "change the SPG Program and the SPG Program Terms at any time, for any reason and without notice." JA724, at § 13.1. The SPG Terms also explicitly incorporate the "Starwood Privacy Statement," which in turn states that Marriott "will take appropriate steps to ensure that your personal data is protected and handled as described in this Privacy Statement." SA528. These SPG Terms were not negotiated by any individual class member, were drafted by Marriott, and govern "any disputes arising out of or related to the SPG Program or these SPG

Program Terms." JA727, at § 13.21. Plaintiffs' breach of contract claims allege that Marriott breached this contract promising to protect personal data.

### B. Marriott asked the JPML to create aggregate litigation in Maryland and sought application of the law of many different states in that proceeding.

In late 2018, after Marriott announced the data breach, customers filed lawsuits around the country, including in New York. Marriott asked the JPML to transfer all the cases to its home state of Maryland (not New York). SA3-4. The JPML agreed, and the cases were consolidated before Judge Paul W. Grimm in the District of Maryland. Plaintiffs added Accenture as a defendant in the consolidated amended complaint after learning of its IT-security-provider role. JA129-500.

At status conferences in April and May 2019, the parties and the District Court discussed how to manage the MDL. The parties jointly suggested a bellwether approach using plaintiffs from several states and claims under those various states' laws. SA222. In its motion to dismiss, Marriott relegated to a footnote "that neither party was waiving any arguments it may have regarding choice of law." SA236, at n.1. It did not mention, however, that it believed that there was a class waiver clause that could moot the entire bellwether process or

-10-

otherwise assert that New York law applied exclusively. *Id*. Nor did

Marriott bring up a class waiver during the bellwether negotiations

before the District Court. *See* SA38-39, SA74, SA75 (Apr. 5, 2019 Hr'g

Tr.); SA216 (CMO #3, ordering parties to select bellwether claims); *see*

*generally* SA102-215 (Apr. 29, 2019 Hr'g Tr.).[3]

### C.   **Class Certification Briefing and Expert Reports**

More than two years after that first status conference, Plaintiffs

moved to certify: (1) negligence classes in Florida, Georgia, Maryland,

and Connecticut on behalf of all persons who gave personal information

to Marriott that was compromised in the breach; (2) consumer

protection classes against Marriott under state statutes in California,

Maryland, New York, and Michigan on behalf of persons who paid for a

stay at a Marriott property; and (3) contract classes against Marriott

under Maryland and New York law. SA505-508. For the last group,

Plaintiffs proposed a subclass of only people who "paid for a stay."

SA508. Plaintiffs' motion was supported by expert reports from liability

---

[3] Marriott also did not move to sever the claims of SPG members bound
by the SPG agreement nor seek to dismiss or strike class allegations.

expert Mary Frantz, damages expert Dr. Jeffrey T. Prince, and

consumer survey expert Sarah Butler. SA504-505.

A few months later, after deposing Plaintiffs' experts, Defendants

opposed Plaintiffs' motion for class certification. JA618. In support of

their opposition, they offered Dr. Catherine Tucker's expert report

rebutting Dr. Prince. *See generally* JA618. But Defendants did not rebut

Ms. Frantz's liability report.[4]

### D. The Class Certification Order and *Daubert* of Dr. Prince

The next year, the District Court issued two orders, one on class

certification and one on Marriott's *Daubert* motion for Dr. Prince.

JA501, JA539, JA541, JA614. As relevant here, the District Court

certified three damages classes under two theories of liability—breach

of contract and three state consumer protection statutes—and certified

---

[4] Significant damages expert work continued for the next six months. JA502-503 (detailing expert work). On October 12, 2021, Dr. Prince and Ms. Butler filed rebuttal reports. *Id.* Thereafter, the Court permitted Marriott to take another deposition of Dr. Prince, overseen by the Special Master, on December 23, 2021. JA503. On February 18, 2022, Marriott was permitted to submit a supplemental expert report from Dr. Tucker. *Id.* Finally, on March 21, 2022, the Court held a "tutorial" wherein Judge Grimm asked questions to Dr. Prince and Dr. Tucker for six hours to better understand their respective positions, assisted by a separate economist to which both parties consented (and compensated). JA503-504.

two negligence per se issue classes. JA610-612. In its opinion, at
Defendants' urging, the District Court blue penciled Plaintiffs' class
definitions to only include "persons who bore the economic burden for
hotel room(s);" i.e., people who were not reimbursed for their stays from
their employer. JA547-548, JA551.

The District Court's opinion considered and addressed the subjects
of Marriott's appeal in depth. The Court rejected Marriott's class action
waiver argument because it would not defeat predominance, remarking
that "Plaintiffs raise a strong argument that Defendants have waived
their right to enforce the class action waiver." JA565, at n.26; JA580. It
similarly rejected Marriott's ascertainability arguments, noting that
objective facts could be determined by, for example, looking to
Marriott's database to get the "names and contact information for
virtually all class members." JA554.[5] And while it excluded an
alternative damages model, it accepted Dr. Prince's "benefit of the
bargain" model after conducting a hearing during which the District

---

[5] And with respect to whether someone was ultimately reimbursed by
his or her employer, the District Court noted that "affidavits can and
will be cross checked against the NDS database, which can confirm
whether a reservation was made, the dates of that reservation, the
payment card used, etc." JA556.

Court was assisted by a court-appointed independent economist. JA591.

The District Court also certified two issue classes under Rule 23(c)(4)

against Accenture and Marriott, holding that whether each had a duty

to Plaintiffs and breached that duty were classwide issues (neither

Marriott nor Accenture contended otherwise). JA504, JA611.

Defendants then appealed under Rule 23(f). 22-181 (4th Cir. July

14, 2022).

## SUMMARY OF ARGUMENT

The Court should affirm the District Court's certification order.

I.    The District Court was within its discretion to reserve

Marriott's "class waiver" argument because discovery is still open and

because that argument does not apply to most claims. But even if the

District Court should have resolved the issue now, it is clear that

Marriott voluntarily and intentionally abandoned and waived

enforcement of the waiver.

II.    The District Court did not err in finding that it is

administratively feasible to identify class members. Indeed, Marriott

concedes that the class definitions turn on objective criteria and does

not contest that its own records allow identification of almost every

-14-

class attribute. The only issues that remain are whether a customer was later reimbursed, and courts hold sensibly that customer affidavits or other manageability tools can resolve that question. In any event, to the extent there are concerns about ascertainability of who paid, this Court could either refine the class definition to include all customers who paid for their stay or instruct the District Court to do so on remand, and Marriott's database contains a comprehensive list of those individuals.

III.   The District Court correctly certified Plaintiffs' breach of contract and consumer protection statute classes based on Dr. Prince's benefit of the bargain damages model. Because that model matches Plaintiffs' damages theories, it satisfies *Comcast*'s requirements. The Court should reject Marriott's attempts at a renewed *Daubert* challenge through this Rule 23(f) appeal. The District Court properly determined that Dr. Prince's model was reliable.

IV.   The District Court correctly certified negligence issue classes because they will materially advance the litigation. Defendants' argument about Rule 23(c)(4) is inconsistent with this Court's precedent

(and the precedent of essentially every other court to consider the issue) and can be rejected for that reason alone.

## STANDARD OF REVIEW

At the Circuit Court level, "review of class certification issues is deferential, cognizant of both the considerable advantages that our district court colleagues possess in managing complex litigation and the need to afford them some latitude in bringing that expertise to bear." *Krakauer v. Dish Network L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019).

## ARGUMENT

## I.    MARRIOTT'S "CHOICE OF LAW AND VENUE" CLAUSE DOES NOT BAR THIS CLASS LITIGATION.

Marriott claims that the Court must decide any class action waiver issue now, even though the District Court reserved a definitive ruling for the close of discovery and rightly questioned the merits of such a defense.[6] Although the District Court has discretion to manage its docket in this way, there is also little question that Marriott cannot enforce its class action waiver in this litigation. Marriott intentionally

---

[6] It is well-established "that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016).

repudiated the Choice of Law and Venue clause, and that clause would have been unenforceable in any event.

### A.   Marriott repudiated every provision of its "Choice of Law and Venue" clause, including the class action waiver.

The class action waiver at issue in this case is included in a Starwood Loyalty Program clause entitled "Choice of Law and Venue." This clause provides that disputes must be: (1) individual, (2) under New York law, and (3) in New York. It states in relevant part:

> Any disputes arising out of or related to the SPG Program or these SPG Program Terms will be *handled individually* without any class action, and will be *governed by, construed in accordance with the laws of the State of New York*, United States, without regard to its conflict of law rules. The exclusive jurisdiction for any claim or action arising out of or relating to these SPG Program Terms or the SPG Program *may be filed only in the state or federal courts located in the State of New York*, United States.

JA727 § 13.21 (emphases added). But from day one of this four-year long litigation, Marriott advocated for: (1) consolidated litigation (not individual litigation); (2) in Maryland (not New York); and (3) under multiple states' laws (not New York's law). It cannot attempt to selectively enforce one piece of this provision concerning class action waivers now. *See Kortright Cap. Partners LP v. Investcorp Inv. Advisers*

*Ltd.*, 257 F. Supp. 3d 348, 359 (S.D.N.Y. 2017); *cf.* SA14 (transferring two cases filed in New York to Maryland).

Marriott presumably declined to enforce its Choice of Law and Venue clause because that repudiation initially provided a litigation advantage. Marriott told the JPML that consolidated litigation was sensible because it would "prevent duplicative discovery and inconsistent pretrial rulings[.]" SA4. It sought litigation in Maryland because it was headquartered there and "relevant witnesses and documents likely will be found there." SA3[7] Marriott then participated in a multi-year, bellwether process involving the law of a dozen states, affirmatively asking the District Court to resolve claims from states other than New York under the law of those states, JA565, perhaps because New York law includes statutory penalties and most other states do not.

---

[7] During oral argument on Plaintiffs' motion for class certification, Marriott noted that the JPML has the power to consolidate a case despite a forum-selection clause. SA434. This does not legitimize, however, Marriott's strategy of affirmatively requesting consolidation in a forum contrary to its purported contractual terms. Marriott was the only defendant at the time. The JPML would have surely placed substantial weight on any alleged forum-selection clause if Marriott had indicated any desire to attempt to enforce it.

Now, years and millions of dollars later, Marriott argues that it should be able to enforce just one portion of the Choice of Law and Venue clause because its strategic gambit of pursuing multi-state litigation in Maryland is not going as well as it had hoped. But Marriott cannot undo years of judicial work because it is now not happy with the outcome of its litigation strategy. *See Stern v. Marshall*, 564 U.S. 462, 482 (2011) (The consequences of a "litigant . . . 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor—can be particularly severe." (citations omitted)).

A case from the Southern District of New York is instructive. *See Am. Int'l Grp. Eur. S.A. (Italy) v. Franco Vago Int'l, Inc.*, 756 F. Supp. 2d 369, 380 (S.D.N.Y. 2010). That court found that the defendant waived its right to enforce a forum-selection clause after it failed to assert the clause "during the first eleven months" of the litigation. *See id.* And in that case, the defendant merely participated in the litigation by "filing several affidavits, affirmations, and memoranda of law[.]" *Id.* Marriott has done much more: it pursued a comprehensive litigation strategy for years that conflicts with each provision of the venue clause.

-19-

Marriott nevertheless states that "it raised the class waiver at the first possible opportunity (in its Answer) and then fully pressed the defense at exactly the right time (class certification)." Marriott Br. at 42. This is inaccurate; as detailed above, Marriott continuously and expressly repudiated this clause by: (1) successfully arguing that the JPML should join many plaintiffs together in one case; (2) successfully arguing that these cases should proceed in Maryland; and (3) asking the Maryland District Court to resolve claims under the laws of states other than New York.[8]

---

[8] Similarly inaccurate was Marriott's claim in the District Court that it did not know that some Plaintiffs were relying on the contract (the "SPG Terms") that contained the Choice of Law and Venue Clause. Marriott should not claim that it did not know that at least some Plaintiffs were possibly subject to the SPG Terms. SA432 ("[T]he argument as we make it now is because the very first time in this case that Plaintiffs made this about a single uniform contract was in their motion for class certification[.]"). For example, Plaintiffs Linda Wu and Roger Cullen expressly alleged SPG membership. JA162, JA166-167. And the Second Amended Complaint made several general allegations about the SPG Program and its contractual terms. JA246-247. Yet Marriott admitted that venue was proper in its answer. SA280, at ¶ 11. In stark contrast to its litigation tactics in this case, in a District of Hawaii case during the pendency of this case, Marriott moved to dismiss or sever claims based on the SPG Terms. *See Martin v. Marriott Int'l, Inc.*, 2019 WL 4201260 (D. Haw. July 12, 2019) (Trial Motion).

Marriott should not be able to reject the clause when Marriott finds it strategically advantageous at the outset of litigation and then seek to invoke just one portion of the clause three years later. To allow so would encourage gamesmanship and waste judicial resources. And although prejudice generally is not material to a court's consideration of whether a party has repudiated a contractual clause, out of an abundance of caution Plaintiffs note that they have expended enormous resources litigating this case. *Cf. Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713-14 (2022) (holding prejudice generally not required to find waiver). Plaintiffs have, among other things:

- Produced 35,274 documents;

- Reviewed millions of pages of documents produced by Defendants and third parties;

- Conducted 21 depositions, including expert depositions;

- Defended 18 depositions spanning more than 84 hours;

- Retained and compensated multiple experts;

- Compensated the District Court-hired economist (as did Marriott and Accenture); and

- Worked extensively with a Special Master to handle dozens of discovery disputes (also compensated by the Parties).

Marriott cannot now successfully embrace the Choice of Law and Venue clause it so clearly rejected repeatedly over the past four years.

## B.  Marriott's class action waiver is unenforceable.

Even if Marriott had not repudiated the Choice of Law and Venue clause, however, it would be of no relevance to this litigation. That is so because its provision mandating individual litigation is not enforceable. A party cannot contract around the federal rules so the clause fails procedurally; New York courts would not enforce the clause in any event, so it fails as a matter of substance; and the clause cannot apply to most of Plaintiffs' claims by its plain terms. The clause simply has no effect here.

## 1.  Marriott's class action waiver is not enforceable in federal court.

The first problem with Marriott's class action waiver is that it fails as a matter of procedure in federal court. After all, the Rules govern "except as stated in Rule 81." Fed. R. Civ. P. 1. And Rule 81 does not carve out an exception for contractual agreements. *See* Fed. R. Civ. P. 81; *see also Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (*en banc*) (explaining that "[there is a] presumption that when a statute designates certain persons, things, or manners of

-22-

operation, all omissions should be understood as exclusions" (cleaned up)). As a result, each federal rule must be applied to its full extent, including Rule 23.

### a. Rule 23 does not contain an exception for private contracts.

Rule 23 provides that "[a] class action may be maintained" if certain prerequisites are met. The lack of a class action waiver is not one of those prerequisites. *See Silvers*, 402 F.3d at 885. If those requirements are met, a court must certify an appropriate class.

In *Shady Grove*, for example, the Supreme Court made clear that Rule 23 sets out a "categorical rule." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). In that case, the Supreme Court considered whether a New York rule prohibiting class actions in suits for statutory damages under state law "preclude[d] a federal district court sitting in diversity from entertaining a class action under [Rule] 23." *Id*. at 396. The plurality answered no:

> The question in dispute is whether Shady Grove's suit may proceed as a class action. Rule 23 provides an answer. It states that "[a]class action may be maintained" if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b). By its terms this creates a categorical rule entitling a plaintiff whose suit meets

-23-

the specified criteria to pursue his claim as a class action. (The Federal Rules regularly use "may" to confer categorical permission, as do federal statutes that establish procedural entitlements.) Thus, Rule 23 provides a one-size-fits-all formula for deciding the class-action question.

*Id.* at 398-99 (citations omitted). Because the New York statute "attempts to answer the same question," the Court explained, "it cannot apply in diversity suits." *Id*. at 399. If the federal rules control over a statute enacted by a sovereign state to govern claims under its own laws, they also control over Marriott's contract of adhesion.

> **b.    Private contractual agreements cannot preclude the District Court from exercising the power given to it by the federal procedural rules.**

Marriott's private agreement cannot preclude the District Court from exercising the power given to it by the federal procedural rules. The Supreme Court's decision in *Atlantic Construction* is illustrative. In that case, the Court considered two questions: (1) whether a valid forum-selection clause made a different forum "wrong" or "improper" under 28 U.S.C. § 1406, and so required dismissal; and (2) whether a valid forum-selection clause requires transfer under 28 U.S.C. § 1404 to the contractually-selected forum. *Atlantic Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55-66 (2013).

First, the Court held that "[w]hether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." *Id.* at 55. The Court emphasized that the venue statute by its terms applies to "*all civil actions*" with no exceptions. *Id.* (quoting 28 U.S.C. § 1391). Just so here: Rule 23, like all federal rules, applies to "all civil actions," with no exception for where a contract says otherwise. Fed. R. Civ. P. 1.

Second, the Court held that "the clause may be enforced through a motion to transfer under § 1404(a)," but with a caveat. *Atlantic Marine*, 571 U.S. at 59. A valid forum-selection clause precludes a court from relying on "private interests," because "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64. But "a district court may [still] consider arguments about public-interest factors," such as "court congestion," the "local interest in having localized controversies decided at home," and familiarity with the law. *Id.* at 62 n.6 & 64.

Rule 23 is not merely a procedural tool for the benefit of the named parties. To the contrary, it gives the court the authority—and the obligation—to determine the optimal "method[] for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The inquiry necessarily requires courts to account for "the extent and nature of any litigation concerning the controversy already begun by or against class members" and "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(B)-(C).

These considerations sound in the public interest rather than merely the private benefit to the parties before the court, just like the "public-interest" considerations applicable to a motion to transfer that the Supreme Court in *Atlantic Construction* held could not be constrained by a forum-selection clause. *Id.* at 62 & 64. Here, for example, the District Court would be required to consider the effect on the judicial system and the orderly administration of justice of countless individual actions raising the same questions to be adjudicated repeatedly. *See, e.g.*, *Klay v. Humana, Inc.*, 382 F.3d 1241, 1270 (11th Cir. 2004) ("Even if sufficient incentive existed for individual claimants

to pursue their claims separately, class action treatment is far superior to having the same claims litigated repeatedly, wasting valuable judicial resources." (citation omitted)).[9]

This is no hypothetical: there are already a dozen lawsuits on behalf of many plaintiffs on file from this data breach. And there could be many more—the data breach affected over 100 million people. Marriott cannot unilaterally decide to flood the federal courts with litigation. Instead, the federal rules mandate that courts must determine the most efficient and just way to manage these cases.

### c. **Marriott elected to proceed in a federal forum so they necessarily accede to the Federal Rules.**

Marriott was not forced into a federal forum; its contract permits the use of either federal or state courts. And it admitted that venue was proper in the District of Maryland. SA280. Perhaps this case would be different if it were somehow forced into federal court against its will. For example, if the SPG Terms included an arbitration clause (they do not), then the entire action would be subject to individual arbitration by operation of the Federal Arbitration Act. *See AT&T Mobility LLC v.*

---

[9] *Abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

*Concepcion*, 563 U.S. 333, 345-51 (2011). But here, Marriott's contract expressly contemplates a federal judicial forum. And with the federal forum comes the Federal Rules. Nothing in the Rules—or any other authority—permits a party to enjoy the benefits of the taxpayer-funded federal adjudicatory system, while opting out of rules the party does not like.

A contrary rule would have absurd results. Could contracting parties agree, pre-dispute, that any litigation will be adjudicated in federal court but that Rule 16 does not apply, and instead, the case schedule is predetermined? Could a defendant bargain for the right not to answer a complaint in a federal action, contrary to Rule 12, or avoid sanctions under Rule 11? Of course not.

### 2. **<u>Marriott's class action waiver is unenforceable under New York law.</u>**

Out of an abundance of caution, Plaintiffs note that New York courts would not enforce Marriott's class action waiver, even setting aside the Federal Rules. This is so because New York courts would consider it an exculpatory contract of adhesion in any event, both procedurally and substantively unfair. *See Gillman v. Chase Manhattan*

*Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988) (defining procedural and substantive unconscionability).[10]

### a.    Marriott's contract of adhesion was procedurally unconscionable.

Like all contracts of adhesion, the SPG Terms are procedurally unconscionable unless a party can opt-out without adverse consequences. *See, e.g.*, *Tsadilas v. Providian Nat'l Bank*, 13 A.D.3d 190, 191 (N.Y. App. Div. 2004) (no procedural unconscionability when party can opt-out "without any adverse consequences"); *Brennan v. Bally Total Fitness*, 153 F. Supp. 2d 408, 416 (S.D.N.Y. 2001) ("An unconscionable contract of adhesion is not a valid contract."). Marriott drafted the terms and presented them in clickwrap without any ability for consumers to negotiate them. *Accord JetBlue Airways Corp. v.*

---

[10] Marriott argues that Plaintiffs waived their unconscionability argument by not arguing it at the District Court. That is not true. Plaintiffs argued at the class certification hearing that if the venue clause applied, it was unenforceable. SA468-470 (stating that the venue clause is both substantively and procedurally unconscionable). This argument is also remarkable: Marriott is trying to handcuff Plaintiffs from defending an issue that the District Court *did not reach on the merits* and asks the Court to finally decide the issue without the benefit of full argument. Marriott's only support, *Zoroastrian Ctr. and Darb-E-Mehr of Met. Washington, D.C. v. Rustam Guiv Found. of New York*, 822 F.3d 739 (4th Cir. 2016), did not involve an interlocutory appeal and involved an issue the District Court had actually reached. *Id.* at 743-44.

*Stephenson*, 932 N.Y.S.2d 761 (N.Y. Sup. 2010) (noting "equal

bargaining power" did not exist between JetBlue and its pilots), *aff'd*

931 N.Y.S.2d 284 (N.Y. App. Div. 2011). And Marriott reserved the

right to alter the terms of the contract unilaterally at any time and

without notice. JA724, at §13.1 ("Starwood may change the SPG

Program and the SPG Program Terms at any time, for any reason, and

without notice."). New York courts find these consumer contracts

procedurally unconscionable. *See*, *e.g.*, *In re Currency Conversion Fee

Antitrust Litig.*, 361 F. Supp. 2d 237, 250 (S.D.N.Y. 2005) ("Adhesion

contracts tainted by unconscionability are unenforceable."); *OConner v.

Agilant Solutions, Inc.*, 444 F. Supp. 3d 593, 603 (S.D.N.Y. 2020)

(arbitration clause unenforceable); *McCormick v. Resurrection Homes*,

956 N.Y.S.2d 844, 851 (N.Y. Civ. Ct. 2012) (residential agreement is

unconscionable contract of adhesion).[11]

---

[11] Marriott's cases are not to the contrary. Those cases involved sophisticated businesses and were distinguished on that ground. *See U1IT4Less Inc. v. FedEx Corp.*, 2015 WL 3916247, at *4 (S.D.N.Y. June 25, 2015) ("Plaintiff is a business involved in the selling and shipment of merchandise; it is not an individual selling a small quantity of goods it sold on eBay. Plaintiff . . . admits to having the time and business savvy to review the contract before agreeing to it."); *Korea Week, Inc. v. Got Capital, LLC*, 2016 WL 3049490, at *10 n.77 (E.D. Pa. May 27, 2016) ("Plaintiffs here . . . are not consumers.").

## b. **The class waiver is substantively unconscionable.**

Marriott's contract imposes "overly harsh or one-sided terms" that are also substantively unconscionable. *Matter of Frankel v. Citicorp Ins. Servs., Inc.*, 80 A.D.3d 280, 289 (N.Y. App. Div. 2010) (cleaned up). That is, its standalone class action waiver effectively forecloses relief. Nor does the contract include an arbitration clause. It is therefore not shrouded in precedent expressing a preference for arbitration. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019) ("ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration").

Marriott acknowledges implicitly that the standalone class action waiver creates an insurmountable barrier to individual relief after a data breach. It contends, for example, that "full-blown merits litigation … will entail years of discovery." Marriott Br. at 37. It is not necessarily right about what remains *here*, but it is accurate that the parties have spent many millions to date on discovery issues. Such costs would have been prohibitively high if a plaintiff must proceed on her own. *Cf. Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The

-31-

*realistic* alternative to a class action is not 17 million individual suits, but zero individual suits[.]" (emphasis in original)).

Marriott's only response is that class action waivers are not *always* unconscionable. True enough, they are not even *procedurally* unconscionable when applied to a business that admits it had "the time and business savvy to review the contract before agreeing to it," for example. *U1IT4Less*, 2015 WL 3916247, at *4. But New York courts find substantive unconscionability when a class action waiver effectively precludes relief as it does here. *See, e.g., Scarcella v. Am. Online, Inc.*, 11 Misc.3d 19, 20 (N.Y. Sup. Ct. Dec. 28, 2005); *Licitra v. Gateway, Inc.*, 189 Misc.2d 721, 727 (N.Y. Civ. Ct. Oct. 18, 2001) (same).[12]

Marriott's cases from inside this Circuit do not advance its cause. Marriott Br. at 41 (collecting cases). In each, the class action waiver was tethered to an arbitration agreement. That has two consequences. First, arbitration agreements generally insulate class action waivers

---

[12] Marriott cites *Horton v. Dow Jones & Co., Inc.*, 804 Fed. App'x 81, 84 (2d Cir. 2020), but that unpublished decision has no persuasive value as it only held that a class action waiver, *without more*, is not unconscionable. It did not analyze whether that contract, like Marriott's here, effectively foreclosed relief.

against unconscionability. *See*, *e.g.*, *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013). Second, courts hold that arbitration can decrease substantive unconscionability by providing a cheap and informal process for a plaintiff to pursue her rights. In *Snowden*, for example, the Court highlighted the plaintiff-friendly elements of arbitration like the potential for (only) the plaintiff to recover attorneys' fees. *See Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002) (upholding class action waiver tied to an arbitration agreement when the plaintiff could collect attorneys' fees). But here, Marriott has engaged in scorched-earth litigation for years, seeking discovery from Plaintiffs' financial institutions, and insisting that their devices be searched and forensically-imaged. SA524-525. The arbitration cases are not applicable.

C.    **The Choice of Law and Venue clause cannot apply to Plaintiffs' tort and consumer fraud claims.**

Even if Marriott had not repudiated the class waiver, and the Court finds that waiver could apply in federal court, and that waiver were substantively enforceable under New York law, it still could apply only to Plaintiffs' contract claims. But the language of the clause limits its application to particular areas not at issue in this case.

The Choice of Law and Venue clause only applies to "disputes arising out of or related to the SPG Program." JA727. It will therefore only touch claims that "have a significant relationship" to the SPG Program. *Traton News, LLC v. Traton Corp.*, 528 Fed. App'x 525, 529 (6th Cir. 2013) (unpublished). And neither Plaintiffs' consumer fraud nor tort claims have any such relationship. Instead, they arise out of and relate to Marriott's deficient security practices.

The consumer fraud and tort claims, indeed, do not even mention the SPG Program.[13] This case is indistinguishable from the many others that have rejected attempts to "bootstrap" independent claims to contract claims. *Gamble v. New England Auto Fin., Inc.*, 735 F. App'x 664, 667 (11th Cir. 2018); *see also, e.g.*, *Traton*, 528 Fed. App'x at 530; *Sholopa v. Turk Hava Yollari A.O., Inc.*, --- F. Supp. 3d ---, 2022 WL 976825, at *3 (S.D.N.Y. Mar. 31, 2022). The Choice of Law and Venue clause cannot impact Plaintiffs' tort and statutory fraud claims.[14]

---

[13] *See* JA240-243 (Negligence), JA243-244 (Negligence Per Se), JA255-259 (Maryland Consumer Protection Act), JA276-279 (California Unfair Competition Law), JA394-397 (New York General Business Law).
[14] All the more so because Marriott attempted to argue in the District Court that it did not even know the Choice of Law and Venue clause could apply until Plaintiffs moved for class certification of their contract claims. SA432.

Even so, Marriott now tries to sweep up these claims through a broad reading of its clause. For support, it eagerly highlights cases interpreting arbitration agreements. Marriott Br. at 39-40. Those cases are irrelevant. Unlike arbitration agreements, there is no federal law indicating a preference for class action waivers. *Cf. Traton*, 528 Fed. App'x at 530 (emphasizing the principle that arbitration agreements must be read favorably, but noting that forum selection clauses do not receive the same treatment). And general contract rules dictate that this contract of adhesion should be interpreted narrowly. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (N.Y. 1985) ("[I]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language."). Accordingly, if the SPG Terms even did potentially apply here, they would only apply to Plaintiffs' breach of contract claims.

## II.    THE DISTRICT COURT'S CLASSES ARE ASCERTAINABLE.

Marriott next contends that the classes are not ascertainable enough for class certification. An ascertainable class is one that is defined by objective criteria, provided that it is administratively feasible

to identify people who meet those criteria. *EQT Prod. Co. v. Adair*, 764

F.3d 347, 358 (4th Cir. 2014). Marriott concedes that the class

definitions are objective. It contends, however, that it is not

administratively feasible to determine who bore the economic burden

for a hotel room because some people are reimbursed for their hotel

stays.[15]

But Marriott is wrong. Marriott's records identify every potential

class member and almost every criterion for class membership. And for

the one remaining criterion not identified in Marriott's records,

procedures exist to identify such class members. This is more than

enough.

## A.    <u>Marriott has misunderstood the law.</u>

One point bears emphasis at the outset. Marriott provided an

inaccurate picture of the law. Most Circuits reject administrative

feasibility entirely: they reason, among other things, that the text of

Rule 23 simply does not require it.[16] Among those Circuits to now reject

---

[15] If Marriott is correct, no hospitality or travel company could ever be
subject to class litigation. Such cases *always* involve some element of
reimbursement.

[16] *See Mullins v. Direct Digit., LLC*, 795 F.3d at 659-72 (7th Cir. 2015);
*In re Petrobras Sec.*, 862 F.3d 250, 265-69 (2d Cir. 2017); *Rikos v.*

administrative feasibility are the Eleventh and Second.  This is relevant because Marriott mistakenly highlights *Karhu* (Eleventh) and references *Brecher* (Second), apparently unaware that the Eleventh Circuit abandoned administrative feasibility in *Cherry* as did the Second Circuit in *Petrobras*. Marriott also showcases three Third Circuit decisions—*Carrera*, *Marcus*, and *Hayes*—but misses that the Third Circuit has since retreated from strict administrative feasibility in *City Select*, *Hargrove*, and *Kelly*.

The change in the law since *EQT* may be one reason that, in the almost decade following that opinion, this Court has not reversed a single class certification decision because of a lack of ascertainability. In fact, it recently reversed and admonished a district court for applying ascertainability "too rigidly." *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021). Plaintiffs respectfully ask this Court to reject Marriott's invitation to do so now.

---

*Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015); *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016); *Briseño, v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123-33 (9th Cir. 2017); *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021).

### B. **Marriott's records contain the names of all potential class members and most of their identifying characteristics.**

Even setting aside that Marriott misunderstands the law in other Circuits, its administrative feasibility arguments miss the forest for the trees. Marriott asserts that the classes are not administratively feasible for only one reason: it is too hard to determine whether someone was reimbursed for his or her hotel stay.[17] The District Court's definitions, however, turn on far more than just who bore the economic burden for a room. And Marriott's own records can identify every other aspect of class membership. This alone defeats its claims that these classes lack administrative feasibility.

Of particular relevance, "Marriott's database contains the names and contact information for virtually all class members." JA554. Marriott also keeps extensive records of customer email addresses, contact information, credit card and payment information, hotel-stay information, and loyalty program data. *See id.* This information, in

---

[17] Because Marriott's database shows whether someone paid with a personal or corporate credit card, there is no real debate that it is generally administratively feasible to determine whether someone paid Marriott with his or her own money in the first instance: the question Marriott raises is primarily about reimbursement.

turn, can show: (1) where a customer resides; (2) whether a customer is an SPG member; (3) whether the customer made a reservation from July 28, 2014, to November 30, 2018; (4) whether the customer had her data stolen; and (5) the payment method used to pay for the hotel stay. *See Krakauer*, 925 F.3d at 658 (defendant's record "showed when calls were placed and whether the call went through"). Marriott's extensive records thus answer nearly every single question for ascertaining class membership.[18] All that remains to ascertain is whether a customer bore the economic burden for a hotel room.

Marriott's reliance on *EQT Prod Co.* is misplaced. First, unlike here, the records in *EQT* did *not* provide a practical starting point for determining class membership. In that case, the plaintiffs claimed that the defendants "unlawfully deprived the class members of royalty payments from the production of coalbed methane gas in Virginia." *EQT*, 764 F.3d at 352. Because ownership was not "static [after defendants] first prepared the ownership schedules," the Court held

---

[18] Like other cases involving travel and hospitality companies, Marriott's vast data collection supports administrative feasibility. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 691-92 (N.D. Ga. 2016) (airline customers ascertainable); *Cox v. Spirit Airlines, Inc.*, 341 F.R.D. 349, 372, (E.D.N.Y. 2022) (same).

that the schedules could not "aid a court in ascertaining those class members who obtained their interest in the gas estates after the schedules were first prepared." *Id*. at 359; *see also Brecher v. Republic of Arg.*, 806 F.3d 22, 26 (2d Cir. 2015) (similar). Here, every potential class member will appear in Marriott's database. And no potential class member could be missing from the database.

Second, in *EQT*, the only important class characteristic for determining the merits of an individual's claim required settling "numerous heirship, intestacy, and title-defect issues[.]" 764 F.3d at 359. It does not require a lawyer to decide who eventually paid for a hotel room in this litigation. *EQT* does not support Marriott's administrative feasibility claims.

## C.    **The District Court outlined an administratively feasible plan for determining class members.**

The District Court developed a reasonable plan for determining who bore the economic burden for a hotel room following trial. It explained that it can use a combination of Marriott's records, customer records, and customer affidavits. Although similar processes have been universally accepted under analogous circumstances, Marriott both

contests the use of more than one record to determine class membership and challenges the use of customer affidavits.

### 1.   <u>Plaintiffs can rely on multiple records to show class membership.</u>

Marriott first faults the District Court for relying on more than one record. Marriott says that if there is "no single record" showing class membership, there can be no class action. But Marriott mistakes convenience for feasibility. Even the Third Circuit (the originator of administrative feasibility) rejected a defendant's argument that individual file review and the crossmatching of many records violated the requirement. It held:

> To the extent [Defendant's] objection is to the number of records that must be individually reviewed, that is essentially an objection to the size of the class, which . . . is not a reason to deny class certification. To hold otherwise would be to categorically preclude class actions where defendants purportedly harmed too many people, which would 'seriously undermine the purpose' of a class action to 'vindicate meritorious individual claims in an efficient manner.'

*Kelly v. RealPage, Inc.*, 47 F.4th 202, 224-25 (3d Cir. 2022); *see also Frey v. First Nat'l Bank Sw.*, 602 Fed. App'x 164, 169 (5th Cir. 2015) ("[S]ome inquiries with banks or individual class members can be made to establish whether the account is a personal account or a business account."). The same is true here.

### 2.   The District Court's use of affidavits is accepted almost universally.

Under the circumstances of this case, courts broadly accept the use of affidavits. Marriott, however, incorrectly suggests there is a blanket prohibition on them. It also claims erroneously that these customer affidavits: (1) are unreliable; (2) violate its constitutional rights; and (3) create an opt-in class action.  None of these arguments are supported by precedent or the evidence.

### a.   Customer affidavits are permitted when combined with other records.

Customer affidavits are routinely accepted to prove class membership when combined with other records. *See*, *e.g.*, *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 480 (3d Cir. 2020) (holding customer affidavits satisfied administrative feasibility when combined with other records); *City Select Auto Sales Inc. v. BMW of N. Am. Inc.*, 867 F.3d 434, 442 (3d Cir. 2017) (same); *In re Sonic Corp.*, 2021 WL 6694843, at *2 (6th Cir. Aug. 24, 2021) ("[W]e have never rejected self-identification as a means of determining membership when there are records verifying that determination."). This case should be no exception. Marriott's records identify customers from certain states that stayed at any specific property at any specific time and had their information

-42-

stolen. Class member affidavits will be "cross checked against" that information and used with a customer's own credit card records. JA556. Affidavits are not controversial in this scenario.

Indeed, this exact process was established in *Delta*. There, plaintiffs sued airlines for baggage fees that allegedly violated antitrust law. Defendants countered, like Marriott, that their records would "not permit identification of class members because they identify only the passenger associated with the bag-fee transaction, which is not always the same person as the one who actually paid the fee." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. at 691. The court rejected the argument because the defendant's records "undoubtedly contain[ed] information that is 'useful for identification purposes[.]'" *Id*. at 692. It also noted that "class members' own records … [could] be used to further aid identification. . . ." *Id.* So too here.

Marriott's cases rejecting affidavits miss the mark. They only indicate that affidavits should not be used when: (1) there is overlap between the question of standing and class membership (as in many antitrust cases); (2) there are no objective records at all; or (3) affidavits

would be used to show a person's state of mind.[19] None of those scenarios is present here.

### b.  The District Court correctly held that these customer affidavits would be reliable.

The District Court held that customer affidavits would be reliable. Its determination is entitled to substantial deference and is well supported. *See Krakauer*, 925 F.3d at 654 (review of district court is "deferential, cognizant of both the considerable advantages that our district court colleagues possess in managing complex litigation and the need to afford them some latitude in bringing that expertise to bear"). Marriott's customers are not looking for a needle in a haystack of records. Instead, Marriott can identify the exact timeframe that a customer should review. And because hotel stays are expensive, it will be obvious in almost every case whether a person was reimbursed. *Cf. Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 91 n.2

---

[19] *See, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 61 (1st Cir. 2018) (no records to narrow the number of people who lacked standing at all, and class membership turned on state of mind); *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 471-72 (6th Cir. 2017), as corrected (Sept. 1, 2017) (people were "not realistically expected to remember receiving a one-page fax sent seven years ago" and there were no other records); *Carrera v. Bayer Corp.*, 727 F.3d 300, 311-12 (3d Cir. 2013) (no records or reason to remember who bought a particular inexpensive vitamin many years in the past).

(2d Cir. 2018) ("Since we think it is more likely that a consumer would remember the time frame in which he purchased a bath or wash for his baby . . . we see no ascertainability problem with having the class members submit sworn affidavits describing the circumstances under which the purchases were made.").[20] And to the extent some customers inevitably will not remember, perfection is not the standard. *Vance v. DirecTV, LLC*, 2022 WL 3044653, at *5 (N.D. W.Va. Aug. 1, 2022) ("However, 100% accuracy is not required when evaluating ascertainability." (citation omitted)).

Marriott resorts to erroneous attacks on certain Plaintiffs' ability to remember whether they were reimbursed for a hotel room during their depositions. But Plaintiffs had no reason to dwell on whether they were reimbursed; it had nothing to do with the merits of their claim. Nor do depositions reflect the situation in which customers will review

---

[20] After a rudimentary search, most people can recall whether a hotel stay was for leisure or business, and if it was for business, whether the person's employer had a policy to book the travel directly or reimburse the employee for the stay. Accordingly, a customer who knows they get reimbursed for work trips can determine in short order whether a credit was added to their paycheck shortly after a hotel stay. Similarly, if a customer receives a check or electronic payment transfer from a relative after sharing a hotel, they will likely know they were reimbursed.

-45-

their records. Unlike a pressure-filled, closed-off interrogation, customers will have time to assess their records with an eye to whether they were reimbursed. *Cf. Reeves v. Case W. Reserve Univ.*, 2009 WL 3242049, at *15 (N.D. Ohio Sept. 30, 2009) (O'Malley, J.) ("Depositions, of course, can be high-pressure situations and it is not, in isolation, impossible that [the witness] was simply confused. . . ."). Plaintiffs' inability to remember without first consulting their records does not somehow indicate that they would submit false affidavits, nor is it any indication that the District Court would be overwhelmed with fraudulent claims.

### c.  Customer affidavits do not violate Marriott's constitutional rights.

Marriott next cites several cases about due process and a right to a jury trial. This conflates standing with ascertainability. Affidavits will merely be used to ascertain class membership, not liability or total damages. *See, e.g., Hargrove v. Sleepy's LLC*, 974 F.3d 467, 480 (3d Cir. 2020) (holding administrative feasibility met by the possibility of cross-referencing defendant's voluminous records with affidavits from putative class members); *City Select Auto Sales Inc. v. BMW of N. Am.*

*Inc.*, 867 F.3d 434, 442 (3d Cir. 2017) (same). Marriott's cases thus do not apply.

Next, Marriott asserts that customer affidavits are not "conclusive," and it has a "right to challenge" each affidavit in court. Perhaps, although perhaps not. *See, e.g.*, *Butler v. Sears*, 727 F.3d 796, 800 (7th Cir. 2013) (Posner, J.) (discussing various, appropriate, post-litigation claims strategies to award damages in class litigation). But whether Marriott later challenges any affidavits in the future has nothing to do with whether it is administratively feasible to determine class membership now. Indeed, while Marriott "may prefer to terminate this litigation in one fell swoop at class certification rather than later challeng[e] each individual class member's claim to recover, []there is no due process right to 'a cost-effective procedure for challenging every individual claim to class membership.'" *Briseño*, 844 F.3d at 1132 (citing *Mullins*, 795 F.3d at 669). As the Seventh Circuit put it, "[i]f the concern is that claimants in cases like this will eventually offer only a 'self-serving affidavit' as proof of class membership, it is again unclear why that issue must be resolved at the class certification stage to protect a defendant's due process rights." *Mullins*, 795 F.3d at 669.

-47-

### d. __Customer affidavits do not transform this case into a de facto opt-in class action.__

Finally, Marriott claims that requiring customer affidavits transforms this case into an opt-in class action. It is wrong. The class definitions would bind any customer that bore the economic burden for a room whether or not that class member ultimately submitted an affidavit. It bears no resemblance to an opt-in class. There is thus no reason such affidavits would have to be submitted *before* trial.[21]

### D. __The Court can modify the class definitions to include reimbursed customers.__

Although the District Court was well-within its discretion to narrow the class in the way that it did, if this Court has concerns about ascertainability, it could elect to modify the definitions to include every customer who paid Marriott for their hotel rooms and whose information was stolen. Indeed, Plaintiffs asked the District Court to

---

[21] Marriott's discussion about absent class member discovery is something of a detour for that reason, and also because Marriott's own cited case required defendants to demonstrate the merits of obtaining class discovery, something Marriott has not attempted to do. *See Clark v. Universal Builders, Inc.*, 501 F.2d 324, 340 n.24 (7th Cir. 1974) (rejecting request to issue interrogatories to absent class members due to their "substantive nature" and requirement of "the assistance of technical and legal advice in understanding the questions and formulating responsive answers thereto").

certify exactly such classes. SA507-508. But it was Marriott who strenuously argued that reimbursed customers were not injured and should be excluded. So it requested that the District Court certify, at most, those who paid *and were not later reimbursed by their employer*. JA565.[22] To avoid any risk that the classes included uninjured people, the District Court limited the classes to people who bore the economic burden for their hotel room.

Marriott's argument, however, was incorrect. Every customer, whether reimbursed or not, is injured and thus has standing. This means that this Court has the discretion to decline to reach Marriott's ascertainability argument by modifying the class definitions to include

---

[22] Plaintiffs reiterated during the class certification hearing that reimbursement is unrelated to standing. SA403 ("So Defendants appear to also argue that at least for those classes that are defined by those who paid for their Marriott stays, that those classes aren't ascertainable for some reason because Marriott itself doesn't have a record of who might have been reimbursed for those stays. With all due respect, that is not an ascertainability issue. If it has any bearing, Your Honor, it's on the amount of damages or the allocation of damages that class members could receive."); SA407 ("But, in fact, Your Honor, everyone in that subclass was injured because they all paid for their stays and, therefore, they all overpaid for their stays. To the extent that some small number, some identified small number of that subclass may be subjected to a repayment demand from some third-party person or some third-party entity that may have reimbursed them really has nothing to do with injury or standing.").

every customer who paid Marriott and had his or her information stolen
as Plaintiffs initially requested.

### 1. Every person who paid Marriott for a hotel room has standing, whether or not they were reimbursed.

Plaintiffs have shown that all of Marriott's customers have
"standing for each claim that they press and each form of relief that
they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).
Plaintiffs introduced evidence that: (1) every customer faces an
imminent risk of identity theft; (2) every customer overpaid Marriott
when they paid for their hotel room; and (3) every customer had a
binding contract with Marriott and Marriott did not perform under that
contract.

### a. Every customer faces an imminent risk of identity theft.

Every Marriott customer faces an imminent threat of identity
theft. Indeed, the same elements that establish standing for Plaintiffs
create standing for every customer. Like Plaintiffs, each customer
provided personal information to Marriott. *In re Marriott Int'l, Inc.,
Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 457 (D. Md.
2020). Marriott customers suffered from "one of the largest sustained

cyberattacks in history." *Id.* at 459. Afterward, several Plaintiffs (and likely many others) experienced actual misuse of their personal information. *Id.* This brought "the actual and threatened harm out the realm of speculation and into the realm of sufficiently imminent and particularized harm to satisfy the injury-in-fact requirement for Article III standing for all [customers.]" *Id.*

Marriott's customers' standing, however, is not tied to whether they personally experienced misuse of their information. None of its customers need "to wait until they, too, suffer identity theft to" become class members. *Id.* Every customer has standing based on an imminent risk of identity theft.[23]

### b.    <u>Reimbursement does not affect the standing analysis for any claim.</u>

Marriott argues that a customer's standing depends on whether they were later reimbursed for their hotel stay. This is wrong. Plaintiffs provided evidence that *every* customer overpaid when they transacted with Marriott for their hotel stay. So those customers suffered an injury and subsequent reimbursement is not "of any concern to" Marriott.

---

[23] Marriott baselessly claims that Plaintiffs "changed" their theory from misuse to "benefit of the bargain" damages. (Plaintiffs did not.)

*Adams v. Mills*, 286 U.S. 397, 407 (1932). In fact, it is blackletter law that a plaintiff's ability to "pass on the damages that they sustained in the first instance by paying the unreasonable charge" does not affect their ability to sue for overcharge. *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533-34 (1918); *see also, e.g.*, *Continental 332 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124, 1145 (M.D. Fla. 2018) ("Defendants cite no authority to suggest the court should look to recovery from a third-party when determining whether Plaintiffs have suffered an injury in fact."). This is generally called the collateral source rule.[24] And it is enforced broadly in all three states with certified damages classes, here:

- *California.* "The Supreme Court of California has long adhered to the doctrine that if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." *Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61, 63 (Cal. 1970) (citations omitted). The collateral source rule also applies to UCL claims. *See Cottrell v. AT&T Inc.*, 2020 WL 4818606, at *7 (N.D. Cal. Aug. 19, 2020) ("[T]he Court holds that the collateral source rule applies to this claim, and that

---

[24] *See* Joseph M. Perillo, *The Collateral Source Rule in Contract Case*, 46 SAN DIEGO L. REV. 705, 707 (2009) (discussing findings that "the collateral source rule has usually prevailed regardless of the type of breach, type of loss, or type of collateral benefit" (cleaned up)).

Cottrell's reimbursement by third party Bank of America is therefore not relevant to his claim against AT&T.").

- *Maryland.* "It is generally well settled that the fact that the plaintiff may receive compensation from a collateral source (or free medical care) is no defense to an action for damages against the person causing the injury." *Plank v. Summers*, 203 Md. 552, 561 (Md. Ct. App. 1954) (citations omitted). Marriott may respond that the collateral source rule is "generally not applied in [Maryland] contract cases." *E. Shore Title Co. v. Ochse*, 453 Md. 303, 342 (Md. Ct. App. 2017). But collateral benefits that bear a close analogue to employment benefits are the exception to that generalization. *Id.* And reimbursement by an employer for travel is like any other employment benefit.

- *New York.* "The collateral source rule is a substantive rule of law that bars the reduction of an award by funds or benefits received from collateral or independent sources." *Ventura Assocs., Inc. v. Int'l Outsourcing Servs., Inc.*, 2009 WL 691066, at *2 (S.D.N.Y. Mar. 17, 2009) (citations omitted). And "'New York generally follows the 'collateral source' rule in a contract claim[.]'" *Anhui Konka Green Lighting Co., Ltd. v. Green Logic LED Elec. Supply, Inc.*, --- F. Supp. 3d ---, 2022 WL 4086831, at *6 (S.D.N.Y. Sept. 6, 2022) (Swain, C.J.).[25]

---

[25] Nothing suggests that this case should be the exception. *Cf. id.* at *6 n.3 ("Although New York has limited the application of the rule by statute 'such that evidence of third-party indemnification may be considered in certain types of actions,' to reduce a plaintiff's recovery, the statute, on its face, does not prohibit application of the rule to contract actions.") (citations omitted). New York only excludes collateral sources in personal injury, injury-to-property, or wrongful death actions. But that exception should be construed narrowly. *Oden v. Chemung Cnty. Indus. Dev. Agency*, 87 N.Y.2d 81, 86 (N.Y. 1995). The court also cannot consider "those payments as to which there is a statutory right to reimbursement." N.Y. C.P.L.R. § 4545. And New York

**c.    Plaintiffs' breach of contract claims and New York consumer fraud claim do not turn on whether there was reimbursement.**

Although an overpayment injury happens at the time of payment, Plaintiffs' breach of contract and New York consumer fraud claims do not need payment at all. To the contrary, every customer's standing depends solely on Marriott's failure to adequately protect their personal information.

**i.    Under Maryland and New York contract law, Plaintiffs are entitled to nominal damages even if they did not overpay.**

Plaintiffs submitted evidence that they were party to a binding contract with Marriott: The SPG Terms as incorporated with the Privacy Policy. SA528. Plaintiffs also presented evidence that Marriott violated that binding contract because it provided deficient data security that led to the exfiltration of class members' personal information. And a party to a breached contract necessarily has standing to remedy the breach, whether or not the breach resulted in any further concrete injury. *See, e.g.*, *L-3 Commc'ns Corp. v. Serco, Inc.*,

---

requires employers to reimburse employees for any business expense. NY Lab. L. § 198-C (2015) (making it a misdemeanor not to reimburse an employee's travel expenses).

673 Fed. App'x 284, 289 (4th Cir. 2016); *see also Cernelle v. Graminex, LLC*, 2022 WL 2759867, at \*5 (6th Cir. July 14, 2022) ("[I]njury from breach of contract does not require economic harm.").[26] As a result, New York and Maryland law entitle Plaintiffs to nominal damages if they prevail on summary judgment or at trial. *See Hirsch Elec. Co. v. Comm. Servs., Inc.*, 145 A.D.2d 603, 605 (N.Y. App. Div. 1988) ("It is a well-settled tenet of contract law that even if the breach of contract caused no loss . . . the injured party is entitled to recover . . . nominal damages[.]" (cleaned up)); *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 648 (Md. 1999) (similar).[27] Every customer therefore has standing based

---

[26] The Alabama Supreme Court already rejected Marriott's identical argument. In *Avis Rent A Car Systems, Inc.*, the defendant argued that reimbursed customers lacked standing for their breach of contract claim. *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So.2d 1111, 1120 (Ala. 2003). But the court explained:

> Heilman, not Stewart, executed the rental contract with Avis. Privity exists between Heilman and Avis, not between Stewart and Avis. The breach-of-contract count alleges the 'invasion of a legally protected interest,' for standing purposes, regardless of the reimbursement of her alleged actual damages. Thus, the fact that she was reimbursed for the cost of the rental does not deprive Heilman of standing to assert a breach-of-contract claim.

*Id*.

[27] Neither Marriott nor Accenture attempted to refute Plaintiffs' evidence on this point. While Defendants may respond that they have not yet been *required* to show they can survive summary judgment, it is

on Marriott's breach of its contractual obligation to provide them

adequate security.

> ### ii. New York consumer fraud law does not require overpayment to show standing.

New York General Business Law § 349 bars "deceptive acts or

practices in the conduct of any business, trade or commerce or in the

furnishing of any service in [New York]." N.Y. Gen. Bus. Law § 349(a)

(cleaned up). This broad, remedial statute is designed to address "the

numerous, ever-changing types of false and deceptive business practices

which plague consumers in [New York] State." *Karlin v. IVF Am., Inc.*,

93 N.Y.2d 282, 291 (N.Y. 1999). To accomplish this goal, a plaintiff may

prevail even without a "pecuniary" harm. *Oswego Laborers' Local 212

Pension Fund v. Marine Midland Bank*, 85 N.Y.2d. 20, 26 (N.Y. 1995).

Customers instead must only show that they "suffered injury as a result

of" Marriott's materially misleading conduct. *Crawford v. Franklin

Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014).

---

still noteworthy that if summary judgment on the question of liability
were decided on the current record, Defendants would lose on the
merits as to all class members.

They can. Every customer faces an imminent threat of identity theft among the myriad other risks that consumers face from hackers accessing their information. *Id*. If Plaintiffs prove on summary judgment or at trial that they faced this risk because of Marriott's unfair practices, they will be entitled to $50 statutory damages. N.Y. Gen. Bus. Law § 349(h). Accordingly, Marriott's customers have standing whether or not they were reimbursed.

### 2. **The Court can modify the class definitions to include reimbursed customers.**

Because every customer has standing to pursue these damages claims, the Court can modify the definitions to include both reimbursed and unreimbursed customers. Marriott "lawfully brought" the class definitions "before it for review." 28 U.S.C. § 2106. Thus, the Court has jurisdiction to "modify" those class definitions if it sees fit. *Id*.; *see also Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377–78 (8th Cir. 2018) (modifying class definition and citing 28 U.S.C. § 2106); *accord Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007) ("Therefore, we will modify the class definition to exclude persons who proceeded pro se or who were represented by attorneys other than public defenders.") (collecting cases). And while the Court need not

modify the class definition, doing so would avoid Marriott's purported ascertainability issues.

## III.  **PLAINTIFFS' DAMAGES THEORY SATISFIES *COMCAST*.**

Marriott's argument that Plaintiffs' benefit of the bargain theory of damages does not satisfy *Comcast* fails. It is fundamentally an attempt to relitigate its failed *Daubert* motion—procedurally improper generally, and futile on this record specifically. The District Court took the step of employing an independent economic advisor specifically to assure itself that Plaintiffs' model, authored by Professor Jeffrey Prince, is rigorous and scientifically sound. And there is no real question that Dr. Prince's benefit of the bargain damages model complies with *Comcast* itself; Marriott's token argument to the contrary is just a rehash of its flawed argument about ascertainability. Marriott's various damages arguments should be rejected in full.

### A.  **Marriott cannot relitigate *Daubert* on 23(f).**

The Court should not countenance Marriott's attempts to shoehorn an appeal of the District Court's *Daubert* opinion into a Rule 23(f) appeal. Marriott's appeal focuses entirely on highly technical co-movement principles and only briefly addresses the fit between Dr. Prince's model and Plaintiffs' damages theory. That resolves the issue

here: parties cannot relitigate *Daubert* under Rule 23(f), which permits

review only of an order granting or denying class certification. *See, e.g.*,

*In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 603 (7th

Cir. 2014) (Easterbrook, J.) (refusing to consider whether experts'

reports satisfy Federal Rule of Evidence 702 on Rule 23(f) appeal).[28]

### B.   The District Court was well-within its discretion to find that Plaintiffs' damages expert provided admissible testimony.

Even if it could be proper to re-challenge *Daubert* on a 23(f)

appeal, Marriott's appeal would still fail. The District Court considered

Dr. Prince's credibility, his model's rigor, and his model's fit to the facts

of the case, ultimately issuing a thorough 38-page *Daubert* opinion.

JA538. Indeed, the District Court employed its own expert economist

from Duke University School of Law to assist it with its determination.

JA504 n.4. The District Court did not abuse its discretion.

---

[28] *See also, e.g.*, *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 314 (5th Cir. 2005) ("[W]e may not review the exclusion of [plaintiffs'] expert report."); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132 n.4 (2d Cir. 2001) (finding "no jurisdiction to review the motion to strike").

### 1.    <u>Dr. Prince presented a robust economic model to the District Court.</u>

Dr. Prince is a "highly credentialed economist and Professor at the Kelley School of Business at Indiana University." JA501. He was the Chief Economist at the Federal Communications Commission from 2019 to 2020 and he develops and teaches Ph.D.-level courses in which he instructs students on a wide range of econometric techniques, including those used in his reports. JA971, JA1031.

Dr. Prince's overpayment model in this case—as detailed in his two expert reports, two depositions, and a six-hour March 2022 expert tutorial where he and Defendants' expert directly responded to questions from the District Court—calculated the expected difference between the market price in the real world and the market price in a "but for" world where consumers had known about Marriott's alleged security deficiencies. JA502-503 (detailing this work).

Dr. Prince first gathered data from several sources to understand supply and demand in any given hotel market. For each market, he:

- Identified Marriott's competitor hotels. JA518. Dr. Prince used a maximum of nine competitors in part because Marriott's internal pricing group uses the same approach. *Id.*

- ████████████████████████████████████████
  ████████████████████████████████████
  JA1659 at ¶ 35.

- ████████████████████████████████████████
  ██████████████████████████████████. JA1665 at
  ¶ 45.[29]

- ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████ JA1668-1669 at ¶ 51.

- Calculated the "outside option," which measures the statistical
  probability that a customer would choose to stay somewhere
  other than the hotels within the competitor set. JA518.

Dr. Prince next factored in the results of a conjoint survey

undertaken by expert Sarah Butler (whom Marriott did not move to

exclude). JA514-515. Ms. Butler's survey asked participants a series of

questions about what value they place in various hotel features. JA515.

It proved that customers place less value on staying in a hotel that does

not adequately protect data. JA515. To put this in economic terms, the

survey shows that demand for Marriott rooms shifted downward in a

---

[29] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
JA1664-1667, at ¶¶ 44-49.

but-for world where the hotel did not adequately protect data, holding all else (e.g., prices, hotel features, etc.) unchanged. JA515; *see also* JA518; *cf.* JA515 n.9 ("Dr. Prince appropriately relied on Ms. Butler's findings in developing his overpayment model.").

Finally, Dr. Prince found the equilibrium prices for hotels in a but-for world; i.e., to determine where supply and demand meet in the but-for world where consumers know of Marriott's data security deficiencies. JA519. Once these but-for prices were calculated, he compared them with the actual observed prices to calculate an overcharge percentage. *Id.* His equation requires only that he identify the Marriott hotel for the stay, the class member who stayed in the hotel, the price that the class member paid, and the dates of the stay. *Id.*[30]

*     *     *

---

[30] ██████████████████████████████████████████
██████ JA1669, at Fig. 1. ████████████████████
████████████████████████████ *Id.* This is precisely
what Dr. Prince could and would do for all class member stays once
Marriott produces its entire NDS database instead of just those stays
related to the bellwether plaintiffs.

-62-

Marriott takes no issue with the above core three steps in Dr. Prince's model. While it spent nearly a year arguing to the District Court about various perceived issues with the model, these issues were not raised on appeal. *See, e.g.*, SA549, SA564, SA570, SA571, and SA576 (moving to exclude on basis of "███████████████████ ██████████████████████████████████████ ████████. Rather than acknowledge that it has no basis to appeal nearly all of Dr. Prince's model, Marriott attempts to recast his work as a "single assumption"—the co-movement principle. Marriott Br. at 3-4.

### 2.   Dr. Prince appropriately incorporated the co-movement principle into his model, and the principle is not as Marriott describes it.

Unable to rebut any of Dr. Prince's overpayment model steps or the District Court's analysis, Marriott attempts to create an appealable issue by arguing about how many times Dr. Prince would have to run his model. Marriott argues that Dr. Prince either must do the "impossible" task of running his model for every stay at every day at every hotel in each relevant market or he would take an impermissible shortcut in running his model only once by relying on his "assumption" that prices between competing hotels co-move across the class period.

Marriott Br. at 4. This false dichotomy is not supported by Dr. Prince's reports or common economics methodology.

### a. In economics, "co-movement" means that prices tend to move together.

Dr. Prince explained at his deposition that ███████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████" JA1776, at 360:7-14. For this definition, he relies on ██ ███████████████████████████████████████████ ███████████████████████████████████████.

JA1663, at n.46 (citing Cho, et al., *Optimal Dynamic Hotel Pricing*, available at https://cowles.yale.edu/3a/hpabridged-optimal-dynamic-hotel-pricing.pdf).[31]

The Cho paper included a chart plotting the prices of the seven hotels it studied across seven years. Cho, at 14. It is included below for clarity:

---

[31] The Frisch Medal Award, The Econometric Society, available at https://www.econometricsociety.org/society/awards.

Figure 2: Annual price dynamics for all seven hotels



The chart demonstrates that prices move together in a predictable pattern. However, critically, neither the Cho paper nor Dr. Prince suggested that each competitor hotel must retain its pricing rank relative to its competitors nor that each percentage increase must be consistent across hotels. In his deposition, to the contrary, Dr. Prince explained, ██████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." JA1777-1778, at

361:25-362:1.

       **b.** **In part because of co-movement, Dr. Prince does not need to run his model separately for every hotel stay.**



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮. *See* JA1854-1855 at 438:14-

439:10. This is "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ JA1663 at ¶ 43 (quoting Cho, et al.). The

District Court properly credited Dr. Prince's reliance on this paper in its

*Daubert* Order, noting that Dr. Prince based his co-movement

"assumption on a working paper published by four economists (at least

one of whom, John Rust, is highly respected amongst economists)."

JA521; *see also* JA517 ("It is a sophisticated study of the hotel industry

showing that hotel prices reflect co-movement[.]").



. JA1663-1664, at ¶ 43.

*Id.* (citing Mazzeo (2002) and Wilson (2011)).[32]

### c.  Marriott misstates the implications of co-movement.

Marriott's responses to the above misunderstand both *Daubert* and economics. None of its arguments undermines Dr. Prince's testimony.

---

[32] *Daubert* requires Dr. Prince only to act in accordance with the practices of his field of expertise. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (*Daubert* "makes certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practices of an expert in the relevant field"); *Hewitt v. Metro-North Commuter R.R.*, 244 F. Supp. 3d 379, 391 (S.D.N.Y. 2017) (denying motion to exclude when expert "employs multiple methodologies that are generally accepted in the field of [expertise]"); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) (approving economist's damages model based on "generally accepted methods").

First, Marriott incorrectly states that Dr. Prince "maintained that he could determine class damages by measuring the market data from any given Marriott hotel and its competitors at a *single* random point in time." Marriott Br. at 50. Not so. As Dr. Prince explained in his deposition: ████████████████████████████████████████████████ ████████████████████████████████████████████████

JA1854-1855, at 438:24-439:1.

Next, Marriott argues, without citation, that "Plaintiffs conceded below that their damages model depended entirely on a 'co-movement' assumption." Marriott Br. at 46. This grossly misstates the role of co-movement in Dr. Prince's work. Economists do not rerun models for every date when conducting analyses of pricing whether or not there is co-movement. JA1650, at ¶ 15 ████████████████████████ ████████████████. Tellingly, Marriott provides no citation to research that reruns a similar pricing model at such a rate.[33]

_____

[33] Dr. Prince went above and beyond in his report by providing added context for why his proposed frequency of running his model intuitively makes sense for his application. *See* JA1663, at ¶ 43. Even if any of the features of hotel industry pricing that Dr. Prince highlighted proves to be inaccurate (neither Marriott nor its expert has given any reason to think any is), it does not follow that Dr. Prince must run the model for every date and stay. *See TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336

Third, Marriott misstates Dr. Prince's report and the Cho paper when it defines co-movement as an assumption that "hotel prices—in all places, at all times, and for all rooms—rise and fall at the same rate relative to each other." Marriott Br. at 46. Marriott has no citation for that formulation, and it is wrong. ████████████████████

████████████████████████████ JA1663, at ¶ 43. As the chart above from leading economists demonstrates, hotel prices *do* move up and down together.[34]

Fourth, Marriott attempts to confuse the issue by citing a string of hypotheticals that it claims are not properly considered by co-movement. Marriott Br. at 51. These hypotheticals entirely ignore that

████████████████████████████████████

██████ at ¶ 43, ████████████████████████████

—————————————

F.3d 1322, 1329 n.7 (Fed. Cir. 2003) (denying the antecedent is "an invalid argument of the general form: If p, then q. Not p. Therefore, not q.").

[34] Marriott also argues that the Cho paper did not measure "all markets and at all times." Marriott Br. at 55. Marriott offers no support for its assertion that this level of testing could possibly be a requirement within the field of economics. And Dr. Prince's sources demonstrate that it is not. Marriott argues that the paper found that a different strategy would be optimal for hotels. This is irrelevant. The paper demonstrates what hotels did in a real-world scenario.

█████████████████████, JA1657-1658, at ¶ 31, ████████████████

██████████████████████████. JA1668-1669, at ¶¶ 50-51.

Finally, Marriott argues that its expert, Dr. Catherine Tucker, appropriately "tested" co-movement and disproved Dr. Prince's use of it. Not so. Dr. Tucker did not test co-movement as defined by the literature and Dr. Prince, she tested whether "the most expensive hotel remained the most expensive, by the same amount, even as the overall price rose and fell." Marriott Br. at 53. That is not co-movement: as the Cho paper and Dr. Prince explained, ████████████████████████████

█████████████████████████ JA1663, at ¶ 43. Dr. Tucker's test of whether the most expensive hotel remains the most expensive is found nowhere in the literature and thus has nothing to do with co-movement.

## C.    Dr. Prince's model fits Plaintiffs' damages theory.

In addition to its detailed (incorrect) *Daubert* arguments, Marriott argues briefly that Dr. Prince is calculating "overpayment" instead of damages. Marriott Br. at 57. This is simply a recasting of Marriott's ascertainability argument. It fares no better here than when placed under the correct heading.

Dr. Prince's model calculates damages in the but-for world where class members were aware of Marriott's security deficiencies. In other words, he finds the percentage that every class member overpaid for their hotel stay. This is known as "benefit of the bargain" damages, and it is undisputed that such damages are appropriate if Plaintiffs prove liability for breach of contract or their consumer protection causes of action.

Dr. Prince already applied his model to the claims of the bellwether plaintiffs in certain markets. Marriott does not take issue with his calculations for those stays. This distinguishes Marriott's main authority, *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 253 (D.C. Cir. 2013), in which the district court erred by not considering that plaintiffs' expert's damages model demonstrated false positives. Dr. Prince's model contains no such issues because it does not find overpayment for anyone who did not actually overpay.

The fact that some of the people who overpaid were later reimbursed for that overpayment and thus are excluded from the District Court's class definition is of no moment under *Comcast*. This is

-71-

so because no damages model must grapple with ascertainability (here: whether a particular individual was later reimbursed for his or her overpayment). A damages model must only "be consistent with [plaintiffs'] liability case." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see also, e.g.*, *Mullins*, 795 F.3d at 671 ("It has long been recognized that the need for individual damages determinations at this later stage of the litigation does not itself justify the denial of certification."). Dr. Prince's benefit of the bargain model satisfies *Comcast* and Marriott does not persuasively argue otherwise. The District Court was within its discretion to certify issue classes on the questions of "duty" and "breach."

## IV.   THE DISTRICT COURT PROPERLY CERTIFIED DUTY AND BREACH NEGLIGENCE ISSUE CLASSES.

The District Court certified issues classes to answer the questions of whether Marriott and Accenture breached a duty they owed class members. Because judgment on those questions will "materially advance[] the disposition of the litigation as a whole," the District Court's decision to certify those issues was also correct. *Manual for Complex Litigation* § 21.24 (4th ed. 2004); *see also Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 416 (6th Cir. 2018)

-72-

(affirming issue class certification because although certification of issues "will not resolve Defendants' liability entirely . . . it will materially advance the litigation"). Accenture presses arguments to the contrary on behalf of both Defendants, but those arguments do not have merit.

**A.**    **Rule 23(c)(4) allows courts to certify individual elements of a cause of action.**

Despite the plain language of Rule 23, Defendants contend that Rule 23(c)(4) *forbids* certification of individual elements of a cause of action. Accenture Br. at 40. But Rule 23(c)(4) permits a court to certify "particular issues." And an issue is any "matter that is in dispute between two or more parties." Merriam-Webster, Issue. Each of the individual elements (here: duty and breach) are indisputably a "matter that is in dispute between" the parties. Courts thus unsurprisingly consider "issues" to include the individual elements of a cause of action even outside the context of Rule 23(c)(4); e.g., issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved . . . even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). In other words, the plain meaning of "particular issues" embraces individual elements of a cause

of action. *See United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (holding that the plain meaning of words applies absent "clearly expressed legislative intent to the contrary") (cleaned up).

It is no surprise then that many courts have certified individual elements of liability. For example, the Third Circuit held that courts may certify "particular issues, not just those that decide liability." *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 270 (3d Cir. 2021) (cleaned up); *see also Bennett v. Dart*, --- F.4th ---, 2022 WL 16915837, at *1 (7th Cir. Nov. 14, 2022) ("A class certified under Rule 23(c)(4) certifies the *issue*, not the whole case.") (*per curiam*) (emphasis in original). Myriad other courts have done likewise. *See id.* (collecting cases); *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 296 (S.D. W.Va. 2015) ("There is no impediment to certifying particular issues in a case as opposed to entire claims or defenses."); *Manual for Complex Litigation* § 21.24 (4th ed. 2004) (similar).

Defendants suggest, however, that the advisory committee notes limit issue classes to claim-based or liability-only classes. Accenture Br. at 42. This is a misreading. The note for 23(c)(4) gives *one example* of an issue class. It provides that: "in a fraud or similar case the action may

retain its 'class' characteristic only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims." Fed. R. Civ. P. 23(c)(4) advisory committee's notes to 1966 amendment. Nothing in that note indicates that it is the only type of certifiable issue. And Defendants cite no case agreeing with their interpretation of this nearly sixty-year-old note.

## B.  <u>The issue class members have standing.</u>

Defendants also argue that the issue classes are inappropriate because a jury will reach a conclusion on two elements of class members' claims without determining whether class members have experienced an actual injury traceable to Defendants. Accenture Br. at 32-38.[35] And they similarly claim that any judgment amounts to an

---

[35] To have standing, plaintiffs must show that (1) they suffered an injury in fact; (2) the injury is fairly traceable to defendant's conduct; and (3) the injury is likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Absent class members need not demonstrate standing uniformly prior to class certification, but a class may not include "a large number of uninjured persons." *Krakauer*, 925 F.3d at 657–58.

The Second Circuit has held that the class must "be defined in a way that anyone within it would have standing." *Chen-Oster v. Goldman, Sachs & Co.*, 2022 WL 814074, *19 (S.D.N.Y. Mar. 17, 2022) (quoting

advisory opinion. *Id*. Both arguments contradict Supreme Court

precedent.

> **1.    The Supreme Court has held that individual class members may prove whether they suffered an injury after a trial that determines defendants' general liability.**

Defendants' argument that class members lack standing because

they will not prove they suffered an actual injury at (the first) trial goes

against *Tyson Foods, Inc. v. Bouaphakeo*. There, the Supreme Court

held that "important matters" such as actual injury, causation, and

damages can be tried separately. 136 S. Ct. 1036, 1045 (2016)); *see also*

*Martin*, 896 F.3d at 415 (same). The plaintiffs in *Tyson Foods* contended

that they were not compensated for donning and doffing time. Their

injury and damages overlapped. That is, if a person did not spend

uncompensated time donning and doffing, that person has *neither* an

injury nor damages. Yet the Court held that damages—and necessarily

injury—could be determined later.

The same will be done here. The District Court will conduct a trial

for the money damages claims against Marriott and for the duty and

---

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). This is inconsistent with the better-reasoned *Krakauer*.

breach issue classes against Marriott and Accenture. The jury will then be instructed to decide whether Marriott and Accenture had a duty and whether they breached it. If so, individual class members later can pursue their negligence claims in a court of competent jurisdiction. In that forum, they will have to prove causation and injury. They can collect damages only if they succeed.

Still, Defendants claim incorrectly that such issue classes contradict *TransUnion* and quote the requirement that "[e]very class member must have Article III standing *in order to recover individual damages*." *TransUnion*, 141 S. Ct. at 2208 (emphasis added). But these issue classes will not allow class members to *recover individual damages* without proof of an actual injury that is traceable to Marriott or Accenture. That proof will come at a *second* trial. *See Bennett*, 2022 WL 16915837, at *1 ("Class members would receive the benefit of a declaratory judgment (if the class prevails) on the issue but would need to proceed in individual suits to seek damages[.]").

One final point. If it were somehow necessary for every member of the issues classes to prove standing prior to trial (it is not under *Tyson Foods*), every member of these issues classes has done so. All have an

-77-

injury traceable to Marriott and Accenture because they allowed criminals to obtain class members' personal information. All class members thus have a concrete harm—the "imminent risk of identity theft"—caused by Defendants' conduct. *See* Sec. II.D.1. Defendants' standing arguments thus also fail for this independently sufficient reason.

### 2.   The Supreme Court has held that a judgment that increases the risk of recovery in subsequent proceedings is not an advisory opinion.

Defendants next suggest that any judgment is an advisory opinion because class members will not collect damages at the issue class trial. This argument, too, cannot be squared with *Tyson Foods*, which specifically approved of a trial that left causation, injury, and damages for another day.

The *reason* such a trial is permissible is that an issue class judgment would redress, at least in part, class members' concrete harm by removing an obstacle to a monetary award. And redressability only requires that the "practical consequence" of any declaratory relief "would amount to a significant increase in the likelihood that" a party will "obtain relief" in the future. *Utah v. Evans*, 536 U.S. 452, 463-64

(2002).[36] As a constitutional matter, then, an issue class judgment would help redress the harm caused by Marriott and Accenture because it would "significantly increase" the chance that class members later "obtain relief" in the form of money damages. *See id*.

## C.    <u>The District Court applied the correct legal standard.</u>

The District Court considered two issues for certification: (1) duty; and (2) whether that duty was breached. It held that predominance for both issues was met because "there is little or no variation between class members as to" their relationship with Accenture. JA605. Defendants respond, however, that this was error because an issue class must meet the same commonality and predominance requirements as a typical 23(b)(3) money damages class. Accenture Br. at 22-27. They declare that if there is "no viable class-wide theory of common injury, there can be no [issue] class action." *Id.* at 25. And because the District Court (temporarily) rejected Plaintiffs' classwide damages model for the

---

[36] *See, e.g.*, *Crotzer v. Atlas Roofing Corp.* (*In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*), 2018 WL 2929831, at *8 (N.D. Ga. June 8, 2018) (applying *Evans* to hold that plaintiffs had standing to seek declaration where it "would make it more likely that the Plaintiffs would obtain the necessary relief from the Defendant because it would establish an essential component to liability").

negligence claims, Defendants' reason that the Court cannot certify issue classes.[37] Defendants are incorrect.

### 1.   Plaintiffs seeking class certification under Rule 23(c)(4) need not prove that a class could also be certified under Rule 23(b)(3).

Defendants attempt to rehash a long-settled debate: whether an issue class must meet Rule 23's requirements for the cause of action as a whole or for only the issue(s) certified. Nearly every court to consider the question holds that "courts apply the Rule 23(b)(3) predominance and superiority prongs after common issues have been identified for class treatment." *Martin*, 896 F.3d at 411. Thus, courts permit the use of Rule 23(c)(4) "even where predominance has not been satisfied for the cause of action as a whole." *Id.* (collecting cases). That is not surprising given that the contrary reading all but writes Rule 23(c)(4) out of the rules.

---

[37] After Plaintiffs filed their certification brief, Marriott belatedly disclosed its own valuation of its customers' PII as $0.42 per customer pursuant to requirements of the California Consumer Privacy Act. JA573. The District Court ordered Marriott to produce discovery related to this valuation. Dkt. 1052. This production has not yet ensued, as Marriott is challenging the District Court's jurisdiction to issue this discovery while this appeal is pending.

Plaintiffs are not aware of any modern circuit court to depart from *Martin*, and Defendants cite none, pointing this court only to 23(b)(3) damages classes cases. Even the Fifth Circuit authority, cited by *Amici* as requiring predominance "for the cause of action as a whole," has as a practical matter long since retreated from that position. *Compare Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 n.21 (5th Cir. 1996), *with In re Deepwater Horizon*, 739 F.3d 790, 806 (5th Cir. 2014).[38]

### 2. The majority approach is supported by the text and purpose of the rule.

Courts have almost uniformly rejected Defendants' position for the good reason that it "would virtually nullify Rule 23(c)(4)." *Martin*, 896 F.3d at 413 (citing *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417,

---

[38] The *Amici* are thus mistaken to rely on *Castano*. In *In re Deepwater Horizon*, appellants (objectors to a settlement) complained that the district court's certification of an issue class did not comply with Rule 23(b)(3)'s requirement that common issues predominate for the cause of action as a whole. The Fifth Circuit disagreed. It held that certification was "in accordance with . . . Rule 23(c)(4)." 739 F.3d 790, 806 (5th Cir. 2014). And it reasoned that "determining liability on a class-wide basis, with separate hearing[s] to determine—if liability is established—the damages of individual class members, or homogenous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed." *Id*. at 806 n.66. *Deepwater Horizon*, moreover, cited with approval decisions of "many circuits" that had "divided and tried" "common and individual issues" "by means of . . . Rule 23(c)(4), which permits district courts to limit class treatment to 'particular issues' and reserve other issues for individual determination." *Id*. at 816.

439 (4th Cir. 2003)). In this case, for example, if Defendants were
correct and the whole claim must have a common damages theory, a
liability issue class would never be necessary. Little wonder district
courts within this Circuit are in full accord with *Martin*. *See*, *e.g.*,
*Tillman v. Highland Indus., Inc.*, 2021 WL 4483035, at \*18 (D.S.C.
Sept. 30, 2021) ("In such a case, the plaintiff must still satisfy all of the
requirements of Rule 23(a) and (b)(3) in the context of the claim or issue
she seeks to certify.").[39]

A prior version of Rule 23, moreover, confirms that Courts should
look to see only whether common issues predominate for a particular
issue. *Martin*, 896 F.3d at 413. In that earlier version, Rule 23
specifically instructed courts to look only to whether common issues
predominated for the particular issues certified. *See id*. Although the
text has since been amended, "the Advisory Committee made clear that
the changes to the Rule's language were 'stylistic only.'" *Id*. The courts,

---

[39] *See also, e.g.*, *Parker v. Asbestos Processing, LLC*, 2015 WL 127930, at
\*12 (D.S.C. Jan. 8, 2015); *Good*, 310 F.R.D. at 298 ("The defendants'
contention [that the whole claim must meet Rule 23's requirement] is
thus not meritorious.").

therefore, should continue to apply Rule's 23(a) and (b) *after* selecting issues for class treatment.

### 3.  This Court should decline to create a circuit split.

Although this Court is not bound by other circuits, it nevertheless should avoid creating a circuit split without a "strong" or "compelling" reason. *See United States v. Thomas*, 939 F.3d 1121, 1301 (10th Cir. 2019) (collecting cases).[40] Defendants give none. Lacking significant legal precedent, they claim primarily that the majority view will lead courts to "disassemble nearly any claim and render the predominance requirement of Rule 23(b)(3) meaningless." Accenture Br. at 43.

---

[40] To that end, it is noteworthy that *Amici* have pressed the identical argument before the Rules Committee, the Supreme Court, and Congress, all without success. *See, e.g.*, *Russell*, 15 F.4th at 274 n.7 (noting Rules Committee found no real split on whether (b)(3) predominance was needed before issue certification and declined the suggested amendments); *Educ. Comm'n for Foreign Med. Graduates v. Russell, et al.*, 21-948, Brief amicus curiae of Chamber of Commerce of the United States of America (Jan. 28, 2022); *See* https://www.uschamber.com/lawsuits/https-www-uschamber-com-letter-key-vote-letter-supporting-hr-985-the-fairness-class-action-litigation-and-furthering (explaining that the Chamber of Commerce would "score" a congressional vote on whether to amend the federal rules to provide for the type of "narrow" issues class certification approach for which they advocate here).

But district courts in this Circuit have long followed the majority

view, and issue classes remain rare. That is because, like the District

Court here, other courts in this Circuit carefully apply the superiority

requirement to prevent an "inefficient use of Rule 23(c)(4)." *Martin*, 896

F.3d at 413. This precedent is sound.

### D.    Issue classes are superior to other options.

Lastly, Defendants argue that these issue classes fail for lack of

superiority. To do so, they largely ignore the substantial benefits from

issue class certification outlined in the District Court's opinion. At the

same time, they offer no reasonable alternative to issue class

certification. And none of Defendants' alleged problems should preclude

issue certification.

### 1.    The certified issue classes will materially advance the litigation and avoid significant problems that would arise in their absence.

The District Court correctly highlighted four distinct advantages

from issue class certification: (1) it avoids unnecessary duplication; (2) it

conserves judicial resources; (3) it prevents inconsistent adjudications;

and (4) it provides class members a viable path to compensation.

First, issue classes will avoid "unnecessary duplication" between

Plaintiffs' damages classes and the presumably numerous individual

Accenture-related cases. *See Good*, 310 F.R.D. at 297 ("Absent the proposed liability issues certification, the issue of fault, for one, would have to be tried seriatim. . . . That consideration alone tips the balance heavily toward the limited issue certification sought by plaintiffs."). The efficiency gains are particularly clear in this case because the District Court already certified damages classes against Marriott, and those claims involve the same "factual circumstances relevant to the duty and breach issues." JA606. If the District Court did not certify these issue classes, the "parties would have to repeatedly put on the same witnesses and produce the same documents" at "considerable expense." *Id.*[41]

Second, these issue classes conserve judicial resources because they avoid forcing different forums to hear the same evidence. Without jurisdiction under the Class Action Fairness Act, there is no guarantee that the same forum will preside over a case against both Marriott and Accenture for individual claims based on negligence. But "Plaintiffs will

---

[41] By contrast, in *Tillman*, the district court denied class certification in its entirety. *Tillman*, 2021 WL 4483035, at *20. So too in *Naparala v. Pella Corp.*, 2016 WL 3125473, at *17 (D.S.C. June 3, 2016). Thus, those courts were not guaranteed the efficiency gained from certifying tag-along issue classes.

use the same evidence in their attempt to establish duty and breach for their negligence and negligence per se claims against Marriott and Accenture." JA603-604. For the claims against Marriott, Plaintiffs will rely on Mary Frantz's expert report and the documents and testimony that it is based on. JA604. For the claims against Accenture, the common evidence "includes testimony regarding Accenture's business relationship with Starwood and Marriott, Accenture's data security responsibilities, and Accenture's data security practices related to multifactor authentication, account privileges, monitoring, and encryption." *Id.*; JA 696-700 (Trial Plan). Allowing one court to hear these issues allocates judicial resources efficiently. *See Good*, 310 F.R.D. at 297 ("Additionally, all of the cases . . . are presently centered in this forum. It is obviously desirable to keep them in place to the extent feasible.").

Third, these issue classes prevent inconsistent adjudications of whether Defendants breached their duties.[42] To that point, Defendants

---

[42] Unlike *Tillman*, Defendants have not proposed "a bellwether trial approach accompanied by collateral estoppel where applicable." *Tillman*, 2021 WL 4483035, at *19. But collateral estoppel is not guaranteed to protect against inconsistent determinations.

should invite these issue classes because only absent class members would likely benefit from collateral estoppel. *See Gunnells*, 348 F.3d at 428-29 (explaining that the asymmetric application of collateral estoppel works to a defendant's disadvantage in non-class cases). That is, if Plaintiffs prevail at trial, these absent class members could likely use offensive collateral estoppel against Defendants. If Defendants prevail, these absent class members would not be estopped from bringing their claims. Issue classes therefore dodge a "heads I win, tails you lose" scenario.

Fourth, Plaintiffs note that individual class members have little interest "in controlling and pursuing litigation on their own." *Good*, 310 F.R.D. at 297; *see also* Fed. R. Civ. P. 23(b)(3)(A) (court should consider, among other things, "the class members' interests in individually controlling the prosecution or defense of separate actions"). Because there is relatively little money in dispute, "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for [a small amount]." *Suchanek*

-87-

*v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) (Wood, C.J.).[43]

### 2. **Defendants' superiority arguments are misguided.**

Defendants' various arguments do nothing to undermine the

conclusion that a class action is superior to alternatives.

First, Defendants contend that there will be the same number of

trials even with these issue classes. But "[i]f the jury concludes there is

no [duty] or that [there was no breach]," the case is over. On the other

hand, "if the jury finds there is a [duty and it was breached] then the

scope of subsequent trials will be narrowed significantly." *Weidman v.

Ford Motor Co.*, 2022 WL 1071289, at \*15 (E.D. Mich. Apr. 8, 2022); *see

also Martin*, 896 F.3d at 416 ("Even if the class members brought suit

individually, the seven certified issues would need to be addressed in

each of their cases. Resolving the issues in one fell swoop would

conserve the resources of both the court and the parties.").

Second, Defendants argue that duty centers on a plaintiff's

relationship with a defendant and thus there are too many

---

[43] Again, unlike *Tillman*, there is not an "adequate incentive for class members to employ counsel, pay a filing fee, and proceed with a stand-alone action.'" *Tillman*, 2021 WL 4483035, at \*19. Therefore, these issue classes are necessary for individual class members to vindicate their rights and increase judicial efficiency.

individualized issues. As the District Court determined, however, "there is little to no variation between class members" and their relationship with Accenture. JA605.

Third, Defendants speculate about alleged choice-of-law problems. This makes little sense because the existing bellwether structure is state-specific. But if there is a multistate trial, the jury can be instructed on the different state laws. *See, e.g.*, *In re FCA US LLC Monostable Electronic Gearshift Litig.*, 16-md-02744, (E.D. Mich. Sept. 16, 2022), ECF No. 82. For instance, in *In re FCA*, a recent issue trial, the district court submitted the certified questions state-by-state. ECF No. 853 (E.D. Mich. Sept. 20, 2022). The jury's split verdict form shows that it carefully considered each state's law separately. *See id.*

Fourth, Defendants claim that the "intertwined nature of the duty/breach issues with injury/causation also raises Seventh Amendment Reexamination Clause concerns." Accenture Br. at 53. But "the Seventh Amendment prohibition is not against having two juries *review* the same evidence, but rather against having two juries *decide* the same essential issues." *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 n.5 (3d Cir. 1997) (emphases added) (quotations omitted); *see*

*also Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1356 (11th Cir. 2018) (quotations omitted) ("The repetition of some of the liability evidence, necessary to establish causation, did not render the [second] trial unfair."). To the extent there is a risk of reexamination, the District Court can implement "trial management procedures like special verdicts and detailed jury instructions to ensure that when issues are severed under Rule 42(b), they are clearly presented to each set of jurors." *Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 38 (E.D.N.Y. 2001); *see also* Myriam Gilles and Gary Friedman, Rediscovering the Issue Class in Mass Tort MDLs, 53 GA. L. REV. 1305, 1323 (2009) (collecting cases, and noting that "[j]urors are well capable of following an instruction to respect—and not reexamine—an earlier holding").

In any event, Defendants' Reexamination Clause claim is premature. *See Martin*, 896 F.3d at 416 ("At this time, however, we find no Seventh Amendment issues."). Like most constitutional claims, it is not ripe until a party is injured. And, the first trial has not occurred yet. Thus, no examination—let alone reexamination—of any factual issue

-90-

has happened. Accordingly, no party currently has standing to claim its

Reexamination Clause rights were violated. [44]

## CONCLUSION

Plaintiffs respectfully ask this Court to affirm the District Court

in full.


Dated: November 15, 2022


*/s/ Amy Keller*

---

[44] It is unlikely that Accenture or Marriott will *ever* have standing under the Reexamination Clause. After all, Defendants can only benefit from reconsideration of a factual issue. If the jury finds no [negligence] at the first trial, the case is over. Any reexamination therefore can only happen if Plaintiffs prevail in the initial trial. Of course, Accenture and Marriott could only *gain* from reexamination of that prior verdict. Because Accenture and Marriott will never be harmed by reexamination, neither will ever have standing to pursue a Reexamination Clause violation.

Amy Keller
**DiCELLO LEVITT LLC**
Ten North Dearborn Street
Chicago, IL 60602
312.214.7900

James J. Pizzirusso
**HAUSFELD LLP**
888 16th Street, NW
Washington, D.C. 20006
202.540.7200

Andrew N. Friedman
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., NW
Washington, D.C. 20005
202.408.4600

*Co-Lead Counsel*

Norman E. Siegel
Kasey Youngentob
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
816.714.7100

Jason L. Lichtman
Sean A. Petterson
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
212.355.9500

*On Brief*

MaryBeth V. Gibson
**THE FINLEY FIRM, P.C.**
3535 Piedmont Road, Bldg. 14, Suite 230
Atlanta, GA 30305
404.320.9979

Megan Jones
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
415.633.1908

Timothy Maloney
**JOSEPH GREENWALD & LAAKE, P.A.**
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
301.220.2200

Gary F. Lynch
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
412.322.9243

James Ulwick

**KRAMON & GRAHAM PA**
1 South Street, Suite 2600
Baltimore, MD 21202
410.347.7426

Veronica Nannis
**JOSEPH GREENWALD & LAAKE, P.A.**
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
301.220.2200

Daniel Robinson
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
949.720.1288

Ariana J. Tadler
**TADLER LAW LLP**
One Penn Plaza, 36th Floor
New York, NY 10119
212.946.9300

*Plaintiffs' Executive Committee*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of the Court's August 12, 2022 Order because it contains 18,730 words, as determined by Microsoft Word 2007, including the headings and footnotes and excluding the parts of the brief exempted by Fed. R. App. P. 32(f). The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The text appears in 14-point Century Schoolbook, a proportionally spaced serif typeface.

Dated: November 15, 2022    */s/ Amy Keller*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2022, I caused the Brief of

Plaintiffs-Appellees to be electronically filed with the Clerk of the

United States Court of Appeal for the Fourth Circuit using the

appellate CM/ECF system.

Dated: November 15, 2022        */s/ Amy Keller*

-95-