## No. 22-1744(L)

_____

### UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

_____

IN RE: MARRIOTT INTERNATIONAL, INC.
CUSTOMER DATA SECURITY BREACH LITIGATION

_____

On Appeal from the United States District Court for the District of Maryland
Case No. 8:19-md-02879-PWG (Hon. Paul W. Grimm)

_____

### BRIEF FOR THE NATIONAL ASSOCIATION OF CONSUMER ADVOCATES AND PUBLIC JUSTICE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

_____

Ira Rheingold
NATIONAL ASSOCIATION OF
CONSUMER ADVOCATES
1215 17th Street, Northwest, 5th Floor
Washington, DC 20036
(202) 452-1989
*ira@consumeradvocates.org*

*Counsel for the National Association
of Consumer Advocates*

Shelby Leighton
PUBLIC JUSTICE
1620 L Street, Northwest, Suite 630
Washington, DC 20036
(202) 797-8600
*sleighton@publicjustice.net*

*Counsel for Public Justice*

Hassan A. Zavareei
Glenn E. Chappell
Spencer S. Hughes
Cameron Partovi
Schuyler Standley
TYCKO & ZAVAREEI LLP
1828 L Street, Northwest, Suite 1000
Washington, DC 20036
(202) 973-0900
*hzavareei@tzlegal.com*
*gchappell@tzlegal.com*
*shughes@tzlegal.com*
*cpartovi@tzlegal.com*
*sstandley@tzlegal.com*

*Counsel for Amici Curiae*

November 22, 2022

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1744__        Caption: __Peter Maldini v. Accenture LLP__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__National Association of Consumer Advocates; Public Justice__
(name of party/amicus)

_____

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?          ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?          ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Hassan A. Zavareei _____    Date: ___11/22/2022___

Counsel for: Amici Curiae _____

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ............................................................... 1

INTRODUCTION.................................................................................... 2

ARGUMENT ........................................................................................... 3

    I.    Rule 23(c)(4) Protects Consumer Rights and Does Not Impose
        Onerous Hurdles ..................................................................... 3

        A.    Issue classes help to vindicate consumer rights. ............................ 3

            1.    Rule 23(c)(4) is a powerful, flexible tool for class action
                management. ........................................................................... 4

            2.    The issue-class rule was created to provide access to
                effective class actions. ............................................................. 6

            3.    Rule 23(c)(4) allows for issues within the same claim
                to be separated across class and individual litigation. .......... 8

        B.    Accenture's proposed standing and injury test is incoherent
            and inconsistent with Rule 23(c)(4) and settled precedent. ............ 9

            1.    Accenture's textual challenge to the Rule 23(c)(4) class
                certifications is legally baseless............................................. 10

            2.    Accenture's position is inconsistent with the purpose
                of Rule 23(c)(4). .................................................................... 13

            3.    Rule 23(c)(4) does not render Rule 23(b)(3) superfluous.. 14

            4.    Accenture's standing challenge is meritless........................ 16

    II.    Marriott's Attempt to "Sandbag" Should Be Rejected ........................... 18

        A.    "Sandbagging" is an underhanded litigation tactic that courts
            routinely reject. ....................................................................... 19

        B.    Marriott's attempt to "sandbag" consumers and the judiciary
            would impose massive unnecessary costs. ..................................... 23

CONCLUSION ....................................................................................... 25

CERTIFICATE OF COMPLIANCE ....................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................. 5

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ..................................................... 8

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
6 F.3d 177 (4th Cir. 1993) ..................................................... 4, 5

*Continental Bank, N.A. v. Meyer*,
10 F.3d 1293 (7th Cir. 1993) .................................................... 22

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008) ....................................................... 19, 21, 25

*Gates v. Rohm & Haas*,
655 F.3d 255 (3d Cir. 2011) ................................................ 11, 16

*Gunnells v. Healthplan Services, Inc.*,
348 F.3d 417 (4th Cir. 2003) ........................................ 4, 5, 6, 10

*Guy v. Abdulla*,
57 F.R.D. 14 (N.D. Ohio 1972) ........................................... 14, 15

*Harris v. Med. Transp. Mgmt., Inc.*,
No. 17-cv-01371, 2021 WL 3472381 (D.D.C. Aug. 6, 2021) ................... 13

*Hicks v. Crown Zellerbach Corp.*,
49 F.R.D. 184 (E.D. La. 1967) ................................................. 8

*Hormel v. Helvering*,
312 U.S. 552 (1941) ............................................................ 20

*In re A.H. Robins Co., Inc.*,
880 F.2d 709 (4th Cir. 1989) .................................................. 5

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) .................................................. 16

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
No. 13-cv-07789, 2022 WL 3971006 (S.D.N.Y. Aug. 31, 2022) ............... 13

*In re Motor Fuel Temp. Sales Pracs. Litig.*,
292 F.R.D. 652 (D. Kan. 2013) ............................................... 11

*In re Prograf Antitrust Litig.*,
No. 1:11-md-02242, 2014 WL 4745954 (D. Mass. 2014) ........................................ 13

*J.I. Case Co. v. Borak*,
377 U.S. 426, 433 (1964) ........................................................................................ 20

*Katz v. Pershing, LLC*,
672 F.3d 64 (1st Cir. 2012) ..................................................................................... 17

*L-3 Commc'ns Corp. v. Serco, Inc.*,
673 F. App'x 284 (4th Cir. 2016) ............................................................................ 17

*Martin v. Behr Dayton Thermal Prod. LLC*,
896 F.3d 405 (6th Cir. 2018) ............................................................... 5, 11, 13, 14

*Maxum Foundations, Inc. v. Salus Corp.*,
779 F.2d 974 (4th Cir. 1985) ................................................................................... 22

*Mejdrech v. Met-Coil Sys. Corp.*,
319 F.3d 910 (7th Cir. 2003) ................................................................................... 16

*Minemyer v. R-Boc Representatives, Inc.*,
283 F.R.D. 392 (N.D. Ill. 2012) .............................................................................. 19

*Peterson v. Highland Music, Inc.*,
140 F.3d 1313 (9th Cir. 1998) ................................................................................. 21

*Poliquin v. Garden Way, Inc.*,
989 F.2d 527 (1st Cir. 1993) ................................................................................... 20

*Puckett v. United States*,
556 U.S. 129 (2009) ................................................................................................. 19

*Ross v. Bank of Am., N.A. (USA)*,
524 F.3d 217 (2d Cir. 2008) .................................................................................... 17

*Russell v. Educ. Comm'n for Foreign Med. Graduates*,
15 F.4th 259 (3d Cir. 2021) ............................................................................ 9, 12, 14

*Siegel v. Chicken Delight, Inc.*,
271 F. Supp. 722 (N.D. Cal. 1967) ........................................................................... 7

*Simon v. Philip Morris, Inc.*,
200 F.R.D. 21 (E.D.N.Y. 2001) ............................................................................... 15

*St. Augustine High Sch. v. Louisiana High Sch. Athletic Ass'n*,
270 F. Supp. 767 (E.D. La. 1967) ......................................................................... 8, 9

*Stern v. Marshall*,
564 U.S. 462 (2011) ................................................................................................. 19

*Surowitz v. Hilton Hotels Corp.*,
　383 U.S. 363 (1966) ............................................................. 21

*TransUnion LLC v. Ramirez*,
　141 S. Ct. 2190 (2021) ........................................................ 17

*Union Carbide & Carbon Corp. v. Nisley*,
　300 F.2d 561 (10th Cir. 1961) .............................................. 7

*Valentino v. Carter-Wallace, Inc.*,
　97 F.3d 1227 (9th Cir. 1996) .............................................. 11

*Wal-Mart Stores Inc. v. Dukes*,
　564 U.S. 338 (2011) ............................................................. 9

*Whitman v. Am. Trucking Assocs.*,
　531 U.S. 457 (2001) ........................................................... 12

*Yeldell v. Tutt*,
　913 F.2d 533 (8th Cir. 1990) .............................................. 22

*Ziglar v. Abbasi*,
　137 S. Ct. 1843 (2017) ........................................................ 20

## Statutes

Federal Arbitration Act, 9 U.S.C. § 2 .................................... 23

## Other Authorities

5 *Moore's Federal Practice* § 23.02 (1999) ............................ 6

5 *Moore's Federal Practice* § 23.48 (1997) ............................ 6

*Developments in the Law–Multiparty Litigation in the Federal Courts*, 71 Harv. L. Rev. 877 (1958) ................................................. 7

Jon Romberg, *Half a Loaf is Predominant and Superior to None: Class Certification of Particular Issues Under Rule 23(c)(4)(A)*, 2002 Utah L. Rev. 249 ................................. 4

Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice* § 4:43 (18th ed. 2021) ................................................. 8

Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39 (1967) ................................................. 15

*Partial Class Actions and Subclasses*, 7AA Fed. Prac. & Proc. Civ. § 1790 (3d ed.) ............................................................... 5, 6, 8

**Rules**

Fed. R. App. P. 29.................................................................................1, 6

Fed. R. Civ. P. 1.......................................................................................20

Fed. R. Civ. P. 12....................................................................................21

Fed. R. Civ. P. 42..............................................................................9, 12

Fed. R. Civ. P. 8......................................................................................22

Fed. R. Civ. P. 23.............................................................................passim

## INTEREST OF AMICI CURIAE[1]

The National Association of Consumer Advocates ("NACA") is a nonprofit association of more than 1,500 attorneys and consumer advocates committed to representing consumers' interests against fraudulent, abusive, and predatory business practices. NACA represents consumer interests in areas of the law including class actions, as well as forced arbitration, fair tax treatment, and consumer protection.

Public Justice is a nonprofit legal advocacy organization tackling systemic threats to justice, including abusive corporate power and predatory practices that harm American consumers. It fights to vindicate consumers' rights to class actions and ensure every person gets their day in court, as well as to protect the environment and to solidify and enhance civil rights.

Amici's members include attorneys who regularly represent consumers in class actions and complex cases. Amici are familiar with class action litigation and with the tactics of corporate defendants. It is crucial to amici that Rule 23(c)(4) is faithfully applied to promote the purpose of class actions and keep courthouse doors open to the injured consumers that amici represent. And it is necessary for courts to intervene when defendant corporations seek to manipulate class waiver rules even further in their favor.

---

[1] No counsel for a party authored this brief in whole or in part, and no entity or person, other than amici, their members, or their counsel, made a monetary contribution intended to fund the preparation of submission of this brief. All parties consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

# INTRODUCTION

The rights of consumers everywhere to class actions are threatened in two respects by Defendants' appeal of the District Court's proper class certification order. First, Defendants ask this Court to write off Rule 23(c)(4), the issue-class rule, as meaningless surplusage. They argue that 23(c)(4) does not allow a court to certify a class as to "particular issues" if those "issues" are not entire claims—while ignoring that the rest of Rule 23 provides for exactly that. Second, Marriott seeks to triple down on the unequal advantages that defendants enjoy when looking to enforce class waivers. Despite not having raised the issue of class waiver in years of litigation other than a one-line boilerplate entry buried among 30 affirmative defenses, Marriott belatedly asserted that plaintiffs waived their class action rights after hundreds (if not thousands) of attorney hours were spent preparing to litigate class certification on the merits. This Court should find that Marriott's course of conduct operates as a waiver of its ability to assert this coercive defense.

Amici submit this brief to highlight these important issues of concern to consumers and consumer-rights advocates. Rule 23(c)(4) is a powerful, flexible tool that has been widely used for over 50 years to promote the efficient resolution of class disputes. The District Court used the Rule to do just that, and this Court should affirm its thoughtful exercise of its discretion. Meanwhile, this Court should be suspicious of Marriott's attempt to "sandbag" plaintiffs and the judiciary through its tardy attempt to enforce a class waiver. The Court should not tolerate such a manipulative tactic.

## ARGUMENT

### I.     Rule 23(c)(4) Protects Consumer Rights and Does Not Impose Onerous Hurdles

Rule 23(c)(4), the issue-class rule, allows a district court to certify a class "with respect to particular issues." Fed. R. Civ. P. 23(c)(4). The District Court relied on this rule in certifying some of the classes here. Rightfully so: the classes meet the prerequisites of Rule 23 to the "particular issues" upon which they were certified. But defendants across the country have launched campaigns seeking to persuade courts to rewrite Rule 23 for their benefit.

Those attempts, like this appeal, are wrong for multiple reasons. First, the issue-class rule's text, history, and purpose demonstrate its value in class actions; it is much more than a "mere case management tool." Second, Accenture's shotgun blast of arguments against the District Court's certification order—and against scores of precedent dutifully applying Rule 23—is legally baseless and would harm consumers' ability to seek justice.

#### A.     Issue classes help to vindicate consumer rights.

Issue classes are key to protecting plaintiffs' rights in class actions while efficiently and economically managing complex cases, and that's why courts have relied upon Rule 23(c)(4) for nearly 60 years. It protects defendants from the risk of inconsistent judgments and promotes the efficient resolution of disputes—saving time and money for litigants and courts alike. The District Court's well-reasoned decision

advances the purposes of the issue-class rule, and this Court may now affirm that decision and join a long line of precedent allowing consumers' claims to be heard in a fair, efficient manner.

### 1. Rule 23(c)(4) is a powerful, flexible tool for class action management.

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Issue classes are flexible tools for judicial management of complex litigation, enabling courts to avoid making an "all-or nothing decision to certify an entire case as a class action." Jon Romberg, *Half a Loaf is Predominant and Superior to None: Class Certification of Particular Issues Under Rule 23(c)(4)(A)*, 2002 Utah L. Rev. 249, 262.

Issue classes are like other classes in many respects. They must comply with Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, and they must fall within one of the three categories of proper classes under Rule 23(b). *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). This Court has recognized that district courts should "take full advantage" of Rule 23(c)(4) in order to "promote the use of the class device and to reduce the range of disputed issues in complex litigation." *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (quotation omitted). The Fourth Circuit has further recognized that it would be "unfair" to both "litigants and to the societal interest" to deny issue-class certification when available; otherwise, district courts would be forced into countless inefficient trials over the same

facts and issues. *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 742 (4th Cir. 1989), *abrogated on other grounds by Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997)).

This Court has identified three benefits offered by the issue-class rule. First, issue classes advance the "purpose of class actions," which is to preserve "the resources of both the courts and the parties" and litigate disputes "in an economical fashion." *Id.* at 744; *see Cent. Wesleyan Coll.*, 6 F.3d at 185 ("[T]he consolidation of recurring common issues may reduce litigation costs."). Without Rule 23(c)(4), common, class-wide issues would require "enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues." *Gunnells*, 348 F.3d at 426 (4th Cir. 2003). But the issue-class rule allows courts to reap the "advantages and economies of adjudicating issues that are common to the entire class," while giving flexibility to those courts to avoid certifying unmanageable classes. Partial Class Actions and Subclasses, 7AA Fed. Prac. & Proc. Civ. § 1790 (3d ed.).

Second, issue classes provide "access to the courts" for plaintiffs with "claims that would be uneconomical if brought in an individual action." *Gunnells*, 348 F.3d at 426. Issue classes allow courts to parse out crucial, common issues on which the parties may proceed (perhaps in bellwether fashion) to efficiently decide them, even when those issues are unusually thorny or expensive to litigate—and especially when plaintiffs lack the resources to litigate effectively. *See, e.g.*, *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 416 (6th Cir. 2018) (certifying issue classes and acknowledging low-

income plaintiffs may not pursue claims without them). But for the issue-class rule, those claims might never be heard. In cases where it is "likely that in the absence of class certification, very few claims would be brought," the availability of issue-class certification is "superior to no adjudication of the matter at all." *Gunnells*, 348 F.3d at 426 (quoting 5 *Moore's Federal Practice* § 23.48[1] (1997)).

Third, by resolving common issues on a class-wide basis, issue class certifications ensure consistent liability determinations when many consumers bring claims against the same defendants. Because they allow issues to be certified in "a single proceeding," they "protect[] *the defendant* from inconsistent adjudications." *Id.* at 426 (quoting 5 *Moore's Federal Practice* § 23.02 (1999)). Issue classes provide plaintiffs, defendants, and the court with the benefits of judicial economy, consistent results, and "finality and repose." *Id.* at 427.

### 2. The issue-class rule was created to provide access to effective class actions.

When the Advisory Committee codified Rule 23(c)(4) in its amendments to the Federal Rules of Civil Procedure in 1966, it did not invent issue classes out of whole cloth; it simply formalized a technique that courts had begun to employ to streamline complex litigation.

Before the 1966 amendments, courts often dismissed class actions when "common and noncommon issues were intermingled" or when class members had "divergent or antagonistic interests." Partial Class Actions and Subclasses, 7AA Fed.

Prac. & Proc. Civ. § 1790 (3d ed.). But this was inefficient and time consuming, and it piled costs onto plaintiffs, defendants, and the judiciary. To fix this, courts began leveraging class-wide determinations of specific issues by allowing absent class members to benefit "without the necessity of relitigating the common issues." *Developments in the Law–Multiparty Litigation in the Federal Courts*, 71 Harv. L. Rev. 877, 935 (1958). While this represented "a departure from the traditional view" of class actions, it enabled courts "to expand the utility" of class actions and better protect the rights of plaintiffs. *Id.*

This novel procedure was upheld in *Union Carbide & Carbon Corp. v. Nisley*, where the Tenth Circuit found that "it would be grossly redundant to say that [Defendants' liability] must be proven again by the unnamed members of the represented class," even though damages would have to be proven in individual proceedings. 300 F.2d 561, 589 (10th Cir. 1961). The *Union Carbide* court recognized the practical benefits of determining liability on a class-wide basis up front and later determining damages on an individual basis.

The 1966 amendments to the Federal Rules codified binding class-wide determinations of particular issues as part of the contemporary class action device. Numerous federal courts became early adopters of the provision, recognizing that it gave courts significant flexibility in managing complex litigation. *See Siegel v. Chicken Delight, Inc.*, 271 F. Supp. 722, 725 (N.D. Cal. 1967) (finding that courts ascribe "too little weight" to Rule 23's "flexible provisions . . . particularly 23(c)(4)"); *St. Augustine*

*High Sch. v. Louisiana High Sch. Athletic Ass'n*, 270 F. Supp. 767, 774 (E.D. La. 1967) (certifying issue class regarding constitutional issues); *Hicks v. Crown Zellerbach Corp.*, 49 F.R.D. 184, 197 (E.D. La. 1967), *supplemented*, 321 F. Supp. 1241 (E.D. La. 1971) (certifying issue class regarding discrimination issues).

Courts have since found myriad uses for issue classes. Courts certify issue classes to avoid potential conflicts among class members, to certify partial class actions and leave individualized issues for individual adjudication, and to determine liability on a class-wide basis while leaving damages to be determined in later trials. *See* Partial Class Actions and Subclasses, 7AA Fed. Prac. & Proc. Civ. § 1790 (3d ed.) (collecting cases).

### 3.    Rule 23(c)(4) allows for issues within the same claim to be separated across class and individual litigation.

The separation of parts of a claim or case is common in both individual litigation and class actions. Today, it is "rare" that *every* issue in a class action "is appropriately the subject of class treatment;" Rule 23(c)(4) is essentially "applied *sub silentio* to almost all certifications." Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice* § 4:43 (18th ed. 2021). Requiring all class members to have identical damages, after all, "would drive a stake through the heart of the class action device" by "requir[ing] that every member of the class have identical damages." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). But separating damages from liability is certainly not the *only* way that courts have used issue classes: the rule is a tried-and-true method for

8

separating out other parts of claims, too. *See, e.g.*, *Russell v. Educ. Comm'n for Foreign Med. Graduates*¸ 15 F.4th 259, 265 (3d Cir. 2021); *St. Augustine High Sch.*, 270 F. Supp. at 774.

This kind of separation is not unique. Rule 23(c)(4) is analogous to another provision in the Federal Rules. Rule 42 provides district courts the discretion to run separate trials for "separate issues [or] claims" within a case, for reasons including "to expedite and economize." Fed. R. Civ. P. 42(b). Rule 23(c)(4)'s power is similar, granting a court the ability to do the same, in part to economize the litigation for plaintiffs, defendants, and the court.

Issue classes further the purposes of class actions at large. They "generate common answers apt to drive the resolution of the litigation" in cases where some answers are the same for every class member, and others are not. *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 350 (2011). By allowing courts to avoid "all or nothing" determinations when they are unnecessary, Rule 23(c)(4) provides for the benefits of class actions without sacrificing manageability or fairness.

## B.   Accenture's proposed standing and injury test is incoherent and inconsistent with Rule 23(c)(4) and settled precedent.

Ignoring the purposes of Rule 23(c)(4) and the District Court's proper application of it, Accenture engages in a strained and myopic analysis of the issue-class rule's text to argue that it doesn't permit the certification of issue classes that do not *completely* dispose of a defendant's liability or of an entire cause of action. Dkt. 27 at 31-

38.[2] Neither the text or purpose of the rule, nor federal courts to have considered this issue, support Accenture's interpretation.

### 1. Accenture's textual challenge to the Rule 23(c)(4) class certifications is legally baseless.

Accenture suggests that, because Rule 23(c)(4) is within what Accenture calls "the procedural section of the Rule,"[3] it cannot modify the other class action requirements found in Rule 23(a) or (b), including Rule 23(b)(3)'s predominance requirement. Dkt. 27 at 33-34. But this interpretation would make the issue-class rule surplusage. If Rule 23(c)(4) cannot be used to certify a class as to *some* issues when an action or claim as a whole does not satisfy the predominance requirement, then it serves no purpose. This Court rejected that argument in *Gunnells:*

> The dissent would require a court considering the manageability of a class action—a requirement for predominance under Rule 23(b)(3)(D)—to pretend that subsection (c)(4)—a provision specifically included to make a class action more manageable—does not exist until after the manageability determination is made. Thus, under the dissent's reading of Rule 23, a court could only use subsection (c)(4) to manage cases that the court had already determined would be manageable *without* consideration of subsection (c)(4). **This reading leaves subsection (c)(4)(A) without any practical application, thereby rendering it superfluous**.

---

[2] Citations to Dkt. numbers refer to the lead case docket, No. 22-1744.

[3] Amici the Chamber of Commerce of the United States of America and the National Retail Federation similarly strain to minimize Rule 23(c)(4), calling it a "mere case management tool" to justify writing it off as surplusage. Dkt. 32 at 21. Their arguments fail for the same reasons.

348 F.3d at 439-40 (bolded emphasis added). Courts in nearly every Circuit have also rejected Accenture's twisted reading of the rule. *See, e.g.*, *Martin*, 896 F.3d at 413 ("A requirement that predominance must first be satisfied for the entire cause of action would undercut the purpose of Rule 23(c)(4) and nullify its intended benefits.").[4]

Accenture attempts to dodge this rock-solid precedent, claiming that, while district courts should not be able to certify classes as to *individual elements* of a claim, courts should be able to certify the portions of a claim relating to *liability*. Dkt. 27 at 34-35. But treating "liability-only" issue classes as permissible and "single-element" issue classes as impermissible is arbitrary, not based at all in the text or history of the issue-class rule, and unsupported by a wealth of existing precedent interpreting the rule.

Rule 23(c)(4) states simply that a court may certify a class "with respect to particular *issues*." (Emphasis added). The word "issues" is not qualified by any other term. Thus, the rule does not limit certification to only those "particular issues" that

---

[4] *See also e.g. Gates v. Rohm & Haas*, 655 F.3d 255, 273 (3d Cir. 2011) (finding "liability-only issue class[es]" may be established pursuant to Rule 23(c)(4), and setting out factors that courts should consider in evaluating them); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (stating no prohibition on formation of issue classes under Rule 23(c)(4) in products liability cases); *In re Motor Fuel Temp. Sales Pracs. Litig.*, 292 F.R.D. 652, 665 (D. Kan. 2013) (permitting use of Rule 23(c)(4) to certify parts of claims and noting "the requirements of Rule 23(a) and (b) need to be satisfied only with respect to" the certified issues).

would fully resolve a defendant's liability.[5] And the commonsense understanding of the word "issues" cannot be contorted to mean "all elements comprising a defendant's liability for a cause of action," as Accenture's argument necessarily requires. *See Russell*, 15 F.4th at 270 ("[Rule 23(c)(4)] permits an action to be brought or maintained as a class action 'with respect to particular issues,' not just those that decide liability."). In fact, Accenture's suggested interpretation undermines its own analysis. If Rule 23(c)(4) is just a component of the "procedural section of the Rule" that only explains "how a court should handle a class after it has been certified;" then a "liability-only" issue class would be just as much of an "elephant[] in [a] mousehole[]" as a "single-element" issue class. Dkt. 27 at 33-34 (quoting *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001)).

Federal courts across the country have rejected Accenture's proposed interpretation, finding that district courts have the authority to create issue classes even when resolution of the certified issues would not fully resolve the defendant's liability. *See, e.g., Russell*, 15 F.4th at 270 ("[D]istrict courts may certify 'particular issues' for class

---

[5] The Federal Rules provide contextual support for this interpretation, too. Rule 42, which is in many ways analogous to the issue-class rule, *see supra* at 9, allows a court to order separate trials "for one or more separate issues [or] claims . . . ." Fed. R. Civ. P. 42(b). The use of the term "issues" *in addition to* "claims" requires the conclusion that separate issues need not be limited to whole claims; the term "issues" necessarily allows the separation of components of a claim. There is no basis to draw the "issues" line at only liability and damages—"issues" allows for a host of claim components to be separated.

treatment even if those issues, once resolved, do not resolve a defendant's liability, provided that such certification substantially facilitates the resolution of the civil dispute. . . .'"); *Martin,* 896 F.3d at 416 (permitting certification of issue class even though "resolution of the certified issues will not resolve the question of Defendants' liability" because "resolving the certified issues will go a long way toward doing so"); *In re Foreign Exchange Benchmark Rates Antitrust Litig.,* No. 13-cv-07789, 2022 WL 3971006, at *5 (S.D.N.Y. Aug. 31, 2022) ("Courts have authority to certify issues narrower than 'liability' as a whole in order to 'home in on threshold class-wide inquiries.'"); *In re Prograf Antitrust Litig.,* No. 1:11-md-02242, 2014 WL 4745954, at *1 (D. Mass. 2014) ("Certification can also be of more limited scope, covering specific common issues short of completely resolving liability."); *Harris v. Med. Transp. Mgmt., Inc.,* No. 17-cv-01371, 2021 WL 3472381, at *10 (D.D.C. Aug. 6, 2021) ("'[C]ourts within this Circuit and others have rejected a requirement that an issue class fully resolve liability in the context of 23(b)(3) and 23(c)(4) alike."). Accenture's interpretation flies in the face of each of these precedents.

### 2.    Accenture's position is inconsistent with the purpose of Rule 23(c)(4).

In its attempt to pigeonhole Rule 23(c)(4) into allowing certification of "issue" classes only for entire claims, Accenture wrongly dilutes Rule 23(c)(4) into a provision "meant to address the certification of individual causes of action or liability-only classes." Dkt. 27 at 34. Preventing Rule 23(c)(4) from efficiently certifying classes based

on elements of claims does not serve the rule's purposes. Where certain elements of claims contain common questions, but other elements are individualized, judicial economy and outcome consistency are better served by certifying issue classes on the common elements rather than tossing out the class action. This avoidance of "all or nothing" certification ensures that plaintiffs, defendants, and the judiciary may each reap the benefits of class adjudication.

Contrary to Accenture's arguments, federal district courts have been certifying classes with respect to specific elements of claims for decades. *See, e.g.*, *Guy v. Abdulla*, 57 F.R.D. 14, 18 (N.D. Ohio 1972) (certifying an issue class on certain legal and factual questions); *Russell*, 15 F.4th at 265 (certifying issue classes of defendant's duty and breach). Rule 23(c)(4)'s historical purpose—to prevent wholesale rejection of class certification where partial certification still provides benefits—is equally applicable to issue classes based on entire claims as to those based on elements of claims.

### 3.     Rule 23(c)(4) does not render Rule 23(b)(3) superfluous.

Accenture speculates that "[a]llowing element-by-element class certification . . . would enable plaintiffs to disassemble nearly any claim and render the predominance requirement of Rule 23(b)(3) meaningless." Dkt. 27 at 35. Nonsense.

Courts maintaining issue-class actions under Rule 23(c)(4) must still ensure that predominance (and other Rule 23 requirements) are satisfied as to the "particular issues" certified. *See, e.g.*, *Martin*, 896 F.3d at 413 ("Rule 23(c)(4) contemplates using issue certification to retain a case's class character where common issues predominate

within certain issues. . . ."); *Simon v. Philip Morris, Inc.*, 200 F.R.D. 21, 29-30 (E.D.N.Y. 2001) (observing Rule 23(c)(4) "assists in satisfying Rule 23(b)(3)'s additional class certification requirements of predominance and superiority"). Indeed, the District Court only certified the duty and breach issue classes here after determining that common issues predominated. JA at 63-65 ("Ultimately—with regards to Accenture and Marriott—common issues will predominate over any individual question as to the duty and breach elements of negligence and negligence per se. . . .") Because a Rule 23(c)(4) issue class must still comply with Rule 23(b)(3), Accenture's argument that (b)(3) is somehow "render[ed] . . . meaningless" is absurd.

Accenture's frightening vision of the future ignores that federal courts around the country have long permitted issue classes to be certified precisely this way. *See, e.g.*, *Guy*, 57 F.R.D. at 18 (certifying issue class in 1972). Almost immediately after the 1966 amendments, courts viewed the new Rule 23(c)(4) as a mechanism to assist in the administration of (b)(3) class actions, not replace them. *See, e.g.*, Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 47 (1967) ("[T]he effective administration of (b)(3) class actions will probably require wide use of the already familiar device of split trials."). Accenture does not—and could not—show that federal courts ignore Rule 23(b)(3)'s "predominance" requirement.

Finally, Accenture ignores that, after a court determines that an issue class satisfies Rule 23(b)(3)'s predominance requirement, Rule 23(c)(4) only permits certification of issue classes "[w]hen appropriate." Fed. R. Civ. P. 23(c)(4). To determine

appropriateness, courts consider a wide range of practical factors, in addition to the requirements of Rule 23(b)(3). *E.g.*, *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) (courts should consider the "judicial economy" of trying "genuinely common issues" together); *Gates*, 655 F.3d 255, 273 (3d Cir. 2011) (directing courts to consider nine factors). Courts have deep experience in determining whether an issue class is "appropriate," and the issue-class rule has been interpreted and applied faithfully for decades. Accenture imagines non-existent problems and argues they are imminent, all while none have arisen in 50 years.

### 4.    Accenture's standing challenge is meritless.

Accenture claims that a court's certification of common issues relating to elements that do not include causation and damages is inconsistent with Article III because it permits some absent class members to litigate claims without having suffered an "injury" that is "fairly traceable" to the defendant's conduct. Dkt. 27 at 21-30. This misunderstands the standing inquiry at the class certification stage.

Accenture ignores that a court can ensure that Article III standing requirements at the certification stage are satisfied as to any class, including issue classes, by defining a class narrowly enough that all class members *can allege* that they suffered an injury that is connected to the defendant's conduct. *In re Deepwater Horizon*, 739 F.3d 790, 801-02 (5th Cir. 2014) (finding it "sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they *allege* they have suffered" at the Rule 23 stage).

16

These allegations are more than sufficient to meet the "low threshold" of an Article III injury in fact. *See, e.g.*, *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008).

Whether plaintiffs can *prove* causation and damages goes to the merits of the case, not to standing allegations sufficient to certify a class. *L-3 Commc'ns Corp. v. Serco, Inc.*, 673 F. App'x 284, 289 (4th Cir. 2016) (finding that district court erred in analyzing issue that "does not involve . . . constitutional standing, but presents the question whether the plaintiffs can establish the substantive elements of their claim") (citing *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012)). Requiring more at the class certification stage would inappropriately convert the standing analysis into a full-blown analysis of the merits.[6]

The issue classes in this case face no Article III standing issues. The District Court's well-reasoned opinion certified narrowly-defined Rule 23(c)(4) classes that include only plaintiffs whose data was given to Marriott (Starwood) in the process of making a reservation at a Marriott property, and whose data was then impacted by the

---

[6] Defendants cite to *TransUnion LLC v. Ramirez* for the proposition that every class member must have standing. 141 S. Ct. 2190 (2021). But requiring plaintiffs to *prove* standing for every class member before certifying a class puts the cart before the horse. The *TransUnion* court didn't require this; it found standing was lacking only after a trial verdict. *Id.* at 2202. Plaintiffs need only adequately *allege* standing at this stage. Any factual disputes about injury are still to be resolved, whether in individual trials or classwide. The certification of issue classes does not allow any plaintiff to sneak past standing; no plaintiff here will recover damages without first proving an injury that is fairly traceable to Defendants.

November 2018 data breach. JA 0611-0612. Whether some sensitive information of some of these class members may have been compromised by sources other than Defendants (as the District Court observed, *see* JA 0603) is a factual dispute that has no bearing on whether these class members can *allege* that they suffered an injury caused by Defendants. The Court should reject Accenture's attempt to gum up issue-class certification with a groundless standing argument.

For all the reasons discussed above, the District Court properly applied the law when certifying the Rule 23(c)(4) classes in this case.

## II.    Marriott's Attempt to "Sandbag" Should Be Rejected

In addition to the Rule 23(c)(4) issues, this case presents a second issue of great importance to consumers: whether a defendant should be allowed to "sandbag" its opponent—and the court—by waiting until after years of litigation have passed to argue that plaintiffs waived their rights to proceed as a class. Courts across the country refuse to allow sandbagging in similar contexts, and this Court should similarly reject Marriott's tactical decision to raise class waiver as an issue only after hundreds (if not thousands) of attorney and court hours had been spent.

### A.    "Sandbagging" is an underhanded litigation tactic that courts routinely reject.

In litigation, a party sandbags[7] when it "remains silent" about a legal objection throughout a case, but "belatedly raises" the issue when the party later finds it advantageous. *Puckett v. United States*, 556 U.S. 129, 134 (2009) (cleaned up). This manipulation helps one party gain an edge at the expense of the others and the court, who spend time and money that may end up useless. The Supreme Court has recognized that the consequences of sandbagging "can be particularly severe" in "complex" cases. *Stern v. Marshall*, 564 U.S. 462, 481-82 (2011). There, a party's tactical decision to sandbag may result in the court finding that the party waived the issue in question. *See, e.g.*, *Minemyer v. R-Boc Representatives, Inc.*, 283 F.R.D. 392, 398 (N.D. Ill. 2012) ("Sandbagging in all its forms has been condemned time and again, . . . and sandbagging can result in the waiver or forfeiture even of constitutional rights . . . .").

The waiver of issues, for sandbagging or any other reason, is especially important in massive cases like this. The waiver rule has particular "value" in these complex cases, because it ensures that a large action "remains, to the extent possible, an orderly progression." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 n.6 (2008). Complex litigation "is a 'winnowing process,' and the [waiver rule is] part of the machinery by

---

[7] "Sandbagging" refers to when someone "conceal[s] or misrepresent[s]" their "true position, potential, or intent especially in order to gain an advantage." *Sandbag*, definition 2(d), Merriam-Webster.com Dictionary, available at https://www.merriam-webster.com/dictionary/sandbag (last accessed Nov. 22, 2022).

which courts narrow what remains to be decided." *Id.* (quoting *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 531 (1st Cir. 1993)).

Sandbagging flies in the face of that precedent and the Federal Rules' guiding principles for courts to fairly work through the "winnowing process." As with all dispositive issues, defendants should seek the adjudication of class waiver disputes early enough to advance the "just, speedy, and inexpensive determination" of the case. Fed. R. Civ. P. 1. The Advisory Committee has admonished against litigants' "abuse" of procedural tools that "increase cost and result in delay," Fed. R. Civ. P. 1 Advisory Committee Note (2015), and it has recognized the "affirmative duty" of courts to ensure litigation is "resolved not only fairly, but also without undue cost or delay," Fed. R. Civ. P. 1 Advisory Committee Note (1993).

The Supreme Court has roundly endorsed the central role that courts play in ensuring the "just, speedy, and inexpensive" resolution of their cases. It has explained that the Federal Rules should be "administered first and foremost with the ends of justice in mind" and that courts have "considerable discretion to regulate the proceedings before them in a manner consistent with equity and fairness." *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964) (*abrogation on other grounds recognized in Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)). And the Supreme Court has repeatedly recognized that fairness is central to the application of the Federal Rules. *See Hormel v. Helvering*, 312 U.S. 552, 557 (1941) (the Rules exist to "promote the ends of justice"); *see also Surowitz v. Hilton*

*Hotels Corp.*, 383 U.S. 363, 373 (1966) (the Rules' "basic purpose" is to "administer justice through fair trials").

Indeed, the Advisory Committee recognizes the "salutary" benefits of presenting defenses early and efficiently and admonishes against "delay" in raising certain defenses. *See* Fed. R. Civ. P. 12 1946 Amendment Advisory Committee Note Subdivision (g) ("This required consolidation of defenses and objections in a Rule 12 motion . . . works against piecemeal consideration of a case."); (h) ("The specified defenses are of such a character that they should not be delayed . . . ."). These long-established guidelines make clear that federal courts are empowered to consider—and *should* consider—the risk of unfairness posed by a party's manipulative conduct, especially when that conduct imposes unnecessary costs onto plaintiffs and the judiciary.

The focus of the Supreme Court and many other courts on preserving efficiency and fairness makes clear that Rule 12's requirement to "include [an affirmative defense] in a responsive pleading" is a necessary but not sufficient condition to adequately present that defense. The standard is equitable, not formalistic; at its heart, it furthers the "winnowing process" that the Rules are meant to promote. *See Exxon Shipping*, 554 U.S. at 487 n.6 (quotation omitted). As such, Rule 12 sets out some "minimum steps" for preservation, but a party can be found to have waived a defense *even if* it satisfies those steps. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir. 1998).

For example, a party's "course of conduct" in the case can waive a defense that was nonetheless presented in its motion to dismiss or answer. *Id.* A defendant who met

Rule 12's minimum steps waived its affirmative defense when it "fully participated in litigation of the merits for over two-and-a-half years without actively contesting [that defense], participated in lengthy discovery, filed various motions and opposed a number of motions filed by" the plaintiffs. *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993). Though that defendant may have "literally complied" with Rule 12's minimum steps, it failed to comply with the "spirit of the rule," which is to "expedite and simplify proceedings" in federal court. *Id.* (quoting *Yeldell v. Tutt*, 913 F.2d 533, 539 (8th Cir. 1990)). The defendant, having manipulated the "winnowing process" for its own benefit, was found to have waived its Rule 12 defense by its course of conduct.[8]

The Fourth Circuit has recognized these principles, holding that even where an affirmative defense *was* raised, a defendant's conduct in litigation may constitute waiver of that defense. In *Maxum Foundations, Inc. v. Salus Corp.*, this Court held that substantial engagement in litigation may constitute waiver in the context of an arbitration-provision affirmative defense. *See* 779 F.2d 974, 981 (4th Cir. 1985) ("A litigant may waive its right to [arbitration] by so substantially utilizing the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay.") The Court held that

---

[8] Rule 8 is further proof that fairness demands defendants use or lose affirmative defenses, such as a class waiver defense. That Rule requires that a responsive pleading "must affirmatively state any avoidance or affirmative defense, including," relevant here, "waiver." Fed. R. Civ. P. 8(c)(1).

even in the context of an arbitration-provision affirmative defense—where there is a federal policy favoring arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 2, unlike class waivers—a party who "substantially utilize[s] the litigation machinery" waives that right. *Id.*

A class-waiver provision similarly limits putative class plaintiffs' ability to reach the inside of a courtroom. Class waivers and arbitration clauses are both powerful, coercive tools that class action defendants routinely seek to impose. But with that power comes the responsibility to present those defenses to the Court for timely resolution, as this Court held in *Maxum Foundations*. When a defendant sandbags plaintiffs and the court on the presentation of its affirmative defense, it seeks to manipulate the Federal Rules and the judiciary for its own unfair gain. Courts regularly reject those attempts.

**B.  Marriott's attempt to "sandbag" consumers and the judiciary would impose massive unnecessary costs.**

Marriott's conduct in this case is a quintessential example of "sandbagging," and it should be rejected. Marriott quietly referenced class waiver as one of more than 30 affirmative defenses asserted in one-sentence, boilerplate entries in its answer. Dist. Ct. ECF No. 620, Amended Answer, at 98. Then it clammed up. Marriott went silent as to class waiver for *years*. In that time, Marriott participated in discovery, negotiated bellwether trials with plaintiffs, met and conferred with lawyers for the parties on dozens of occasions, and did not raise or present the class waiver issue to the Court by motion. *See* Dist. Ct. ECF No. 910, Plaintiffs' Reply to Response to Corrected Motion

to Certify Class, at 16. And its decision to sandbag forced Plaintiffs to produce over 35,000 documents, review millions of pages of discovery, conduct and defend 39 depositions, and expend time and resources with expert witnesses and the District Court's special master. Dkt. 42 at 34. Marriott's sandbagging brings about the very results that the Federal Rules seek to prevent: no timely "winnowing," but instead litigation that is unfair, slow, expensive, and ultimately unnecessary for everyone.

If Marriott's dilatory conduct is blessed by this Court, plaintiffs beware. Defendants will have little incentive to do anything at all with their affirmative defenses, other than breezily reference them in an answer. Defendants could simply bring those defenses to the forefront after the case has progressed through hundreds (if not thousands) of attorney hours, dozens of court hearings, and enormous expenditures. Allowing Marriott to sit quietly—and tacitly burdening *plaintiffs* with the responsibility to close the loop on the controlling *defenses* in the case—would create a "heads I win, tails you lose" regime for the pleading and presentation of class waiver defenses.

Class waivers already stack the deck in favor of defendants, and this Court should not compound that inequality. If Marriott is allowed to sandbag plaintiffs and the court, it will gain an uneven advantage in at least three respects. First, Marriott's purported class waiver appeared in a form contract of adhesion. Consumers could not (and still cannot) negotiate their right to class actions with Marriott; they are forced into a "take it or leave it" deal with a more powerful and sophisticated party that drafted the deal. Second, Marriott has the ability at the beginning of a putative class action to assert or

waive its purported class waiver defense. In a putative class action where Marriott would prefer to take advantage of class action benefits—lower costs, a single efficient proceeding, and the ability to dispose of identical claims in one go without risking inconsistent outcomes—it may choose to forego its purported defense. But Marriott now seeks to extend that ability from the beginning of a case all the way through four years of litigation, granting itself a third unequal benefit: the power to sit on its class waiver defense until it thinks it has become advantageous to present it to the District Court. This is a bridge too far.

Class actions are crucial tools for consumers to have their day in court. No party—plaintiff or defendant—has the right to manipulate the court and hide a key issue from the "winnowing process" that the Federal Rules have set forth. *Exxon Shipping*, 554 U.S. at 487 n.6 (quotation omitted). Class action waivers—already an unusually powerful and coercive tool available to defendants—should especially not be subject to that manipulation. Marriott has tried to take advantage of thousands of plaintiffs and a district court that has ably managed an enormous MDL. This Court should find it has waived that ability through its course of conduct.

## CONCLUSION

For all of these reasons, this Court should affirm the District Court's well-reasoned decision.

Dated: November 22, 2022

Respectfully submitted,

*/s/ Hassan A. Zavareei*
Hassan A. Zavareei
Glenn E. Chappell
Spencer S. Hughes
Cameron Partovi
Schuyler Standley
**TYCKO & ZAVAREEI LLP**
1828 L Street, Northwest, Suite 1000
Washington, DC 20036
(202) 973-0900
*hzavareei@tzlegal.com*
*gchappell@tzlegal.com*
*shughes@tzlegal.com*
*cpartovi@tzlegal.com*
*sstandley@tzlegal.com*

*Counsel for Amici Curiae*

Ira Rheingold
**NATIONAL ASSOCIATION OF
CONSUMER ADVOCATES**
1215 17th Street, Northwest, 5th Floor
Washington, DC 20036
(202) 452-1989
*ira@consumeradvocates.org*

*Counsel for the National Association
of Consumer Advocates*

Shelby Leighton
**PUBLIC JUSTICE**
1620 L Street, Northwest, Suite 630
Washington, DC 20036
(202) 797-8600
*sleighton@publicjustice.net*

*Counsel for Public Justice*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a), I certify that this brief complies with the length limitations of Fed. R. App. P. 32(a)(7) because it contains 6,494 words, as counted by Microsoft Word, excluding the items that may be excluded under Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

Dated: November 22, 2022                   Respectfully submitted,

                                           */s/ Hassan A. Zavareei*
                                           Hassan A. Zavareei